Wendy Park (Cal. Bar No. 237331)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: 510-844-7138
Email: wpark@biologicaldiversity.org

Brandon Jones-Cobb (AK Bar No. 1610078)
(*pro hac vice* pending)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 1178
Homer, AK 99603
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological
Diversity and Sierra Club*

Nathaniel Shoaff (Cal. Bar No. 256641)
Elizabeth Benson (Cal. Bar No. 268851)
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
Phone: 415-977-5610
Email: nathaniel.shoaff@sierraclub.org
Email: elly.benson@sierraclub.org

*Attorneys for Sierra Club*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, | ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | Civil Action No. _____ |
| UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary, United States Department of the Interior; BUREAU OF LAND MANAGEMENT; BILL GROFFY, in his official capacity as Acting Director, Bureau of Land Management; BUREAU OF OCEAN ENERGY MANAGEMENT; MATTHEW GIACONA, in his official capacity as Acting Director, Bureau of Ocean Energy Management; BUREAU OF SAFETY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** (Administrative Procedure Act Case) |

AND ENVIRONMENTAL )
ENFORCEMENT; KENNETH STEVENS in )
his official capacity as Acting Director, )
Bureau of Safety and Environmental )
Enforcement; OFFICE OF SURFACE )
MINING RECLAMATION AND )
ENFORCEMENT; LANNY E. ERDOS, in his )
official capacity as Director, Office of Surface )
Mining Reclamation and Enforcement; )
BUREAU OF RECLAMATION; SCOTT J. )
CAMERON, in his official capacity as Acting )
Commissioner, Bureau of Reclamation; )
UNITED STATES FISH AND WILDLIFE )
SERVICE; BRIAN NESVIK, in his official )
capacity as Director, United States Fish and )
Wildlife Service; NATIONAL PARK )
SERVICE; and JESSICA BOWRON, in her )
official capacity as Acting Director, National )
Park Service. )
                                                                    )
                    *Defendant*s.                                   )
                                                                    )
_____ )

# INTRODUCTION

1.      Plaintiffs CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB bring

this action against Defendants DOUG BURGUM, United States Secretary of the Department of

Interior and UNITED STATES DEPARTMENT OF THE INTERIOR (collectively "Interior"),

to challenge and remedy Interior's violation of the Administrative Procedure Act ("APA"), 5

U.S.C. § 551 *et seq*. and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et

seq.*, with respect to Interior's rescission of regulations and procedures requiring public

participation in Interior's and its sub-agencies' environmental reviews under NEPA. Plaintiffs

also bring this action against seven agencies within Interior and their agency heads, to remedy

their unlawful implementation of NEPA pursuant to Interior's challenged rulemaking.

2.     This case concerns Interior's elimination of the public's vital role in federal agency environmental reviews for logging, drilling, mining, road construction, and other projects proposed on Interior-managed public lands. NEPA requires that agencies prepare an environmental impact statement (EIS) that takes a "hard look" at the significant environmental impacts of a proposed action, *before* its approval. Alternatively, agencies must demonstrate that the action's effects are insignificant in an environmental assessment (EA), or that the action falls within a "categorical exclusion" for actions that normally have no significant effects.

3.     For nearly 50 years, Council on Environmental Quality (CEQ) and Interior regulations required that agencies solicit public comment on a draft EIS and also provided for public involvement in preparation of an EA. CEQ's and Interior's regulations ensured that not just the agency decisionmakers but also the affected communities would be apprised of a project's environmental impacts before approval of a project. The opportunity to weigh in on a proposal and the agency's analysis within an EIS or EA allowed the public to alert an agency to significant environmental impacts the agency had overlooked, as well as ways to avoid or reduce harmful impacts. This led to better informed, and, inevitably, more environmentally protective decisions, as intended by NEPA's "look before you leap" mandate.

4.     Earlier this year, however, Interior dismantled NEPA's longstanding regulatory framework governing Interior project reviews, citing section 5(b) of President Trump's Executive Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025), and its directive that "all agencies must prioritize efficiency and certainty above all other objectives," *id.* § 5(c). Interior's revised procedures, adopted in a rushed rulemaking process that sidestepped basic APA procedural requirements, now make public involvement in nearly all aspects of the NEPA process non-existent or, at best, entirely discretionary. As a result, agencies within Interior have left the public in the dark as to the full scope of a proposed project and its impacts—or even the very existence of a project proposal, when an EA is prepared—until after

the agency approves the project. Such inadequate and belated disclosure precludes meaningful public input and undermines NEPA's goal to promote informed agency decision making.

5.    Interior adopted these procedures via a so-called "Interim Final Rule," which the agency finalized and made effective without advanced public notice of, or an opportunity to comment on, the rule, and which provided no explanation for Interior's major change in its longstanding public participation procedures. Plaintiffs now seek judicial relief declaring that Interior's Interim Final Rule violates the APA and NEPA. Plaintiffs also ask the Court to vacate the Interim Final Rule, and to order that, in the interim, Interior operate under its prior NEPA procedures.

## JURISDICTION AND VENUE

6.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (APA). The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701–706.

7.    This Court has jurisdiction to order declaratory relief under 28 U.S.C. § 2201.  If the Court orders declaratory relief, 28 U.S.C. § 2202 authorizes this Court to issue injunctive relief.

8.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e) as this civil action is brought against an agency of the United States and officers and employees of the United States acting in their official capacities and under the color of legal authority; as Plaintiff Sierra Club maintains its principal place of business in this judicial district, in Oakland, California; as all Plaintiffs maintain offices in this judicial district; and as no real property is involved in this action.

**PARTIES**

9.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit 501(c)(3) corporation incorporated and existing under the laws of the State of California, with its main California office in Oakland. The Center for Biological Diversity has over 93,000 members throughout the United States and the world. The Center for Biological Diversity's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through science, policy, and environmental law. Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center for Biological Diversity is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for all of us.

10.      Plaintiff SIERRA CLUB is a nonprofit corporation organized and existing under the laws of the State of California, with its headquarters located in Oakland. Sierra Club is the oldest and largest grassroots environmental organization in the United States, with approximately 614,000 members nationally. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. Sierra Club and its state chapters perform this mission through advocacy, litigation, and educational outreach to members.

11.      The protection of wildlife, wildlands, ecosystems, and recreational opportunities on public lands and other areas affected by Interior's actions is central to Plaintiffs' missions. Plaintiffs and their members have a long history of involvement in proposed actions and activities on Interior-managed public lands, including lands managed by the United States

Bureau of Land Management, the National Park Service, and the United States Fish and Wildlife Service. Those activities include tracking proposals for development and/or resource extraction; commenting on proposed projects and their NEPA reviews to limit or eliminate damaging impacts; researching and analyzing potential environmental effects; surveying project sites; proposing project alternatives and mitigation measures; educating Plaintiffs' members and the public via newsletters, press releases, their websites, action alerts, and other communications; and activating their members and the public to weigh in on proposed projects. To carry out these activities, Plaintiffs and their members rely on agency NEPA reviews for information about proposed projects that may otherwise be unavailable. Such information may include a project's proposed location, configuration, acreage, scope, activities, and timing; the condition of existing environment and resources that would be affected; the project's predicted environmental effects, such as pollution emissions, habitat disturbance, and land-use conflicts, and the severity of those effects; and potential alternatives and mitigation measures the agency is considering to achieve the project's goals while reducing harmful effects.

12.     Plaintiffs' members use and enjoy Interior-managed lands for hiking, fishing, hunting, photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities. Plaintiffs' members derive recreational, inspirational, religious, scientific, educational, and aesthetic benefit from their activities on Interior-managed lands. Plaintiffs' members intend to continue to use and enjoy these public lands frequently and on an ongoing basis in the future, including this winter and spring.

13.     Plaintiffs' members have been extensively involved in the public comment and administrative process for agency actions taken by Interior and its sub-agencies under the APA

and NEPA and/or rely on Plaintiffs and other organizations to engage in those administrative processes on their behalf.

14.     Plaintiffs' members who use the public lands administered by Interior and its sub-agencies and are otherwise affected by Interior's actions have a procedural interest in Interior fully complying with the APA's public participation requirements in the development, promulgation, and implementation of the IFR.

15.     The APA's rulemaking procedures require public participation except in limited circumstances. Interior's failure to abide by those procedures deprived Plaintiffs and Plaintiffs' members of their procedural right to protect their concrete interests in participating in decision making affecting the human environments they use and enjoy around the country. As a result, Interior's rulemaking violation deprived Plaintiffs and Plaintiffs' members of their substantial and long-standing interest in NEPA public participation while simultaneously depriving Plaintiffs and Plaintiffs' members of their right to comment on that deprivation of interest or to receive advance notice of the deprivation.

16.     Plaintiffs have members who have visited and used, and will continue to visit and use, lands that will be harmed by future projects implementing the Interim Final Rule, including harm to their interests in recreation, wildlife viewing, plant observation, aesthetic enjoyment, scientific study, educational pursuits, and/or spiritual practices, among other uses. Plaintiffs' members regularly visit and engage in these activities within areas that will likely be the target of Interim Final Rule implementation and will continue to do so in the foreseeable future. Because of regulatory changes included in the Interim Final Rule, these future projects will be approved without the benefit of public notice and comment on a draft EIS or public involvement in preparation of the EA, significantly reducing or eliminating Plaintiffs' and their members' ability

to meaningfully participate in the NEPA review process for these projects, and increasing the risk of environmental harm within these specific areas. Those increased harms will reduce Plaintiffs' members' ability to engage in and enjoy their planned activities within these specific areas. These actual, concrete interests are directly connected to and jeopardized by Interior's failure to comply with its mandatory rulemaking requirements under the APA. Plaintiffs' members are therefore injured by Interior's failure to abide by the APA process that protects those concrete interests. The injuries would be redressed by the relief sought.

17.     For example, one of Center for Biological Diversity's members has traveled widely throughout his life to enjoy and experience the nation's public lands, including in California, Missouri, Arkansas, Arizona, and New Mexico. Since moving to Arizona in 2011, the member has regularly engaged in family outings, hiked, camped, picnicked, watched sunsets, hunted for signs of ancient cultures, sought solitude, enjoyed educational opportunities, and sought spiritual renewal within public lands in Arizona and New Mexico. The member has made definite plans to return once or twice per year to numerous National Forest, National Park, Bureau of Land Management, and National Wildlife Refuge lands in the future. The member has frequently relied on public participation opportunities provided by Defendants to receive notice of, learn about, and provide comments on proposed actions subject to NEPA. In view of the member's aesthetic, recreational, and spiritual interests in areas that will be affected by mining, logging, and construction projects proposed on these public lands by Defendants in the future, this member is injured by Interior's decision to limit public dissemination of information about these projects and eliminate opportunities for public participation.

18.     Another member of the Center for Biological Diversity, and of Sierra Club, is the Forest Management Issue Chair for the Lone Star Chapter of the Sierra Club and Chair for the

Forestry Subcommittee of the Houston Regional Group of the Sierra Club. He has served as the Chair for these Sierra Club sub-entities for about 20 years. As part of his chair position, he provides comments on public notices related to potential agency activities on public lands in Texas, including the Big Thicket National Preserve, the San Bernard National Wildlife Refuge, and the Brazoria National Wildlife Refuge. He also frequently recreates each year in National Forests and Grasslands in Texas, the Big Thicket National Preserve, the San Bernard National Wildlife Refuge, and the Brazoria National Wildlife Refuge. He regularly visits and recreates in these places, and he has definite plans to return in the foreseeable future. In both his Chair and personal capacities, the member responds to public notices with site-specific, detailed comments about proposals that are of concern to Plaintiffs and Plaintiffs' members. Thus, this member has been harmed by Defendants' removal of public notice and comment opportunities on scoping, application of categorical exclusions, environmental assessments, and environmental impact statements.

19.    Interior sub-agencies have already applied the Interim Final Rule to deprive Plaintiffs and their members of notice and comment on draft EISs and public participation in EAs. For example, subsequent to Interior's adoption of the Interim Final Rule, the Bureau of Land Management (BLM), an agency within Interior, prepared the following EISs or EAs to authorize development of BLM-managed minerals, without providing the public any opportunity to comment on the draft EIS or participate in the preparation of the EA:

     a.    the EIS for the Little Eccles Lease by Application and Flat Canyon Lease Modification Application, two BLM and U.S. Forest Service proposed coal lease sales associated with the Skyline Mine in Utah's Manti-La Sal National Forest, which BLM authorized on September 10, 2025;

b.   the EIS for the West Antelope III Coal Lease by Application, a proposed coal lease sale in Wyoming, for which BLM issued a final decision on September 25, 2025;

c.   the EA for two Navajo Transitional Energy Company proposed coal lease sales associated with the Spring Creek Mine in southern Montana, Proposed Lease-by-Application MTM 105485-01 and Proposed Lease-Modification-Application MTM 110693, which BLM authorized on October 5, 2025;

d.   the EIS for the Lisbon Valley Mining Company Plan Modification, a proposed mine plan to expand open pit copper mining operations in BLM's Moab, Utah field office, which BLM authorized on October 17, 2025; and

e.   the EA for the Unionville Trap Springs 11-42 Application for Permit to Drill an oil and gas exploration well and develop a new access road in Railroad Valley, Nevada. On information and belief, BLM's preparation of an EA for this project was publicly announced for the first time on BLM's website, on December 16, 2025, the same day that BLM finalized and published the EA and "finding of no significant impact" and authorized the project.[1] The decision record states that public involvement was not offered because "NEPA does not require public involvement when a bureau prepares an EA," and the BLM authorized officer "determined that public involvement will not substantially change the analysis for the proposed action and the NEPA analysis

---

[1] BLM, National NEPA Register, Unionville Trap Springs 11-42 Application for Permit to Drill, https://eplanning.blm.gov/eplanning-ui/project/2041601/510.

contained herein is sufficient to identify issues that might affect the human environment."[2]

20.     Interior sub-agencies will continue to deprive Plaintiffs and their members of the opportunity to comment on projects in areas that Plaintiffs' members use and enjoy. On information and belief, Interior agencies plan to approve the following projects without circulating a draft EIS for public comment, pursuant to the Interim Final Rule:

   a.   the South Railroad Mine Project, a proposed gold mine in northern Nevada, for which BLM plans to publish a final EIS and issue a final decision by June 2026. According to a news article, a BLM spokesperson has stated, "The South Railroad mining project is not unique… The BLM has issued decisions on other projects without a draft EIS …."[3] BLM staff also stated in a public meeting that BLM does not plan to circulate a draft EIS for public notice and comment.

   b.   the Outer Continental Shelf, Alaska Region, Cook Inlet Planning Area, Oil and Gas Lease Sale 258 ("Lease Sale 258"), for which the Bureau of Ocean Energy Management (BOEM) plans to publish the final supplemental EIS and issue a final decision by the end of 2025. *See* 90 Fed. Reg. 45052 (Sept. 18, 2025). On September 18,

[2] BLM, Decision Record, Unionville Trap Springs 11-42 Application for Permit to Drill (Dec. 16, 2025), available at https://eplanning.blm.gov/public_projects/2041601/200672858/20148361/251048341/20251216_TrapSprings_Unionville_Decision.pdf.

[3] Northey, Hannah, 'Test case' for NEPA; Fast-tracked mine reviews fuel outcry, *E&E News* (Oct. 21, 2025), available at https://www.eenews.net/articles/test-case-for-nepa-fast-tracked-mine-reviews-fuel-outcry/. *See also* BLM, National NEPA Register: South Railroad Mine Project, https://eplanning.blm.gov/eplanning-ui/project/2038636/510 (showing "initial scheduled date" for publication of notice of intent to prepare EIS, final EIS, and record of decision, but leaving blank draft EIS publication date; *see also* 90 Fed. Reg. 38988 (project schedule only mentioning the release of a final EIS and record of decision).

2025, BOEM issued a notice stating that BOEM "will comply with revised DOI regulations, procedures, and handbook for the remainder of the [Lease Sale 258] supplemental EIS process," referring to Interior's revised NEPA procedures set forth in the Interim Final Rule. *Id.* "As such, a notice of availability (NOA) for the draft supplemental EIS will not be issued for public comment, nor will public hearings be held." *Id*. This represents a reversal from BOEM's April 2025 notice (issued before Interior's Interim Final Rule) stating BOEM's intent to issue the draft supplemental EIS "for public review and comment" and that "[p]ublic hearings will be held following release of the draft supplemental EIS." 90 Fed. Reg. 14866, 14867 (April 4, 2025). On information and belief, once BOEM completes the supplemental EIS, BOEM will reauthorize Lease Sale 258, pursuant to a modified record of decision. In 2022, BOEM authorized Lease Sale 258, as directed by the Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 50264(c), 136 Stat. 2060 (2022), and the lease sale resulted in the issuance of one lease. *Id.* Plaintiff Center for Biological Diversity and other organizations challenged BOEM's authorization of Lease Sale 258 in federal district court, alleging NEPA violations. BOEM is now preparing the supplemental EIS to address NEPA deficiencies in response to the court's remand of the lease sale decision. *Id.*

21.     Plaintiffs have members who have visited and used lands that will be harmed by the above listed projects ("Project Areas") for recreation, wildlife viewing, plant observation, aesthetic enjoyment, scientific study, educational pursuits, and/or spiritual practices, among other uses. Plaintiffs' members regularly visit and engage in these activities within Project Areas and will continue to do so in the foreseeable future.

22.     For example, one of the Center for Biological Diversity's members lives year-round in Homer, Alaska, where he enjoys views of Kachemak Bay from his home and frequently recreates in the Bay and around Cook Inlet. He has visited Tuxedni Bay and the Lake Clark National Park coastland multiple times, and he has definite plans to visit those places again in the future. He frequently recreates by boat in Kachemak Bay—as often as multiple times per week during the summer—and he relies on the Bay for personal use fishing for salmon and halibut. He also enjoys wildlife viewing in Kachemak Bay, including viewing humpback whales, killer whales, sea otters, and various sea and shore birds that depend on the Bay's healthy environment to survive and flourish. Across Cook Inlet, he enjoys viewing Cook Inlet beluga whales, fin whales, and brown bears. The member's aesthetic, recreational, and personal use fishing interests will be harmed by Lease Sale 258. The member is also a frequent participant in agency decision-making processes and will be harmed by Interior and BOEM's denial of public participation on the Lease Sale 258 decision.

23.     Interior's Interim Final Rule, including the failure to solicit any prior public comment on the rule, imminently threatens Plaintiffs' members' interests and their planned activities within the Project Areas. The above-described projects have been or will be approved without the benefit of public notice and comment on a draft EIS or public involvement in preparation of the EA, reducing Plaintiffs' and their members' ability to meaningfully participate in the NEPA review process for these projects, and increasing the risk of environmental harm within the Project Areas, *supra* paras. 19-20. Those increased harms will reduce Plaintiffs' members' ability to engage in and enjoy their planned activities within the Project Areas.

24.     Interior's rulemaking, including the failure to solicit prior public comment, violates Plaintiffs' and their members' rights under the APA, and will cause and threaten injury

to Plaintiffs and their members until the Court grants the relief requested herein. A court order declaring invalid and vacating the Interim Final Rule would redress Plaintiffs' and Plaintiffs' members' injuries, and restore the status quo ante, including the public's opportunity to comment on draft EISs and participate in the preparation of EAs. An order requiring Interior to comply with NEPA and the APA, and to operate under Interior's prior NEPA procedures in the interim, would likewise restore the status quo ante and could result in a new rule that requires public participation in the preparation of an EIS and/or EA.

25.    Defendant DOUG BURGUM, the Secretary of the Interior, is the highest ranking official within the Department of the Interior and, in that capacity, has ultimate responsibility for the administration and implementation of the APA and NEPA within Interior, and for compliance with all other federal laws applicable to Interior and its agencies. Secretary Burgum is sued in his official capacity.

26.    Defendant UNITED STATES DEPARTMENT OF THE INTERIOR's primary mission is to protect and manage the Nation's natural resources and cultural heritage. Interior manages more than 500 million acres of public lands, 700 million acres of subsurface minerals, and 3.2 billion acres of the Outer Continental Shelf.

27.    Agencies within Interior that are subject to the Interim Final Rule include the Bureau of Land Management, Bureau of Ocean Energy Management, Bureau of Reclamation, Bureau of Safety and Environmental Enforcement, National Park Service, Office of Surface Mining Reclamation and Enforcement, U.S. Fish and Wildlife Service, and National Park Service.

28.    Defendant BUREAU OF LAND MANAGEMENT manages 245 million acres of federal public lands and thirty percent of the nation's minerals.

29.    Defendant BILL GROFFY is the Principal Deputy Director serving as Acting Director of the Bureau of Land Management, is the highest ranking official within the Bureau of Land Management, and, in that capacity, has ultimate responsibility for the administration and implementation of NEPA within the Bureau of Land Management, and for compliance with all other federal laws applicable to the Bureau of Land Management. Acting Director Groffy is sued in his official capacity.

30.    Defendant BUREAU OF OCEAN ENERGY MANAGEMENT manages the nation's offshore oil and gas across 1.76 billion acres of Federal offshore lands, offshore renewable energy, and marine minerals programs.

31.    Defendant MATTHEW GIACONA is the Acting Director of Bureau of Ocean Energy Management, is the highest ranking official within the Bureau of Ocean Energy Management, and, in that capacity, has responsibility for the administration and implementation of NEPA within the Bureau of Ocean Energy Management, and for compliance with all other federal laws applicable to the Bureau of Ocean Energy Management. Acting Director Giacona is sued in his official capacity.

32.    Defendant BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT regulates safety, environmental protection, and conservation of natural resources related to energy development on the U.S. Outer Continental Shelf.

33.    Defendant KENNETH STEVENS is the Principal Deputy Director, Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement, is the highest ranking official within the Bureau of Safety and Environmental Enforcement, and, in that capacity, has responsibility for the administration and implementation of NEPA within the Bureau of Safety and Environmental Enforcement, and for compliance with

all other federal laws applicable to the Bureau of Safety and Environmental Enforcement. Acting Director Stevens is sued in his official capacity.

34.    Defendant OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT regulates surface coal mining operations, including mining operations on public lands.

35.    Defendant LANNY E. ERDOS is the Director of the Office of Surface Mining Reclamation and Enforcement, is the highest ranking official within the Office of Surface Mining Reclamation and Enforcement, and, in that capacity, has responsibility for the administration and implementation of NEPA within the Office of Surface Mining Reclamation and Enforcement, and for compliance with all other federal laws applicable to the Office of Surface Mining Reclamation and Enforcement. Acting Director Erdos is sued in his official capacity

36.    BUREAU OF RECLAMATION manages and develops water and hydroelectric resources.

37.    Defendant SCOTT J. CAMERON is the Acting Commissioner of the Bureau of Reclamation, is the highest ranking official within the Bureau of Reclamation, and, in that capacity, has responsibility for the administration and implementation of NEPA within the Bureau of Reclamation, and for compliance with all other federal laws applicable to the Bureau of Reclamation. Acting Commissioner Cameron is sued in his official capacity.

38.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE manages more than 96 million acres of terrestrial land, including more than 570 wildlife refuges, and more than 760 million acres of submerged lands across five marine national monuments.

39.    Defendant BRIAN NESVIK is the Director of the U.S. Fish and Wildlife Service, is the highest ranking official within the U.S. Fish and Wildlife Service, and, in that capacity, has responsibility for the administration and implementation of NEPA within the U.S. Fish and Wildlife Service, and for compliance with all other federal laws applicable to the U.S. Fish and Wildlife Service. Director Nesvik is sued in his official capacity.

40.    Defendant NATIONAL PARK SERVICE manages 433 national parks, monuments, and other significant recreational or historical sites covering 85 million acres.

41.    Defendant JESSICA BOWRON is the Comptroller, Exercising the Delegated Authority of the Director of the National Park Service, is the highest ranking official within the National Park Service, and, in that capacity, has responsibility for the administration and implementation of NEPA within the National Park Service, and for compliance with all other federal laws applicable to the National Park Service. Acting Director Bowron is sued in her official capacity.

## LEGAL BACKGROUND

### A.    NEPA

42.    On January 1, 1970, President Nixon signed into law the National Environmental Policy Act of 1969. Pub. L. No. 91-190, title I, § 101, 83 Stat. 852 (1970).

43.    NEPA declares a national policy "to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. Its "twin aims" are to ensure federal agencies "consider every significant aspect of the environmental impacts of a proposed action" and "inform the public that it has considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec Co. v. NRDC*, 462 U.S. 87, 97 (1983). Accordingly, NEPA establishes "a set of 'action-forcing' procedures that require that agencies take a hard look

1    at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

2    350 (1989) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

3        44.     Specifically, agencies must prepare a "detailed" environmental impact statement

4    (EIS) when they propose to take "major Federal actions significantly affecting the quality of the

5    human environment," 42 U.S.C. § 4332(2)(c), if those significant effects are "reasonably

6    foreseeable," *id.* § 4336(b)(1). Among other things, the EIS must analyze the "reasonably

7    foreseeable environmental effects of the proposed agency action," including "adverse" effects

8    that "cannot be avoided should the proposal be implemented"; " a reasonable range of

9    alternatives to the proposed agency action"; "the relationship between local short-term uses of

10    man's environment and the maintenance and enhancement of long-term productivity"; and "any

11    irreversible and irretrievable commitments of Federal resources which would be involved in the

12    proposed agency action should it be implemented." *Id.* § 4332(2)(C)(i)-(v). The EIS must also

13    discuss "steps that can be taken to mitigate adverse environmental consequences." *Robertson*,

14    427 U.S. at 351. Agencies "shall … ensure the professional integrity, including scientific

15    integrity, of the discussion and analysis" in an EIS. 42 U.S.C. § 4332(2)(D).

16        45.     The EIS "ensures that the agency, in reaching its decision, will have available,

17    and will carefully consider, detailed information concerning significant environmental impacts; it

18    also guarantees that the relevant information will be made available to the larger audience that

19    may also play a role in both the decisionmaking process and the implementation of that

20    decision." *Robertson*, 490 U.S. at 349.

21        46.     Although Congress granted agencies some flexibility in implementing NEPA, it

22    also directed that agencies use "all practicable means" in cooperation with the public to fulfill

23    NEPA's objectives:

> [I]t is the continuing policy of the Federal Government, *in cooperation with State and local governments, and other concerned public and private organizations*, to use *all practicable means and measures*, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

42 U.S.C. § 4331(a) (emphases added); *see also id.* § 4331(b) (establishing the Federal Government's "continuing responsibility" to "use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may … fulfill the responsibilities of each generation as trustee of the environment for succeeding generations," among other objectives. *Id.* § 4331(b) (emphasis added).

47.    Accordingly, Congress directed that agencies, "to *the fullest extent possible* ... shall ... identify and develop methods and procedures, in consultation with the Council on Environmental Quality …, which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." *Id.* § 4332(2)(B) (emphasis added); *see* section B, *infra* (detailing those procedures, including CEQ and Interior regulations).

48.    NEPA established CEQ in the Executive Office of the President. 42 U.S.C. § 4342. The CEQ is a three-member council, whose members are appointed by the President. *Id.*

49.    In 2023, in the first significant revision of NEPA since its 1970 enactment, Congress enshrined into law many of the CEQ NEPA regulations then in effect (formerly at 40 C.F.R. §§ 1500 *et seq.*). Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 321, 137 Stat. 10, 38 (2023).

50.    Among other things, the 2023 amendments codified the CEQ's provisions providing for an EA and "finding of no significant impact" when an agency elects to avoid

preparation of an EIS notwithstanding potentially significant impacts. *See* 40 C.F.R. §§ 1501.5, 1501.6 (2022). Agencies must prepare an EA when the significance of an agency proposal's effect is unknown, or there is no reasonably foreseeable significant effect. 42 U.S.C. § 4336(b)(2). The EA is a "concise public document" that "set[s] forth the basis of [an] agency's finding of no significant impact." *Id*. This finding serves as the agency's determination that a proposed action "does not require the issuance of an [EIS]." *Id*. § 4336e(7).

### B.    Regulatory History of NEPA's Public Participation Procedures

51.    The CEQ and federal agencies, including Interior and its sub-agencies, have since NEPA's enactment recognized that the solicitation of public input throughout the NEPA process is a vital and practicable means to "ensure" that agencies identify and consider potentially significant environmental impacts, weigh reasonable alternatives and mitigation measures to avoid or reduce impacts, and arrive at well-informed decisions that consider environmental values. As the Supreme Court has recognized, the EIS plays an important "informational role" not just for decisionmakers but for the public: the EIS "gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provides a springboard for public comment." *Robertson*, 490 U.S. at 349 (cleaned up).

52.    Two months after NEPA's enactment, President Nixon issued an Executive Order directing agencies to develop procedures for public involvement to carry out NEPA's environmental objectives:

> Consonant with Title I of the National Environmental Policy Act of 1969 ..., the heads of Federal agencies shall ... [d]evelop procedures to ensure the *fullest practicable provision of timely public information and understanding of Federal plans and programs with environmental impact in order to obtain the views of interested parties*. These procedures shall include, whenever appropriate, provision for public hearings, and *shall provide the public with relevant information*, *including information on alternative courses of action*.

Executive Order 11514, *Protection and Enhancement of Environmental Quality*, 35 Fed. Reg. 4247, § 2(b) (Mar. 5, 1970) (emphasis added).

53.     Executive Order 11514 remains in effect today.

54.     Since NEPA's enactment in 1970, and until Interior's issuance of the Interim Final Rule in 2025, Interior, like other federal agencies, required the agencies to provide for public notice and comment on draft EISs.

*Council on Environmental Quality NEPA Regulations*

55.     In 1971, CEQ issued guidelines advising agencies to publish and consider public comments on a draft EIS. 36 Fed. Reg. 7724, 7726 (Apr. 23, 1971) (noting final EISs shall include "all comments received thereon by the responsible agency from Federal, State, and local agencies and from private organizations and individuals"). In 1973, CEQ revised the guidelines, fleshing out public input procedures. The guidelines advised agencies to "[p]rovide for circulation of draft [EISs] to other Federal, State, and local agencies and for their availability to the public," "consider the comments of the agencies and the public," and "issue final [EISs] responsive to the comments received." 38 Fed. Reg. 20550, § 1500.2(b)(1), (2), & (3) (Aug. 1, 1973).

56.     In 1977, to ensure uniform rules in NEPA's implementation across all federal agencies, President Carter issued Executive Order 11991, directing CEQ to issue regulations "for implementation of the procedural provisions of [NEPA]" that would be binding on all federal agencies, and that the regulations "be designed to make the [EIS] process more useful to decisionmakers and the public." Executive Order 11991, *Environmental Impact Statements*, § 1, 42 Fed. Reg. 26967 (May 25, 1977) (amending § 3(h) of President Nixon's Executive Order 11514).

57.    In 1978, CEQ promulgated regulations implementing NEPA. 43 Fed. Reg. 55978 (Nov. 29, 1978). CEQ's rulemaking aimed "to produce better decisions which further the national policy to protect and enhance the quality of the human environment." *Id*.

58.    Among other things, CEQ's regulations recognized that "public scrutiny [is] essential to implementing NEPA," 40 C.F.R. § 1500.1(b) (1978), and set forth a policy to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment," *id*. § 1500.2(d).

59.    Accordingly, the CEQ regulations, from their adoption in 1978 and through multiple recent amendments, have consistently required public comment on draft EISs and public involvement in EAs "to the extent practicable" until their rescission earlier this year. 40 C.F.R. §§ 1501.4(b) (EAs) and 1503.1(a)(4) (EISs) (1978); 40 C.F.R. §§ 1501.5(b) (EAs) and 1503.1(a)(2)(v) (EISs) (2020); 40 C.F.R. §§ 1501.5(f) (EAs) and 1503.1(a)(2)(v) (EISs) (2022); 40 C.F.R. §§ 1501.5(e), (f) (EAs) and 1503.1(a)(2)(v) (EISs) (2024).

*U.S. Department of Interior NEPA Regulations*

60.    Similar to CEQ, in 1971, Interior issued guidelines requiring public notice and comment on draft EISs. 36 Fed. Reg. 19344 (Oct. 2, 1971) (Departmental manual: bureaus "[s]hall give public notice ... of the availability of draft [EISs] and invite comments"). Interior issued these draft EIS procedures in apparent recognition that they are a "practicable" means of providing "timely public information and understanding of Federal plans and programs" and of "obtain[ing] the views of interested parties," as directed by Executive Order 11514.

61.    By 1972, Interior had codified its policies and procedures for compliance with NEPA in Part 516 of Interior's Departmental Manual ("516 DM"). Thus, on June 8, 1972, BLM issued its own NEPA guidelines based on 516 DM that required it to issue a "draft statement"

1    that would be "formally circulated to Federal, State, and local agencies and to other interested

2    parties for review and comment." 37 Fed. Reg. 15015 (July 27, 1972).

3        62.    In 1980, Interior revised its NEPA policies and procedures in 516 DM to formally

4    adopt CEQ's regulations and public participation procedures. 45 Fed. Reg. 27541, 27544 (April

5    23, 1980); 516 DM 1.7(B). Interior set forth a policy "[t]o provide to the fullest extent

6    practicable, timely information to the public to better assist in understanding Departmental plans

7    and programs affecting environmental quality and to facilitate their involvement in the

8    development of such plans and programs," *id*. at 27543, 516 DM 1.2(F), echoing its obligations

9    in Executive Order 11514. *See also id*. at 27544, 516 DM 1.6 (directing bureaus and offices to

10   "develop and utilize procedures to insure the fullest practicable provision of timely public

11   information and understanding of their plans and programs with environmental impact including

12   information on the environmental impacts of alternative courses of action").

13       63.    The Departmental Manual established that the "minimum review period for a

14   draft EIS will be sixty (60) days." *Id*. at 27547, 516 DM 4.24(A). Regarding EAs, the Manual

15   directed that "public notification must be provided and, where appropriate, the public involved in

16   the EA process." *Id*. at 27545, 516 DM 3.3(A).

17       64.    In 2008, Interior revised and codified its NEPA procedures into regulation. 73

18   Fed. Reg. 61292 (Oct. 15, 2008). Interior stated the regulations will be used "in conjunction with

19   and supplementary to" NEPA, CEQ's regulations, and Executive Order 11514, *supra* at para. 52.

20   *Id*. The purpose of the codification was to "provide greater visibility to that which was

21   previously contained in the [Departmental Manual] and highlight opportunities for public

22   engagement and input in the NEPA process," thereby "allow[ing] the public to more easily

23   participate in the NEPA process." *Id*. at 61292-93. The rulemaking recognized that "public

involvement is an integral part of the NEPA process." *Id.* at 61299; *see also id.* at 61297 ("[T]he interests of the regional and local community should be taken into account during the NEPA process.").

65.     With respect to EISs, Interior's 2008 rulemaking required that: "A bureau must seek comment from the public as part of the … notice of availability for a draft environmental impact statement," 43 C.F.R. § 46.435(a), and "must request comments from … persons or organizations who may be interested or affected," among other entities, *id.* § 46.435(b)(4). This requirement incorporates by reference CEQ's former requirements that a draft EIS shall be circulated for public comment, 40 C.F.R. § 1503.1(a)(4). *See* 43 C.F.R. § 46.20(a) ("This part supplements, and is to be used in conjunction with, the CEQ regulations except where it is inconsistent with other statutory requirements."). *See also* BLM H-1790-1 – NEPA Handbook (2008) at 2 ("Draft EISs are made available for public review and comment, and final EISs include our responses to comments received.")

66.     With respect to all NEPA reviews, Interior's 2008 rulemaking required "early" public involvement: "Bureaus must solicit the participation of all those persons or organizations that may be interested or affected as early as possible, such as at the time an application is received or when the bureau initiates the NEPA process for a proposed action." 43 C.F.R. § 46.200(b). Interior's rulemaking explained that the purpose of early public involvement "is to facilitate better outcomes by encouraging dialogue among the affected parties." 73 Fed. Reg. at 61303.

67.     Interior's rule further required that "[t]he bureau must, to the extent practicable, provide for public notification and public involvement when an environmental assessment is being prepared," 43 C.F.R. § 46.305(a), and "must consider comments that are timely received,

whether specifically solicited or not," *id*. § 46.305(a)(1). This requirement paralleled CEQ's former regulation requiring that "[t]he agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1)." 40 C.F.R. § 1501.4(b) (2005).

*Congressional Response to NEPA Implementation*

68.    Congress has reinforced the understanding expressed in CEQ's and Interior's prior regulations that public comment is required for draft EISs. For example, in statutes aimed at expediting NEPA reviews, Congress has limited the length of comment periods on draft EISs, based on the premise that notice and comment on draft EISs is required. *See*, *e.g.*, 42 U.S.C. § 4370m-4(d)(1), Fixing America's Surface Transportation Act ("FAST Act"), Pub. L. No. 114-94, 129 Stat. 1741 (2015) (setting both minimum and maximum lengths for draft EIS comment periods—"not less than 45 days" and "not more than 60 days"—for certain transportation, energy, manufacturing, and other projects); 33 U.S.C. § 2348(g)(2)(A), Water Resources Reform and Development Act of 2014, Pub. L. No. 113–121, title I, § 1005(a)(1), 128 Stat. 1205 (2014) (establishing "a period of not more than 60 days" for "acceleration" of water resource development projects); 23 U.S.C. § 139(g)(2)(A)-(B), Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109–59, 119 Stat. 1862 (2005) (same for "efficient environmental reviews" for highway projects); 49 U.S.C. § 47171(m)(2)(A), FAA Reauthorization Act of 2024, Pub. L. No. 118–63, 138 Stat. 1307 (2024) (same for "expedited, coordinated" reviews for aviation projects).

69.    Likewise, Congress has reinforced the understanding expressed in CEQ's and Interior's prior regulations that the preparation of EAs requires public involvement. 16 U.S.C. § 6514(g), Infrastructure Investment and Jobs Act, Pub. L. No. 117–58, div. D, title VIII, § 40807,135 Stat. 1097 (2021) ("In accordance with section 102(2) of [NEPA] (42 U.S.C.

4332(2)) and the applicable regulations and administrative guidelines, the Secretary shall provide an opportunity for public comment during the preparation of any environmental assessment or environmental impact statement for an authorized hazardous fuel reduction project."); *id*. § 6592c(c)(3), Pub. L. 117-58, § 40803, 135 Stat. 1113 (requiring same for emergency actions).

### C.    APA RULEMAKING PROCEDURES

70.    The APA, 5 U.S.C. § 551 *et seq.*, provides general rules governing the issuance of proposed and final regulations by federal agencies. Fundamental to the APA's procedural framework is the requirement that, absent narrow circumstances, a federal agency publish as a proposal any rule that it is considering adopting, and allow the public the opportunity to submit written comments on the proposal. 5 U.S.C. § 553.

71.    A "rule" is defined by the APA as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency…." *Id*. § 551(4).

72.    The APA provides that all federal agencies must provide "general notice" of any "proposed rule making" to the public by publication in the Federal Register. *Id*. § 553(b). The publication must, at a minimum, include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id*.

73.    The APA requires that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented,

1    the agency shall incorporate in the rules adopted a concise general statement of their basis and

2    purpose." *Id*. § 553(c).

3        74.    The foregoing APA public notice and comment procedures do not apply to "rules

4    of agency organization, procedure, or practice," *Id*. § 553(b)(A), or to "interpretative rules," *id*.

5    An agency may only short circuit the public notice and comment requirements of the APA if it

6    finds, "for good cause," that "notice and public procedure thereon are impracticable,

7    unnecessary, or contrary to the public interest." *Id*. § 553(b)(B).

8

9                **FACTUAL AND PROCEDURAL BACKGROUND**

10       **A.    Executive Order 14154 and CEQ's Rescission of its Regulations**

11       75.    On January 20, 2025, President Trump issued Executive Order 14154, *Unleashing*

12   *American Energy* (Jan. 20, 2025).

13       76.    Section 5 of the Executive Order—titled "Unleashing Energy Dominance through

14   Efficient Permitting"—directed CEQ to "propose rescinding CEQ's NEPA regulations found at

15   40 CFR 1500 *et seq.*" within 30 days of the executive order. EO 14154, § 5(b), 90 Fed. Reg. at

16   8355.

17       77.    Section 5 further directed that, once CEQ issued its new NEPA guidance, CEQ

18   "shall convene a working group to coordinate the revision of agency-level implementing

19   regulations for consistency." *Id*. § 5(c), 90 Fed. Reg. at 8355. Section 5 also directed that the

20   CEQ guidance and the agency-level implementing regulations "must expedite permitting

21   approvals," and that "[c]onsistent with applicable law, all agencies must prioritize efficiency and

22   certainty over any other objectives, including those of activist groups, that do not align with the

23   policy goals set forth in section 2 of this order or that could otherwise add delays and ambiguity

24   to the permitting process." *Id*.

78.    Executive Order 14154 states that "[i]t is the policy of the United States …to guarantee that all executive departments and agencies … provide opportunity for public comment." *Id*. § 2(h), 90 Fed. Reg. at 8354.

79.    Subsequently, CEQ issued an interim final rule rescinding CEQ's NEPA implementing regulations, effective April 11, 2025. *See* 90 Fed. Reg. 10610 (Feb. 25, 2025). CEQ also issued guidance to federal agencies on NEPA implementing procedures, including NEPA implementation in the absence of CEQ regulations and while agencies revise their NEPA procedures. *See* CEQ, Memorandum for Heads of Federal Departments and Agencies, Implementation of the National Environmental Policy Act (Feb. 19, 2025).[4] CEQ has since conferred and coordinated with federal agencies to guide agency revision of their NEPA procedures.

80.    CEQ directed all agencies to update their NEPA procedures within 12 months. *Id*. at 7. In the absence of CEQ regulations, CEQ advised agencies that "[w]hile these revisions are ongoing, agencies should continue to follow their existing practices and procedures for implementing NEPA consistent with the text of NEPA, E.O. 14154, and this guidance." *Id*. at 4.

81.    Interior followed CEQ's guidance. During Interior's subsequent process of revising its NEPA procedures, the agencies within Interior applied Interior's NEPA implementing regulations and the CEQ regulations on which those regulations were based, 90 Fed. Reg. at 29502, in recognition that Interior's regulations are to be used "in conjunction with

---

[4] Available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-Memo-Implementation-of-NEPA-02.19.2025.pdf, superseded by Sept. 29, 2025 Memorandum, available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Agency-NEPA-Implementation-Guidance.pdf.

and supplementary to" CEQ's regulations.  Interior thereby assumed CEQ's regulations to be in effect. *See* 73 Fed. Reg. 61292.

**B.      Interior's Rescission of NEPA Regulations**

82.      On July 3, 2025, Interior issued the Interim Final Rule without any advance public notice and comment. 90 Fed. Reg. 29498 (July 3, 2025). The Interim Final Rule rescinded most of the Department's NEPA regulations codified at 43 CFR, part 46, including its procedures on public involvement in the preparation of EISs and EAs. *See* 43 C.F.R. §§ 46.200(b), 46.305, 46.435(b) (2024). Following the issuance of the Interim Final Rule, the only Interior NEPA regulations that remain in the Code of Federal Regulations are "regulations that authorize three tools that [Interior] bureaus may rely on to expedite NEPA reviews"—procedures for (1) responding to emergencies, (2) "categorical exclusions" that exclude certain actions from the preparation of an EA or EIS, and (3) the preparation of EISs or EAs by project applicants or third parties. 90 Fed. Reg. at 29501-502.

83.      Through the Interim Final Rule, Interior revised and relocated the remainder of its NEPA procedures to Interior's 516 Departmental Manual 1—*U.S. Department of the Interior Handbook: National Environmental Policy Act Implementing Procedures* ("Interior NEPA Handbook").[5] *Id*. at 29499 ("[Interior]'s procedures will henceforth be contained in the [Interior NEPA Handbook].") The Interim Final Rule characterizes the Interior NEPA Handbook as "guidance." *Id*. at 29501.

84.      The Interior NEPA Handbook does not require that Interior provide for public notice and comment on a draft EIS, as formerly required by 43 C.F.R. § 46.435(b) and the CEQ

---

[5] Available at https://www.doi.gov/media/document/doi-nepa-handbook (last visited Dec. 17, 2025).

regulations on which this requirement was based. And it removed the prior Handbook's requirement for a minimum 45-day comment period on draft EISs. *See* 516 DM 1.22(A) (2009).

85.    The Interior NEPA Handbook does not require that Interior agencies, "to the extent practicable, provide for public notification and public involvement when an [EA] is being prepared," and "consider comments that are timely received, whether specifically solicited or not," as formerly required by 43 C.F.R. § 46.305(a)(1).  Likewise, the Interior NEPA Handbook does not require that Interior agencies, when preparing NEPA reviews, including EAs, "solicit the participation of all those persons or organizations that may be interested or affected as early as possible," as formerly required by 43 C.F.R. § 46.200(b).

86.    Interior's rulemaking does not acknowledge, let alone justify, the removal and/or drastic revision of public participation procedures concerning draft EISs and EAs, and its departure from CEQ's former public participation requirements, on which those procedures were based.

87.    Interior's rulemaking was finalized and made immediately effective as an "interim final rule" without any advance public notice of, or an opportunity to comment on, the rule. Interior determined that notice-and-comment rulemaking was not required on four grounds:

a.    First, Interior's rulemaking states that the rule falls within the APA exception for "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A), because the rules are purportedly "purely procedural and guide internal agency compliance with NEPA." 90 Fed. Reg. at 29502.

b.    Second, Interior's rulemaking states that the rule falls within the APA exception for "interpretative rules," 5 U.S.C. § 553(b)(A), as it "provides an interpretation of a statute, rather than making discretionary policy choices that establish

enforceable rights or obligations for regulated parties under delegated congressional authority." 90 Fed. Reg. at 29502.

      c.   Third, Interior's rulemaking states that portions of the rule fall within the APA exception for "general statements of policy," 5 U.S.C. § 553(b)(A), as they "provide notice of an agency's intentions as to how it will enforce statutory requirements … without creating enforceable rights or obligations for regulated parties under delegated congressional authority." 90 Fed. Reg. at 29502.

      d.   Finally, Interior's rulemaking states that the rule satisfies the "good cause" exception under the APA because notice and comment is "impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B), and there is "good cause" to make the rule effective immediately, *id*. § 553(d)(3). 90 Fed. Reg. at 29502. Purportedly, good cause exists because after the CEQ rescinded its NEPA regulations, Interior "operate[d] under its prior procedures *as if* the CEQ NEPA regime still existed," and now that Interior has updated its NEPA procedures, Interior "must immediately rescind its duplicative or inconsistent regulations." *Id*. (emphasis in original).

## CLAIM ONE

**(Failure to Provide Notice and Comment on and Delay the Effective Date of the Interim Final Rule)**

88.    Plaintiffs incorporate by reference all paragraphs listed above.

89.    Interior's Interim Final Rule constitutes a "rule" within the meaning of the APA, 5 U.S.C. §§ 551 and 553. This Rule includes Interior's rescission and/or revision of NEPA procedures contained within 43 CFR part 46, and Interior's promulgation of revised NEPA procedures set forth in the Interior NEPA Handbook.

90.     Interior's rulemaking was implemented immediately, without any publication of a general notice of proposed rulemaking in the Federal Register and without any opportunity for interested persons to participate in the rulemaking process before the rule went into effect, as required by the APA, 5 U.S.C. § 553(b) and (c).

91.     Interior's determinations that it need not provide advanced publication of a proposed rule nor provide the public with an opportunity to participate, nor delay the rule's effective date, because the Interim Final Rule establishes "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A), "interpretative rules," and/or "general statements of policy," *id.*, are arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

92.     Likewise, Interior's determination that advanced publication of a proposed Interim Final Rule and providing the public with an opportunity to participate in Interior's rulemaking process falls into the "good cause" exception because doing so would be either impracticable, unnecessary, or contrary to the public interest is arbitrary, capricious, and not in accordance with law, in violation of 5 U.S.C. § 706(2).

## CLAIM TWO

**(Failure to Provide a Reasoned Explanation for the Substantial Curtailment of Public Participation Requirements within the Interim Final Rule)**

93.     Plaintiffs incorporate by reference all paragraphs listed above.

94.     Interior's rulemaking fails to provide a reasoned – or any – specific explanation for the evisceration of public participation in NEPA reviews, as embodied in the Interim Final Rule.

95.     Moreover, Interior's rulemaking fails to explain how the Interim Final Rule is consistent with Executive Order 11514 § 2(b), Executive Order 14154 § 2(h), and with NEPA's

requirements that federal agencies "to the fullest extent possible," 42 U.S.C. § 4332, (1) "identify and develop methods and procedures … which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations," *id*. § 4332(2)(B); (2) "in cooperation … with concerned public and private organizations … use all practicable means and measures … in a manner calculated to" serve NEPA's environmental objectives, *id*. § 4331(a), and (3) "use all practicable means … to improve and coordinate Federal plans, functions, programs, and resources" for NEPA's environmental protection aims, *id*. § 4331(b).

96.    Interior's unexplained evisceration of public participation procedures via the Interim Final Rule was also arbitrary and capricious because Interior's rulemaking failed to acknowledge and adequately explain the departure from Interior's longstanding approach to NEPA implementation, and failed to consider the longstanding recognition that public involvement is essential to the proper functioning of NEPA, and that public involvement in NEPA reviews is a practicable means of achieving NEPA's aims.

97.    Interior's failure to rationally explain its rulemaking is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2) and NEPA, 42 U.S.C. §§ 4331(a)-(b), 4332(2)(B).

**RELIEF REQUESTED**

Plaintiffs respectfully request that the Court:

(A)    Declare that Interior violated the Administrative Procedure Act in the development and completion of the Interim Final Rule due to its failure to provide public notice and comment on the Interim Final Rule and failure to provide a reasoned explanation for changes to Interior's public participation procedures adopted in the Interim Final Rule;

(B)     Declare that Interior's Interim Final Rule violated the APA and NEPA, 42 U.S.C. §§ 4331(a)-(b), 4332(2)(B), by failing to consider relevant factors under NEPA;

(C)     Vacate the Interim Final Rule, including the rescission and revision of regulations at 43 C.F.R., part 46, and the promulgation of revised NEPA procedures in Interior's NEPA Handbook;

(D)     Issue an injunction ordering that, until and unless they comply with the APA, Interior and its agencies shall operate under the NEPA procedures regarding public participation that Interior applied before the Interim Final Rule took effect;

(E)     Retain jurisdiction of this matter for purposes of enforcing and effectuating the Court's order;

(F)     Grant Plaintiffs their reasonable costs of litigation, including attorneys' and expert fees; and

(G)     Grant such further relief as the Court deems just and proper.

Respectfully Submitted,

/s/ *Wendy Park*
Wendy Park (Cal. Bar No. 237331)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Tel: 510-844-7138
Email: wpark@biologicaldiversity.org

Brandon Jones-Cobb (AK Bar No. 1610078)
(*pro hac vice* pending)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 1178
Homer, AK 99603
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity and Sierra Club*

Nathaniel Shoaff (Cal. Bar No. 256641)

Elizabeth Benson (Cal. Bar No. 268851)
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
Phone: 415-977-5610
Email: nathaniel.shoaff@sierraclub.org
Email: elly.benson@sierraclub.org

*Attorneys for Sierra Club*

DATED: December 18th, 2025