Wendy Park (Cal. Bar No. 237331)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: 510-844-7138
Email: wpark@biologicaldiversity.org

Brandon Jones-Cobb (AK Bar No. 1610078)
(*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 30604
Seattle, WA 98113-0604
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org

Hannah Connor (DC Bar No. 1014143)
(*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St. NW, Suite 1300
Washington, DC 20005
Phone: 202-641-6176
Email: hconnor@biologicaldiversity.org

*Counsel for Plaintiffs Center for Biological Diversity & Sierra Club*

(Additional counsel listed in signature block)

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.<br><br>*Defendants*.<br><br>---<br><br>CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, | Civil Action No. 3:25-cv-10793-JSC<br>(rel. 3:26-cv-00866-JSC)<br><br>**PLAINTIFFS' NOTICE OF CONSOLIDATED MOTION FOR PARTIAL SUMMARY JUDGMENT, CONSOLIDATED MOTION FOR PARTIAL SUMMARY JUDGMENT, & MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: November 5, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Jacqueline Scott Corley<br>Place: Courtroom 8, Golden Gate Ave., San Francisco, CA |

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.

*Defendants*.

Date Filed: June 18, 2026

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

TABLE OF ACRONYMS ........ X

NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT ........ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........ 1

INTRODUCTION AND ISSUES TO BE DECIDED ........ 1

LEGAL AND FACTUAL BACKGROUND ........ 4

I. NEPA and the Government's NEPA Regulations ........ 4

A. The National Environmental Policy Act ........ 4

1. Environmental Impact Statements ........ 5

2. Environmental Assessments ........ 5

3. Categorical Exclusions ........ 5

4. Agency NEPA Implementing Procedures ........ 6

B. CEQ's Interior's, and USDA's Regulations on Public Participation in NEPA Reviews ........ 6

1. CEQ Guidelines and Regulations ........ 6

2. USDA, Interior, and Sub-Agency Guidelines and Regulations ........ 8

II. NEPA's Implementation and Effectiveness Since Enactment ........ 11

III. Executive Order 14154 and Interior's and USDA's Rescission of their NEPA Regulations ........ 12

STANDARD OF REVIEW ........ 14

ARGUMENT ........ 15

I. Plaintiffs Have Standing ........ 15

A. Plaintiffs Have Standing to Bring Their Substantive NEPA Claims ........ 15

B. Plaintiffs Have Satisfied the Requirements for Procedural Standing ........ 16

C. Plaintiffs Have Organizational Standing ........ 17

II. Interior and USDA's Replacement of Public Participation Procedures with Agency Discretion Violates Congress's Ratification of Public Comment Requirements and NEPA's Mandate that Agencies Rely on "Methods and Procedures" ........ 18

A. Congress Affirmed CEQ's Public Participation Framework as a "Practicable," and Thus Required, Means of Implementing NEPA ........ 19

B. Defendant's Failure to Have Any Procedures Concerning Public Comment on Draft EISs and Public Involvement in the Preparation of EAs Violates NEPA ........ 22

III. Interior and USDA Fail to Adequately Explain Their Removal of Longstanding Mandatory Public Participation Requirements ........ 24

A. USDA and Interior Fail to Provide "Good Reasons" for Eliminating Public Comment on Draft EISs and Public Involvement in the Preparation of EAs ........ 26

1. Defendants' Reliance on NEPA, E.O. 14154, and *Seven County* Is Misplaced ........ 27

2. Both Departments' Efficiency Rationales Are Arbitrary and Capricious ........ 29

3. USDA and Interior Fail to Establish that Public Comment Will Continue To Apply Where "Appropriate" or that Existing Procedures Are Adequate ........ 33

B. USDA's Elimination of Forest Service Public Participation Requirements Was Arbitrary and Capricious ........ 35

C. USDA and Interior Failed to Consider Alternative Approaches within the Ambit of their Existing Policies ........ 37

D. Interior and USDA Failed to Adequately Explain How Their New Policies Are Permissible Under NEPA ........ 38

IV. Vacatur is the Appropriate Remedy for USDA's and Interior's APA Violations ........ 39

CONCLUSION ........ 40

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. U. S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) .......... 39

*Am Mining Congress v. EPA*,
965 F.2d 759 (9th Cir. 1992) .......... 33

*Aqualliance v. U.S. Bureau of Reclamation*,
312 F. Supp. 3d 878 (E.D. Cal. 2018) .......... 40

*Ariz. All. for Retired Ams. v. Mayes*,
117 F. 4th 1165 (9th Cir. 2024) .......... 17

*Balt. Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983) .......... 4, 29, 30

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
524 F.3d 938 (9th Cir. 2008) .......... 8

*Calif. v. Block*,
690 F.2d 753 (9th Cir. 1982) .......... 6, 10, 23

*Calif. v. U.S. Dep't of Interior*,
381 F. Supp. 3d 1153 (N.D. Cal. 2019) .......... 37

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .......... 28

*Citizens for Better Forestry v. USDA*,
341 F.3d 961 (9th Cir. 2003) .......... 8, 16, 17

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) .......... 17

*Ctr. for Biological Diversity v. U.S. BLM*,
141 F.4th 976 (9th Cir. 2025) .......... 17

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
No. 24-cv-04651-JST, 2026 WL 898264 (N.D. Cal. March 30, 2026) .......... 14, 16

*Ctr. for Envtl. Health v. Vilsack*,
No. 15-cv-01690-JSC, 2016 WL 3383954 (N.D. Cal. 2016) .......... 40

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) .......... 19, 21

*Def. of Wildlife v. Zinke*,
856 F.3d 1248 (9th Cir. 2017) .......... 15

*Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 25, 37

*Douglas v. Xerox Bus. Servs., LLC*,

875 F.3d 884 (9th Cir. 2017) ... 19

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ... 24, 25, 26, 38

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ... 19, 21

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ... 15, 16

*Home Box Office v. FCC*, 567 F.2d 9 (D.C. Cir. 1977) ... 33

*Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972 (9th Cir. 2025) ... 18

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238 (N.D. Cal. 2015) ... 40

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ... 4

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400, 412 (2024) ... 14

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ... 1, 11

*Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025) ... 24, 30, 31, 39

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983 ... 24, 25, 34

*N. Idaho Cmty. Action Network v. U.S. Dept. of Transportation*, 545 F.3d 1147 (9th Cir. 2008) ... 5

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ... 24

*Nat. Res. Def. Council v. Jewell*, 749 F.3d 776 (9th Cir. 2014) ... 17

*Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024) ... 28

*New York v. Trump*, 811 F. Supp. 3d 215 (D. Mass. 2025) ... 28

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) ... 31

*Organized Village of Kake v. Dept. of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) ... 24

*Pollinator Stewardship Council v. U.S. EPA*,
806 F.3d 520 (9th Cir. 2015) ..................... 39, 40

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)..................... 4, 11, 18, 21

*Sequoia Orange Co. v. Yeutter*,
973 F.2d 752 (9th Cir. 1992) ..................... 31

*Seven County Infrastructure Coalition v. Eagle County*,
605 U.S. 168 (2025)..................... 28, 29

*Vermont Yankey Nuclear Power Corp. v. NRDC*,
435 U.S. 519, 558 (1978)..................... 29

*Weyerhaeuser Co. v. Costle*,
590 F.2d 1011 (D.C. Cir. 1978)..................... 31

*W. Watersheds Project v. Kraayenbrink*,
620 F.3d 1187 (9th Cir. 2010) ..................... 32

*WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Insp. Serv. Wildlife Servs.*,
135 F.4th 717 (9th Cir. 2025) ..................... 5, 18

**Statutes**

5 U.S.C. § 553(b)(A)..................... 14

5 U.S.C. § 553(b)(4)(B) ..................... 14

5 U.S.C. § 553(d)(3) ..................... 14

5 U.S.C. § 706(2) ..................... 39

5 U.S.C. § 706(2)(A)..................... 1, 15

5 U.S.C. § 706(2)(D)..................... 15

15 U.S.C. § 720b(c)(1)(B) ..................... 21

15 U.S.C. § 720b(d)(1) ..................... 21

16 U.S.C. § 3164(e) ..................... 21

16 U.S.C. § 6514(g) ..................... 21

16 U.S.C. § 6592c(c)(3)..................... 21

23 U.S.C. § 139(g)(2)(A)..................... 21

30 U.S.C. § 1419(d) ..................... 21

33 U.S.C. § 2348(g)(2)(A)..................... 21

33 U.S.C. § 2348(g)(2)(B) ..................... 22

42 U.S.C. § 4321..................... 1, 4

42 U.S.C. § 4331 .......... 1
42 U.S.C. § 4331(a) .......... 2, 3, 6, 20, 22, 38, 39
42 U.S.C. § 4331(b) .......... 3, 6, 18, 20, 22, 38, 39
42 U.S.C. § 4332 .......... 22, 39
42 U.S.C. § 4332(1) .......... 20
42 U.S.C. § 4332(2) .......... 20
42 U.S.C. § 4332(2)(B) .......... 2, 4, 6, 8, 19, 22, 24, 27, 34, 38, 39
42 U.S.C. § 4332(2)(C) .......... 1, 5, 39
42 U.S.C. § 4332(2)(C)(i)-(iv) .......... 5
42 U.S.C. § 4336(a)(2) .......... 5
42 U.S.C. § 4336(b)(2) .......... 5, 8
42 U.S.C. § 4336a(c) .......... 13
42 U.S.C. § 4336e(1) .......... 5
42 U.S.C. § 4342 .......... 6
42 U.S.C. § 4370m-4(d)(1) .......... 20
42 U.S.C. § 4370m-4(d)(2) .......... 21
42 U.S.C. § 4370m-4(m)(6) .......... 20
42 U.S.C. § 9117(e) .......... 21
49 U.S.C. § 47171(m)(2)(A) .......... 22

**Regulations**

7 C.F.R. § 1b.1(a) (1983) .......... 13
7 C.F.R. § 1b.3(e) (2025) .......... 35
7 C.F.R. § 1b.3(e)-(g) (2025) .......... 6
7 C.F.R. § 1b.3(f)(1) (2025) .......... 35
7 C.F.R. § 1b.3(f)(3) (2025) .......... 35
7 C.F.R. § 1b.4(c)-(d) (2025) .......... 5
7 C.F.R. § 1b.4(d)(36) (2025) .......... 35
7 C.F.R. § 1b.4(d)(39) (2025) .......... 39
7 C.F.R. § 1b.4(d)(47) (2025) .......... 39
7 C.F.R. § 1b.5 (2025) .......... 23

7 C.F.R. § 1b.5(e)(3)(ii) (2025) .......... 23
7 C.F.R. § 1b.5(e)(3)(iii) (2025) .......... 23
7 C.F.R. § 1b.7(b)(1) (2025) .......... 34
7 C.F.R. § 1b.7(d)(1)(i)-(ii) (2025) .......... 39
7 C.F.R. § 1b.7(n)(1) (2025) .......... 23, 27
7 C.F.R. § 372.8(b)(1) (1995) .......... 9
7 C.F.R. § 372.8(b)(2) (1995) .......... 9
7 C.F.R. § 372.8(b)(3) (1995) .......... 9
7 C.F.R. § 372.9(a)(1) (1995) .......... 9
36 C.F.R. § 220.1(b) (2008) .......... 9
36 C.F.R. § 220.4(d) (2008) .......... 10, 25, 35
36 C.F.R. § 220.4(e) (2008) .......... 25, 33, 36
36 C.F.R. § 220.4(e)(1) (2008) .......... 10, 13, 35
36 C.F.R. § 220.6(e) (2008) .......... 10, 37
36 C.F.R. § 220.6(f) (2008) .......... 10, 35, 37
40 C.F.R. § 1500.1(b) (1978) .......... 7, 8
40 C.F.R. § 1500.2(d) (1978) .......... 7, 8, 39
40 C.F.R. § 1501.4(b) (1978) .......... 8, 20, 25, 39
40 C.F.R. § 1501.7 (1978) .......... 8, 33
40 C.F.R. § 1501.7(a)(1) (1978) .......... 8, 13
40 C.F.R. § 1502.4(c) (2024) .......... 13
40 C.F.R. § 1503.1(a) (1978) .......... 25
40 C.F.R. § 1503.1(a)(4) (1978) .......... 7
40 C.F.R. § 1503.4(a) (1978) .......... 7
40 C.F.R. § 1506.6(a) (1978) .......... 7
40 C.F.R. § 1506.6(b) (1978) .......... 7
40 C.F.R. § 1506.10(c) (1978) .......... 7, 20
40 C.F.R. § 1508.9(a)(1) (1978) .......... 8
43 C.F.R. § 46.20(a) (2008) .......... 10
43 C.F.R. § 46.305(a) (2008) .......... 10, 25
43 C.F.R. § 46.435(a) (2008) .......... 10, 25

**Federal Register Notices**

35 Fed. Reg. 4,247 (March 7, 1970) .......... 7
36 Fed. Reg. 7,724 (Apr. 23, 1971) .......... 7
36 Fed. Reg. 19,344 (Oct. 2, 1971) .......... 9
36 Fed. Reg. 23,666 (Dec. 11, 1971) .......... 9
39 Fed. Reg. 40,048 (Nov. 13, 1974) .......... 9
42 Fed. Reg. 26,927 (May 25, 1977) .......... 7
43 Fed. Reg. 55,978 (Nov. 29, 1978) .......... 7, 20
45 Fed. Reg. 27,541 (April 23, 1980) .......... 10
48 Fed. Reg. 11,403 (March 18, 1983) .......... 9
60 Fed. Reg. 6,000 (Feb. 1, 1995) .......... 9
73 Fed. Reg. 43,084 (July 24, 2008) .......... 9
73 Fed. Reg. 61,292 (Oct. 15, 2008) .......... 10
85 Fed. Reg. 43,304 (July 16, 2020) .......... 8
89 Fed. Reg. 35,442 (May 1, 2024) .......... 8
90 Fed. Reg. 8,353 (Jan. 29, 2025) .......... 2
90 Fed. Reg. 10,610 (Feb. 25, 2025) .......... 12
90 Fed. Reg. 29,498 (Jul. 3, 2025) .......... 13, 14
90 Fed. Reg. 29,632 (Jul. 3, 2025) .......... 13, 14
91 Fed. Reg. 5,387 (Feb. 6, 2026) .......... 33
91 Fed. Reg. 8738 (Feb. 24, 2026) .......... 2, 4, 14, 22, 25, 27, 28, 29, 33, 34
91 Fed. Reg. 17,062 (April 3, 2026) .......... 2, 4, 14, 22, 25, 27, 28, 29, 33, 34, 36
91 Fed. Reg. 29,155 (May 19, 2026) .......... 34

**Legislative Authorities**

Pub. L. 114-94, 129 Stat. 1741 .......... 20
Pub. L. 118-5, 137 Stat. 39 .......... 8, 22
Pub. L. 118-63, 138 Stat. 1307 .......... 22

**Executive Orders**

Exec. Order 11514, 35 Fed. Reg. 4247 (March 7, 1970)....................................................... 6, 8, 28

Exec. Order 11991, 42 Fed. Reg. 26967 (May 25, 1977)................................................... 7, 10, 12

Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025).................................... 2, 12, 13, 26, 28, 29

**Other Authorities**

Dept. of Interior, Handbook of NEPA Procedures (Feb. 2026), 516 DM 1 ............... 13, 23, 27, 39

Fed. R. Civ. P. 56.......................................................................................................................... 1

Merriam-Webster Online Dictionary, https://www.merriam-webster.com/................................ 23

# TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| APHIS | Animal and Plant Health Inspection Service |
| BLM | Bureau of Land Management |
| CE | categorical exclusion |
| CEQ | Council on Environmental Quality |
| DOI | Department of Interior |
| EA | environmental assessment |
| EIS | environmental impact statement |
| E.O. | Executive Order |
| FAST Act | Fixing America's Surface Transportation Act |
| FRA | Fiscal Responsibility Act |
| NEPA | National Environmental Policy Act |
| SOPA | Schedule of Proposed Actions |
| USDA | U.S. Department of Agriculture |

**NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56, Plaintiffs Center for Biological Diversity and Sierra Club move for partial summary judgment on Claims Three and Four of Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief against the U.S. Department of the Interior (Interior) (Case No. 3:25-cv-10793-JSC, Dkt. 27) and Claims Three and Four of Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief against the U.S. Department of Agriculture (USDA) (Case No. 3:26-cv-866-JSC, Dkt. 34). The motion is based on the points and authorities below, the attached declarations, and any arguments presented at the motion hearing. Plaintiffs have requested that the Court hear this motion on November 5, 2026.

This action concerns Final Rules issued separately by Interior and USDA, each of which eliminated nearly all of the public's long-held rights to participate in the Departments' and their sub-agencies' environmental reviews for logging, mining, drilling, wildlife killing, animal and plant disease control, and other projects, under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq*. There is no genuine issue as to any material fact, and Plaintiffs are entitled to summary judgment as a matter of law. Therefore, Plaintiffs respectfully request that this Court declare that Interior's and USDA's Final Rules effecting these changes were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A), and vacate the Final Rules.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION AND ISSUES TO BE DECIDED**

For more than a half century, the National Environmental Policy Act (NEPA) worked "to 'prevent or eliminate damage to the environment and biosphere' by focusing Government *and public attention* on the environmental effects of proposed agency action." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321) (emphasis added). NEPA requires that before authorizing any action "significantly affecting the quality of the human environment," agencies must prepare a "detailed" environmental impact statement (EIS) that takes a hard look at the proposed action's environmental effects and alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). Consistent with this statutory requirement that agencies look

before they leap, Interior, USDA, and their sub-agencies have—since 1971—ensured the public had a right to comment and provide additional relevant information on draft EISs, and then published final EISs incorporating the public's input. They also invited public participation in the preparation of "environmental assessments" (EAs) that agencies use to evaluate projects with lesser or less certain impacts than those that require an EIS. Further, USDA's Forest Service required early public input for "all" of its proposed actions, including those the agency proposed as "categorically excluded" from review in an EIS or EA.

USDA and Interior (together, "the Departments") implemented this framework as a "practicable means" to make decisions "in cooperation" with the public and ensure that "environmental amenities and values" received due consideration. 42 U.S.C. §§ 4331(a), 4332(2)(B). And, as Congress intended, these "action-forcing" procedures involving and empowering communities in an open democratic process put pressure on agencies to respond to environmental concerns, leading to better decisions and less harmful logging, mining, road development, and other projects.

But no more. On July 3, 2025, Interior and USDA published "Interim Final Rules" rescinding most of their NEPA regulations, citing President Trump's direction to agencies to prioritize "efficiency and certainty over any other objectives." Exec. Order 14154, *Unleashing American Energy*, § 5(c), 90 Fed. Reg. 8353 (Jan. 29, 2025). Both Departments made their Rules immediately effective upon publication and solicited public comment after-the-fact. After receiving hundreds of comments, many of which (including Plaintiffs') objected to the removal of public comment procedures, Interior followed with a "Final Rule" on February 24, 2026, which purported to "adopt" and "affirm[]" the Interim Final Rule that preceded it. 91 Fed. Reg. 8738, 8741, 8748 (Feb. 24, 2026). USDA received thousands of comments and followed suit on April 3, 2026, issuing its own Final Rule that "adopted" the prior Interim Final Rule. 91 Fed. Reg. 17062, 17063 (April 3, 2026).

The rescissions wiped out the public participation framework that had been in place for decades, and have monumental consequences for public lands and waters, communities, public health, and wildlife. Collectively, Interior and the USDA's Forest Service manage hundreds of

millions of acres—roughly 30% of public lands—much of which is available for logging, mining, and drilling. Interior's Bureau of Ocean Energy Management manages almost 3.2 billion acres of ocean. USDA's Animal and Plant Health Inspection Service (APHIS) controls how the federal government responds to the spread of diseases in the U.S.'s largest animal farming operations. And APHIS's Wildlife Services kills hundreds of thousands of wild animals including wolves, bears, mountain lions, and bobcats every year for the benefit of livestock operators. For decades, communities, organizations, Tribes, and state and local governments have relied on these agencies' NEPA processes to learn about proposed projects; provide evidence, data, and perspectives that flag a project's harms and ways to avoid or reduce them; and lobby agencies to better protect water, air, forests, and wildlife.

But under the guise of eliminating "unnecessary" delays and uncertainty for project proponents—which neither USDA nor Interior show that public comment is to blame for—USDA's and Interior's rules now make most forms of public participation in the NEPA process entirely discretionary, i.e., subject to the whims of agency officials. Thus, these agencies can now approve the clearcut of forests, the construction of mines, the drilling of oil wells, and the killing and poisoning of native wildlife—all without the type of public input that has improved environmental outcomes for more than fifty years, or even without the public's knowledge until well after their authorization. The removal of public scrutiny, and resulting disempowerment of communities, undermine NEPA's primary action-forcing mechanism, reducing NEPA to a paperwork exercise.

The Departments' elimination of enforceable public comment procedures violates NEPA's command that agencies use all "practicable means" to carry out NEPA's environmental goals "in cooperation" with the public, 42 U.S.C. § 4331(a)-(b). Through numerous statutes that aimed to streamline NEPA review for certain projects and either require or assume that public comment procedures apply to expedited projects, Congress ratified the Departments' longstanding public participation procedures as a practicable and therefore required means of implementing NEPA. Their new reliance on unfettered discretion instead of standard procedures

also violates NEPA's plain command that agencies rely on "methods and procedures" to "ensure" consideration of environmental values, 42 U.S.C. § 4332(2)(B).

In addition, even if the drastic rule changes could be reconciled with NEPA, they are arbitrary and capricious. Neither Department explained why public participation procedures they had been substantially implementing since 1971 are no longer practicable, or are now suddenly "unnecessary" or "undue." 91 Fed. Reg. at 8751; *id.* at 17091. Nor do they even acknowledge the value of public involvement in the NEPA process. Rather, the Departments erroneously rely on recent NEPA amendments, President Trump's executive order, and a recent S upreme Court decision as purportedly necessitating the rescission of public participation requirements, while ignoring NEPA's bedrock action-forcing purpose and the longstanding role that public participation has played to meaningfully change projects for the better.

For all of these reasons, the Departments' Final Rules violate NEPA and are arbitrary and capricious, and Plaintiffs respectfully request that this Court vacate them.

## LEGAL AND FACTUAL BACKGROUND

### I. NEPA and the Government's NEPA Regulations

#### A. The National Environmental Policy Act

NEPA declares a national policy "to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. NEPA's "twin aims" are to ensure federal agencies "consider every significant aspect of the environmental impact of a proposed action" and to "inform the public that it has considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). Accordingly, NEPA establishes "a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences" before committing to a proposed action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.* at 349. Several NEPA procedures are enshrined in statute.

**1. Environmental Impact Statements**

When agencies propose to take "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), NEPA requires them to prepare a "detailed" EIS that analyzes the "reasonably foreseeable environmental effects of the proposed agency action," including "adverse" effects that "cannot be avoided should the proposal be implemented"; "a reasonable range of alternatives to the proposed agency action"; and "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," *id.* § 4332(2)(C)(i)-(iv). The EIS "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

**2. Environmental Assessments**

As an alternative to the more robust EIS process, agencies may prepare an environmental assessment (EA) and "finding of no significant impact" for proposed actions that do not have a reasonably foreseeable significant effect on the environment. 42 U.S.C. § 4336(b)(2). If the significance of the proposed action's effects is "unknown," agencies must also use the EA process to determine whether an EIS is required. *See id*. Like EISs, EAs must take a "hard look" at the reasonably foreseeable environmental effects of the proposed action and consider alternative courses of actions. *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1155 (9th Cir. 2008). EAs also must provide a "convincing statement of reasons" that the effects are insignificant. *WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Inspection Serv. Wildlife Servs.*, 135 F.4th 717, 722, 728 (9th Cir. 2025).

**3. Categorical Exclusions**

An agency generally need not prepare an EIS or EA where it determines that a "categorical exclusion" (CE) applies, 42 U.S.C. § 4336(a)(2), (b)(2), i.e., that the proposed action falls within a category of actions that the agency has determined "normally" does not have significant effects, *id*. § 4336e(1); *see also, e.g.*, 7 C.F.R. § 1b.4(c)-(d) (2025) (USDA CEs). The

application of CEs involves agency discretion. For example, USDA regulations provide that if "extraordinary circumstances" exist and result in "uncertain[]" or "significant" effects, the agency cannot apply the CE. *See id.* §1b.3(e)-(g).

**4. Agency NEPA Implementing Procedures**

Although Congress granted agencies some flexibility in implementing NEPA, it also directed that agencies use "all practicable means" to fulfill NEPA's objectives "in cooperation with . . . concerned public and private organizations." 42 U.S.C. § 4331(a); *see also id.* § 4331(b) (establishing the Federal Government's "continuing responsibility" to "use all practicable means" to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations," among other objectives). Accordingly, Congress directed that federal agencies, "to the fullest extent possible," "shall . . . identify and develop methods and procedures" to "ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations." *Id.* § 4332(2)(B). Those procedures must be developed "in consultation with the Council on Environmental Quality." *Id*. CEQ is a three-member council appointed by the President and housed within the Executive Office of the President. *Id.* § 4342.

**B. CEQ's, Interior's, and USDA's Regulations on Public Participation in NEPA Reviews**

In accordance with NEPA's mandate that agencies develop their own NEPA procedures so that "environmental amenities and values may be given appropriate consideration," 42 U.S.C. § 4332(2)(B), agencies have long required public participation in the preparation of NEPA reviews. The fundamental and critical role of NEPA reviews to ensure that agency decisionmaking is informed by "responsible opposing viewpoints" traces back to NEPA's enactment. *California v. Block*, 690 F.2d 753, 770 (9th Cir. 1982).

**1. CEQ Guidelines and Regulations**

Shortly after signing NEPA into law, President Nixon issued Executive Order 11514 to jumpstart the creation of procedures providing for "timely" public information and participation in NEPA reviews. Exec. Order 11514, *Protection and Enhancement of Environmental Quality*,

35 Fed. Reg. 4247 (March 7, 1970). E.O. 11514 directed CEQ to issue NEPA guidelines applicable to other agencies, *id.* § 3(h), and required all federal agencies to develop "procedures to ensure the fullest practicable provision of timely public information and understanding of Federal plans and programs with environmental impact in order to obtain the views of interested parties," *id.* § 2(b). E.O. 11514 is still in effect today. Accordingly, CEQ issued NEPA guidelines in 1971 advising all agencies to consider public comments on a draft EIS, "in order to permit meaningful consideration of the environmental issues involved." 36 Fed. Reg. 7724, 7726 (Apr. 23, 1971).

In 1978, CEQ promulgated NEPA regulations, 43 Fed. Reg. 55978 (Nov. 29, 1978), incorporating the substance of the guidelines, pursuant to President Carter's directives to issue regulations and "to make the [EIS] process more useful to decisionmakers and the public," Exec. Order 11991, § 1, 42 Fed. Reg. 26967 (May 25, 1977). The CEQ NEPA regulations were binding on all federal agencies.

Consistent with CEQ's recognition that "public scrutiny [is] essential to implementing NEPA," 40 C.F.R. § 1500.1(b) (1978), the CEQ regulations set forth a policy to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment," *id.* § 1500.2(d); required "diligent efforts to involve the public in preparing and implementing [agencies'] NEPA procedures," *id.* § 1506.6(a); and prescribed procedures "to inform those persons and agencies who may be interested or affected," *id.* § 1506.6(b). Like their predecessor guidelines, CEQ's regulations required agencies to solicit public comment on draft EISs. *Id.* § 1503.1(a)(4) ("After preparing a draft [EIS] and before preparing a final [EIS] the agency shall . . . [r]equest comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected."). The regulations established a minimum 45-day comment period, *id.* § 1506.10(c), and required that agencies "assess and consider" and respond to comments in the final EIS, *id.* § 1503.4(a). The CEQ regulations further required that before preparing a draft EIS, the agency conduct "an early and open process for determining the scope of issues to be addressed and for identifying the significant issues

related to a proposed action," known as "scoping," *id*. § 1501.7, and invite the participation of government agencies, affected Tribes, "and other interested persons," *id*. § 1501.7(a)(1).

The CEQ regulations also adopted alternative NEPA review procedures allowing agencies to use an EA "for determining whether to prepare an EIS or a finding of no significant impact." *Id*. § 1508.9(a)(1). EA and other CEQ procedures were later statutorily incorporated into NEPA in 2023, through the Fiscal Responsibility Act's "Builder Act." Pub. L. No. 118-5, Title III, div. C, sec. 321(b), § 106(b)(2), 137 Stat. 39 (2023) (codified at 42 U.S.C. § 4336(b)(2)) ("FRA Amendments"). The regulations required that agencies "involve environmental agencies, applicants, and the public, to the extent practicable, in preparing [EAs]," 40 C.F.R. § 1501.4(b) (1978), which entitled the public to notice of, and involvement in, the preparation of an EA, *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003), and to "sufficient environmental information" to allow "the public to weigh in," *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008).

For nearly five decades, CEQ's regulations retained this fundamental public participation framework for the preparation of EISs and EAs, despite several regulatory overhauls undertaken by different administrations beginning in 2020, until President Trump directed CEQ to rescind its regulations last year, *infra* 12-14.[1]

**2. USDA, Interior, and Sub-Agency Guidelines and Regulations**

As required by NEPA Section 102(2)(B) and E.O. 11514, USDA and Interior each developed their own NEPA "methods and procedures" shortly after the law's enactment.

---

[1] Each of the foregoing CEQ provisions remained in effect until CEQ rescinded its NEPA regulations last year, except CEQ's policy statements at sections 1500.1(b) and 1500.2(d), which CEQ removed in 2020, among others not at issue here. 85 Fed. Reg. 43304, 43316-17, 43357-58 (July 16, 2020). In 2024, CEQ restored the policy statements, among other provisions. 89 Fed. Reg. 35442, 35554 (May 1, 2024). The 2020 and 2024 rulemakings also reorganized the regulations. Citations to the CEQ regulations are to the date of promulgation, per L.R. 3-4(d)(2). *See also generally* CEQ, CEQ NEPA Rulemaking, https://ceq.doe.gov/laws-regulations/regulations.html (last visited June 17, 2026) (cataloguing CEQ rule changes since 1971).

USDA's procedures largely tracked CEQ's Guidelines, including requirements for public comment on draft EISs. 36 Fed. Reg. 23666, 23669 (Dec. 11, 1971) ("Comments and views of the public will be solicited."). USDA's sub-agencies' NEPA guidelines followed suit. *See, e.g.*, *id.* 29671 (Forest Service: "[T]he responsible official should distribute copies [of the Draft EIS] to, and solicit comments from[,] . . . the public."); 39 Fed. Reg. 40048, 40050 (Nov. 13, 1974) (APHIS requiring that EISs be "prepared in two stages," with a "draft" that would be subject to "review and comment by other Agencies and the public"). Interior's guidelines similarly tracked CEQ's for itself and its bureaus. *See* 36 Fed. Reg. 19344 (Oct. 2, 1971) (Interior bureaus "[s]hall give public notice . . . of the availability of draft [EISs] and invite comments.").

After CEQ promulgated its regulations in 1978, many agencies including USDA and Interior replaced their internal guidelines with enforceable regulations. Over the following decades, Interior, USDA, APHIS, and the Forest Service each separately maintained their own NEPA regulations and robust public participation procedures.

**USDA** - In 1979, USDA "incorporate[d] and adopt[ed]" CEQ's regulations into its own regulations, including public participation requirements for draft EISs and EAs. 7 C.F.R. § 3100.20(a) (1979) (subsequently recodified at 7 C.F.R. Parts 1b and 1c, 48 Fed. Reg. 11403 (March 18, 1983)).

**APHIS** – In 1995, USDA sub-agency APHIS replaced its NEPA guidelines with regulations requiring that "[a]ll public and other involvement in APHIS' [EIS] process . . .will be pursuant to CEQ's implementing regulations." 7 C.F.R. § 372.8(b)(1) (1995); *see* 60 Fed. Reg. 6000 (Feb. 1, 1995). The regulations also required that APHIS provide public notice of "the availability of [EAs]," 7 C.F.R. §§ 372.8(b)(3), 372.9(a)(1), and of "[o]pportunities for public involvement in the [EA] process," *id.* § 372.8(b)(2).

**Forest Service** - In 2008, USDA sub-agency Forest Service codified CEQ's procedures into its own regulations, 73 Fed. Reg. 43084 (July 24, 2008), stating that its NEPA regulations are "to be used in conjunction with the CEQ regulations and USDA regulations at 7 CFR part 1b," 36 C.F.R. § 220.1(b) (2008). In addition, the Forest Service's regulations independently required that public scoping process requirements, *supra* pp. 7-8, apply to "all Forest Service

proposed actions," including actions reviewed under an EA, and "including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS." 36 C.F.R. § 220.4(e)(1) (2008). The regulations also required the agency to maintain a "Schedule of Proposed Actions," or "SOPA," *id.* § 220.4(d), which functioned as an online notification system for all proposed actions. For many actions approved under a categorical exclusion, the Forest Service was required to issue a "decision memo" providing the public with notice of, and details about, the project. *Id.* § 220.6(e), (f).

Each of the foregoing USDA and USDA sub-agency provisions remained unchanged until their rescission through USDA's Interim Final Rule.

**Interior** - In 1980, Interior incorporated CEQ's regulations into its internal agency NEPA handbook. 45 Fed. Reg. 27541, 27544 (April 23, 1980). In 2008, Interior codified its procedures into regulations, 73 Fed. Reg. 61292, 61292-93 (Oct. 15, 2008), and directed that their regulations "be used in conjunction with[] the CEQ regulations." 43 C.F.R. § 46.20(a) (2008). Interior's regulations also independently required public participation in the preparation of EISs and EAs. Specifically, the 2008 regulations provided that an Interior bureau "must seek comment from the public as part of the . . . notice of availability for a draft environmental impact statement," *id.* § 46.435(a), and "must, to the extent practicable, provide for public notification and public involvement when an environmental assessment is being prepared," *id.* § 46.305(a).[2]

***

In sum, this regulatory history reflects that public participation has, since NEPA's enactment, been "at the heart of the NEPA review process," reflecting "the paramount Congressional desire to internalize opposing viewpoints into the decisionmaking process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision." *California*, 690 F.2d at 771 (citation omitted). Accordingly, public notice and comment has long been a primary tool for carrying out NEPA's action-forcing purpose: "the

[2] Some provisions were subsequently recodified or renumbered. All citations to USDA's, Interior's, and sub-agencies' regulations reference the date of promulgation, per L.R. 3-4(d)(2).

broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time," *Marsh*, 490 U.S. at 371, and is "almost certain to affect the agency's substantive decision," *Robertson*, 490 U.S. at 350.

**II. NEPA's Implementation and Effectiveness Since Enactment**

Multiple studies have documented the effectiveness of CEQ's longstanding NEPA framework for public involvement in improving agency decisionmaking, as intended by Congress's action-forcing design. For example, CEQ published a study in January 1997 that evaluated NEPA's effectiveness over its first 25 years of implementation. DOI-10773; USDA-6071.[3] The study described public input as a "critical innovation" that "provides agencies an extraordinary opportunity to respond to citizen needs and build trust in surrounding communities." DOI-10798. According to information and case studies gathered by CEQ, this process has "improved the quality of projects and reduced impacts on the environment." *Id.*; *see also* DOI-14569; USDA-9784 (2010 compilation of "NEPA success stories" resulting in part from public comment).

A second study, published in June 2025, analyzed 108 EIS processes spanning 22 years. DOI-15771; USDA-22325. That widely cited study "test[ed] NEPA's fundamental hypothesis about the value of public comment," DOI-15774, and found that "public comments resulted in substantive decision alterations in 62% of cases." DOI-15772. Of these examples where public comment influenced agency decisionmaking, "64% show[ed] modification to alternatives, 42% show[ed] modifications to mitigation plans and 11% [led] to the selection of an entirely new preferred alternative." *Id.* Within those EISs, agency officials credited public comments as the reason for changing project alternative 88% of the time, and credited public comments as the cause of modifying mitigation plans or selecting a different alternative 100% of the time. *Id.* The study concluded that "public comment influences agency decisions and is a valuable tool for

[3] "DOI-xxxx" and "USDA-xxxx" denote citations to Interior's and USDA's administrative records.

agencies to gather information and refine plans, which could lead to more sustainable outcomes for affected communities and the natural world." DOI-15777.

Another analysis of Forest Service project decisions showed that public scoping resulted in substantive changes to agency decisions in most cases. In a sample of 68 Forest Service "restoration" projects, 60 were modified during the NEPA process, including 37 that were substantially modified between public scoping and the EA. USDA-28862 (citing USDA-28961; USDA-29122). Forty-three of the 68 projects (63.2%) were substantively modified based on public input. USDA-29115-19; USDA-29121-22. Project changes included reducing acreage (collectively, a reduction of 127,699 acres, or one out of every five acres, USDA-29022), reducing the lengths of roads or changing their locations, changing timber harvest types or harvest locations, and dropping activities entirely. USDA-29023-34. In 6 of the 68 projects (8.8%) the Forest Service "gathered additional information, performed additional analysis, or developed alternative(s) for comparison," in response to public concerns. USDA-29034.

## III. Executive Order 14154 and Interior's and USDA's Rescission of their NEPA Regulations

On January 20, 2025, President Trump issued Executive Order 14154. Section 5 of the Order revoked President Carter's E.O. 11911, including its mandate that CEQ promulgate NEPA regulations, and directed CEQ to "propose rescinding CEQ's NEPA regulations found at 40 CFR 1500 *et seq.*" within 30 days. Exec. Order 14154, § 5(b). E.O. 14154 also stated that "[i]t is the policy of the United States . . . to guarantee that all executive departments and agencies . . . provide opportunity for public comment." *Id.* § 2(h).

On February 25, 2025, CEQ issued an Interim Final Rule rescinding its NEPA implementing regulations, effective April 11, 2025. 90 Fed. Reg. 10610 (Feb. 25, 2025). According to CEQ, the rule was necessary because it no longer had authority to issue binding NEPA regulations following the revocation of E.O. 11911. *Id.* at 10613; *see also id*. at 10613-14 (discussing recent cases that held CEQ lacked statutory authority to issue binding regulations). CEQ issued guidance directing agencies to update their NEPA procedures within 12 months. *See*

CEQ, Memo. for Heads of Fed. Dept's and Agencies, Implementation of the National Environmental Policy Act, at 7 (Feb. 19, 2025) (DOI-16860).

On July 3, 2025, Interior and USDA issued nearly identical "Interim Final Rules," each of which rescinded the respective Department's longstanding NEPA regulations. 90 Fed. Reg. 29498 (July 3, 2025) (Interior); 90 Fed. Reg. 29632 (July 3, 2025) (USDA). Each Rule took effect immediately, without advanced notice, and without public comment. These rushed rulemakings reversed decades-old policies on NEPA implementation, citing E.O. 14154's direction to "prioritize efficiency and certainty over any other objectives, including those of activist groups." 90 Fed. Reg. at 29500; *id*. at 29634. In addition, both Rules eliminated requirements to publish a draft EIS and allow the public to comment on it before issuing a final EIS. *Id.* at 29501; *id.* at 29632**.** Both Rules limited mandatory public comment opportunities to when the agency first announces its intent to prepare an EIS. *Id.* at 29500; *id.* at 29634—before a project's impacts are evaluated and disclosed and before any alternatives are developed*, see* 42 U.S.C. § 4336a(c). Each Rule also eliminated the public's right to involvement in the preparation of EAs. 90 Fed. Reg. at 29501; *id.* at 29632.

Interior removed nearly all of its NEPA procedures from the Code of Federal Regulations to its internal "Handbook of NEPA Procedures" (cited herein as "516 DM 11" with the current version located at DOI-268). This move rendered those former requirements—including any concerning public participation—merely "guidance." 516 DM 1, at Section .01.

USDA's Interim Final Rule also specifically rescinded each of its sub-agencies' regulations, eliminating other public participation requirements in the process. *See infra* pp. 35-37. These include the obligation to solicit comments at the scoping stage on "all Forest Service proposed actions," including actions proposed pursuant to an EA or CE. 36 C.F.R. § 220.4(e)(1) (2008). This requirement—which went beyond CEQ's requirement for public scoping on EISs, 40 C.F.R. § 1501.7(a)(1) (1978); *see also id.* § 1502.4(a) (2024) (last version in effect before rescission)—applied broadly to require the solicitation of early public input from other agencies, Tribes, state and local governments, and the public to define the scope of issues to be evaluated. *See* 40 C.F.R. § 1501.7(a)(1) (1978) (incorporated at 7 C.F.R. § 1b.1(a) (1983)).

Both Interior and USDA made their Interim Final Rules immediately effective, claiming they were "procedural" rules, "interpretive rules," and/or "general statements of policy" exempt from notice-and-comment rulemaking under 5 U.S.C. § 553(b)(A). 90 Fed. Reg. at 29502; *id.* at 29644. They also claimed that the Administrative Procedure Act's (APA) "good cause" exemption, 5 U.S.C. § 553(b)(4)(B), (d)(3), justified making the rules immediately effective. Nonetheless, each Department established a 30-day, after-the-fact public comment period for these "final rules." 90 Fed. Reg. at 29503; *id.* at 29645. Interior and USDA received more than 600 and 6,000 public comments, respectively, on their Interim Final Rules—many of which opposed the elimination of public participation procedures, including Plaintiffs' comments, DOI-15815; DOI-15380; USDA-14548; USDA-28657; USDA-29585.

On February 24, 2026, Interior issued a "Final Rule," which purported to "adopt," "affirm[]," "reaffirm[]," and "supersede[]" the Interim Final Rule that preceded it. 91 Fed. Reg. 8738, 8741, 8748 (Feb. 24, 2026). The Final Rule retained the evisceration of Interior's public participation requirements, including eliminating the requirement to publish a draft EIS for each proposal and solicit comment on it, as well as the requirement to involve the public in preparing EAs "to the extent practicable." *See* 91 Fed. Reg. at 8752. USDA followed suit on April 3, 2026, issuing its own Final Rule that purported to "adopt[]," "affirm," and "reaffirm[]" the Interim Final Rule that preceded it. 91 Fed. Reg. 17062, 17063 (April 3, 2026). Both Rules provided that agency officials would have the unfettered discretion whether to solicit public comment, citing the need to limit "unnecessary regulatory burdens," 91 Fed. Reg. at 8751 (Interior), or "undue process," *id*. at 17076 (USDA).

**STANDARD OF REVIEW**

In matters of statutory construction, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires," and determine the "best reading" of the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400, 412 (2024); *see also Ctr. for Biological Diversity v. U.S. Dep't of Interior*, No. 24-cv-04651-JST, 2026 WL 898264, at *8 (N.D. Cal. March 30, 2026) (requiring agencies to "adopt the best possible interpretation of the statute" (internal citations omitted)).

The APA requires that reviewing courts "shall [] hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (D). An action is arbitrary and capricious if the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible the it could not be ascribed to a difference in view or the product of agency expertise." *Def. of Wildlife v. Zinke*, 856 F.3d 1248, 1257 (9th Cir. 2017) (internal citation omitted).

## ARGUMENT

### I. Plaintiffs Have Standing.

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). An association has standing to bring suit on behalf of its members when "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 181. The public participation and environmental protection interests at stake here are germane to both Plaintiffs' organizational missions, *see* Cummings Decl. ¶¶ 3-9; Craven Decl. ¶¶ 2-7, and individual member participation is not required to resolve or remedy the lawsuit's purely legal administrative procedure claims.[4]

#### A. Plaintiffs Have Standing to Bring Their Substantive NEPA Claims.

[4] All declarations cited in this motion are attached to this motion. They update and supplant those declarations filed in support of Plaintiffs' prior Motion for Partial Summary Judgment in the *USDA* case, Case No. 3:226-cv-00866-JSC, Dkts. 20, 20-1 to 20-14, on which briefing has been stayed, Dkt. 37.

Plaintiffs' members have suffered injury from implementation of the challenged Final Rules, including the Rules' denial of the right to comment on draft EISs and participate in EA-based decisions, in violation of NEPA. *Friends of the Earth*, 528 U.S. at 180-81. First, Plaintiffs establish that Defendants' application of the Final Rules to specific planned projects threatens harm to their members' interests in areas that they visit and enjoy. *See, e.g.,* Mannchen Decl. ¶¶ 8-9, 12-13, 19; Gibson Decl. ¶¶ 3-11; Freeman Decl. ¶¶ 3, 11-12; McMahon Decl. ¶¶ 3-9. The elimination of guaranteed public notice and comment on draft EISs will result in "added risk to the environment that takes place when governmental decisionmakers make up their mind without having before them an analysis (with public comment) of the likely effects of their decision on the environment," *Citizens for Better Forestry*, 341 F.3d at 971, thereby threatening injury to Plaintiffs' members' aesthetic, recreational, educational, wildlife-viewing, and other interests. Mannchen Decl.¶¶ 15-22; Gibson Decl. ¶ 13; Freeman Decl. ¶¶ 7-12; McMahon Decl. ¶ 11. These injuries are traceable to the Final Rules, and vacatur of the Final Rules would redress these injuries by restoring the status quo ante.

**B. Plaintiffs Have Satisfied the Requirements for Procedural Standing.**

Plaintiffs' members have also suffered injury from the development and implementation of the challenged Final Rules, in violation of the APA. *Friends of the Earth*, 528 U.S. at 180-81. Plaintiffs establish an injury-in-fact where the APA's procedural requirements invoked "are designed to protect" their members' "threatened concrete interest[s]" in recreation, scenic and aesthetic enjoyment, and other interests, *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 35 (9th Cir. 2025), such as the APA's "prohibition on arbitrary and capricious decisionmaking," *Ctr. for Biological Diversity*, 2026 WL 898264, at *7 (procedural standing established where plaintiffs' concrete interests were "affected by" poorly explained rule). And Plaintiffs have demonstrated that their members' concrete interests are threatened "by virtue of their geographic proximity to and use of areas that will be affected by" Defendants' policies reducing public participation in NEPA reviews, by Defendants' failure to reasonably explain the change in policy before it took effect, and by the "added risk to the environment" caused by the new policy, *Citizens for Better*

*Forestry*, 341 F.3d at 971; *see, e.g.*, Bugbee Decl. ¶¶ 2-26; Mannchen Decl. ¶¶ 5-23; Burdette Decl. ¶¶ 3-24; Craven Decl. ¶¶ 8-20.[5]

Plaintiffs also easily meet their "relaxe[d]" burden for showing causation and redressability for procedural violations. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv*., 789 F.3d 1075, 1083 (9th Cir. 2015). Plaintiffs' members' threatened injuries are traceable to Interior's and USDA's unlawful elimination of rights to public participation. And vacatur and reconsideration of the Final Rules on remand, in compliance with the APA's requirements for reasoned decisionmaking "*could* protect" their members' concrete interests—and redress injury to those interests—by resulting in rules that restore public participation in NEPA reviews. *See Ctr. for Biological Diversity v. U.S. BLM*, 141 F.4th 976, 1008 (9th Cir. 2025) (citing *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc)). *See*, *e.g.*, Akland Decl. ¶ 16; Bugbee Decl. ¶ 27; Burdette Decl. ¶ 24; Mannchen Decl. ¶ 24.

**C. Plaintiffs Have Organizational Standing.**

Although Plaintiffs' membership interests are sufficient to establish standing, Plaintiffs also have organizational standing to bring suit on their own behalf because the Departments' rulemakings directly undermine their ability to engage in "core business activities." *See Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1172 (9th Cir. 2024) (citation omitted). Participating in NEPA processes has long been fundamental to Plaintiffs' ability to pursue their basic missions. Craven Decl. ¶¶ 6-7; Cummings Decl. ¶¶ 4-6; Boulton Decl. ¶¶ 10-15, 17-23, 25-26. Defendants' elimination of public notice and comment requirements drastically impairs Plaintiffs' ability to engage in the routine monitoring of, submitting comments on, and educating members and the public about, agency actions bearing on Plaintiffs' organizational missions, which include protecting biodiversity, imperiled species, and the species they depend on, Cummings Decl. ¶¶ 2, 18 (Center), and protecting lands, waters and wildlife, Craven Decl. ¶¶ 3-

---

[5] *See also* Akland Decl. ¶¶ 2-16; McSpadden Decl. ¶¶ 5-22; Parker Decl. 2-13; Bass Decl. ¶¶ 2-16; Augustine Decl. ¶¶ 2-10; Stanley Decl. ¶¶ 1-21; Porter Decl. ¶¶ 2-20; Nowicki Decl. ¶¶ 3-23; Town Decl. ¶¶ 2-22; Curran Decl. ¶¶ 2-23; Hunkler Decl. ¶¶ 2-18; Jespersen Decl. ¶¶ 2-20; Shannon Decl. ¶¶ 2-32; Weisheit Decl. ¶¶ 3-29; Harlan Decl. ¶¶ 2-25; Boulton Decl. ¶¶ 2-26.

4 (Sierra Club). These rule changes have made it substantially harder—or in some cases impossible—for Plaintiffs to engage in these "core business activities," Cummings Decl. ¶¶ 3-20; Henderson Decl. ¶¶ 6-23; Nowicki Decl. ¶¶ 18-23; Freeman Decl. ¶¶ 13-22; Craven Decl. ¶¶ 7-13, thus causing "concrete and demonstrable injur[ies]." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 988 (9th Cir. 2025). Vacatur of the rulemakings would redress these harms. *See, e.g.*, Cummings Decl. ¶ 21.

In sum, because Plaintiffs' members have standing to pursue both the alleged substantive NEPA and APA procedural violations on their own, Plaintiffs may bring this suit on behalf of their members. Plaintiffs also have standing to bring this suit in their own right.

## II. Interior and USDA's Replacement of Public Participation Procedures with Agency Discretion Violates Congress's Ratification of Public Comment Requirements and NEPA's Mandate that Agencies Rely on "Methods and Procedures."

Since 1970, federal agencies have required extensive public involvement in NEPA reviews, such as CEQ's, Interior's, and USDA's rules requiring that each final EIS be preceded by a draft version and an opportunity for public comment, and that an agency's preparation of an EA involve the public "to the extent practicable." These procedures reflected the broad recognition that "a NEPA document is an important 'springboard for public comment' and engagement" on proposed agency actions with potentially significant environmental impacts. *WildEarth Guardians*, 135 F.4th at 728 (citing *Robertson*, 490 U.S. at 349). Through multiple enactments aimed at speeding up NEPA reviews, Congress has affirmatively and consistently approved the CEQ's prior framework, endorsing public participation procedures as both a necessary and "practicable means" of achieving NEPA's environmental protection goals—often with respect to projects affecting the public interest and management of public lands. 42 U.S.C. § 4331(b). The Departments' decision to eliminate these procedures violates Congress's ratification. Moreover, the Departments' across-the-board replacement of binding, enforceable public participation procedures with unbridled discretion for soliciting public input violates Congress's mandate that agencies use "methods and procedures" to "*ensure*" the consideration of "environmental amenities and values." *Id.* § 4332(2)(B) (emphasis added).

**A. Congress Affirmed CEQ's Public Participation Framework as a "Practicable," and Thus Required, Means of Implementing NEPA.**

Congress's repeated incorporation of CEQ's and other agencies' longstanding draft EIS and EA public participation procedures into statutory requirements that streamline NEPA review endorsed those procedures as a "practicable" and therefore necessary means of effectuating NEPA. The Departments' removals of those procedures against Congress's ratification violate NEPA. Congress may "effectively ratif[y]" "long-held" agency practice or statutory constructions through subsequent amendments to a statute or other related enactments, where those enactments "preclude[]" a contrary interpretation. *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 144 (2000); *see also Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981) (interpreting Congress's enactments governing procedures for executive agreements with foreign governments as an "implicit[]" "stamp of approval" on those agreements). "The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute. . . . Thus, a specific policy embodied in a later federal statute should control [courts'] construction of the earlier statute, even though it has not been expressly amended." *Brown & Williamson*, 529 U.S. at 143 (citation modified); *cf. Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 889 (9th Cir. 2017) (holding Congress's "legislative action" implicitly "preserve[d]" agency's "entrenched" policy).

CEQ and agencies have long required public comment on draft EISs and public involvement in EAs as a practicable means of furthering NEPA's goals. *Supra* pp. 6-11. Two overarching statutory commands led to the adoption of public participation procedures for draft EISs and EAs. First, Congress directed that agencies develop standard "methods and procedures" to "ensure" the consideration of "unquantified environmental amenities and values." 42 U.S.C. § 4332(2)(B). Second, Section 101 of NEPA declares the Federal government's (1) "continuing policy" to "use all practicable means and measures" to fulfill NEPA's environmental policy objectives, "in cooperation with . . . concerned public and private organizations," *id*. § 4331(a) (listing objectives), and (2) "continuing responsibility" to "use all practicable means, consistent

with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources" to meet NEPA's environmental protection goals, *id*. § 4331(b) (describing those goals). Importantly, this "declaration of national environmental policy" is not just aspirational but governs how agencies "administer" NEPA and other regulatory duties. *Id*. § 4332(2). Congress directed that "to the fullest extent possible" agencies "shall" interpret and administer "policies, regulations and public laws of the United States," in accordance with NEPA's Section 101 "policies." *Id*. § 4332(1). As CEQ noted in its 1978 rulemaking, "NEPA requires that each Federal agency use 'all practicable means and measures' to protect and improve the environment." 43 Fed. Reg. at 55986 (citing 42 U.S.C. § 4331(b)).

Accordingly, in 1978, to standardize the NEPA process, CEQ promulgated regulations applying to all Federal agencies and required a minimum 45-day public comment period on draft EISs. 40 C.F.R. § 1506.10(c) (1978). The 1978 regulations also allowed preparation of a less rigorous EA instead of an EIS but required agencies to involve the public in the preparation of an EA "to the extent practicable." *Id*. § 1501.4(b). Interior and USDA incorporated these procedures into their own NEPA regulations. *Supra* pp. 9-10.

Subsequent statutory history evinces Congress's repeated endorsement of these public participation procedures as a practicable means of achieving NEPA's objectives, in cooperation with the public. *See Brown & Williamson*, 529 U.S. at 143. Since enacting NEPA, Congress has enacted multiple laws seeking to *expedite* NEPA reviews for specific categories of projects, while leaving agency draft EIS and public comment requirements largely intact. For example, in the Fixing America's Surface Transportation Act ("FAST Act"), Pub. L. No. 114-94, 129 Stat. 1741 (2015) (codified at 42 U.S.C. § 4370m-4(d)(1)), Congress set both minimum and maximum lengths for public comment on draft EISs —"not less than 45 days" and "not more than 60 days"—for certain transportation, energy, manufacturing, and other projects, *id.* § 4370m(6). Significantly, that Congress set a minimum 45-day comment period—paralleling CEQ's requirement—in a statute intended to fast-track NEPA reviews reveals Congress's intent that public comment on a draft EIS is an indispensable part of the EIS preparation process. If FAST Act projects were subject to a minimum 45-day comment period, while non-expedited projects

had no comment period, that would lead to absurd results that "plainly contradict congressional policy," *Brown & Williamson*, 529 U.S. at 139, "since "fast-tracked" projects would actually require more process, rather than less.

Congress also expressly required in the FAST Act that expedited projects comply with CEQ's other public comment procedures. 42 U.S.C. 4370m-4(d)(2) ("For all other review or comment periods in the environmental review process described in parts 1500 through 1508 of title 40, Code of Federal Regulations (or successor regulations), the lead agency shall establish a comment period not more than 45 days after the date on which the materials on which comment is requested are made available . . . ."); *see* 16 U.S.C. § 6514(g) ("In accordance with section 102(2) of [NEPA] . . . and the applicable regulations and administrative guidelines, the Secretary shall provide an opportunity for public comment during the preparation of any [EA] or [EIS] for an authorized hazardous fuel reduction project."); *id.* § 6592c(c)(3) (requiring same for emergency actions).

Other NEPA streamlining provisions express Congress's awareness of CEQ draft EIS and EA public involvement procedures existing outside the statute, but set time limits on those procedures, "implicitly approv[ing]" their baseline requirements. *Dames*, 453 U.S. at 680. For example, Congress limited the time to prepare a draft EIS—the purpose of which has always been to provide a "springboard for public comment," *Robertson*, 490 U.S. at 349—for certain mining and infrastructure projects. 16 U.S.C. § 3164(e) (nine months for any Alaska transportation and utility system project); 30 U.S.C. § 1419(d) (180 days for deep sea mining projects); *see* 15 U.S.C. § 720b(c)(1)(B), (d)(1) (one year for Alaska natural gas pipeline projects); 42 U.S.C. § 9117(e) (180 days for ocean thermal conversion facilities). Congress also limited the length of draft EIS and EA public comment periods. *See, e.g.,* 33 U.S.C. § 2348(g)(2)(A) (establishing draft EIS comment period of "not more than 60 days" for "acceleration" of water resource development projects); 23 U.S.C. § 139(g)(2)(A) (same for "efficient environmental reviews" for highway projects); 33 U.S.C. § 2348(g)(2)(B) ("For all other comment periods established by the Federal lead agency for agency or public comments in the environmental review process, a period of not more than 30 days after the date on which the

materials on which comment is requested are made available. . . . .); 23 U.S.C. § 139(g)(2)(B) (same for highway projects). Notably, Congress again approved of these procedures, even after the 2023 FRA Amendments set a two-year deadline for the completion of EISs, Builder Act, Pub. L. No. 118-5, § 107(g)(1)(A) (codified at 42 U.S.C. § 4336a(g)(1)(A)). Less than a year later, Congress passed the FAA Reauthorization Act of 2024, Pub. L. No. 118-63, 138 Stat. 1307 (May 16, 2024), which set a 60-day maximum public comment period on draft EISs for "expedited-coordinated" reviews for aviation projects, 49 U.S.C. § 47171(m)(2)(A).

In sum, Congress's repeated affirmations that agencies are to involve the public in draft EISs and/or in preparing EAs, even where projects must be expedited, effectively ratified CEQ's and federal agencies' longstanding position that public participation requirements in NEPA reviews are a "practicable means" to achieving NEPA's policies and purposes "in cooperation with the public and private organizations," *see* 42 U.S.C. § 4331(a)-(b), and are therefore required as part of the NEPA review process. Interior's and USDA's rescissions of these public participation requirements violate 42 U.S.C. §§ 4331(a)-(b) and 4332.

**B. Defendants' Failure to Have Any Procedures Concerning Public Comment on Draft EISs and Public Involvement in the Preparation of EAs Violates NEPA.**

USDA and Interior's rulemakings each state that rather than requiring public comment, their respective NEPA regulations now allow agencies to use their discretion to solicit public comment, when they determine it would "assist in reasoned decisionmaking," 91 Fed. Reg. at 17077 (USDA), or would be "appropriate or helpful," *id.* at 8752 (Interior). But the replacement of mandatory public participation procedures with unfettered agency discretion is plainly inconsistent with NEPA, which requires that agencies "identify and develop methods and procedures" to "ensure that presently unquantified environmental amenities and values may be given appropriate consideration." 42 U.S.C. § 4332(2)(B). A "method" is "a procedure or process for attaining an object: such as . . . a systematic procedure, technique, or mode of inquiry employed by or proper to a particular discipline or art." *Method*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/method (last visited June 15, 2026). Similarly, a "procedure" is "a particular way of accomplishing something or of acting," or "a

series of steps followed in a regular definite order." *Id.* at https://www.merriam-webster.com/dictionary/procedure (last visited June 15, 2026). Both statutory terms connote something more standardized, "systematic," and defined than the Departments' broad conferral of uncabined discretion on agency officials to invite public input.

Indeed, nothing in USDA's or Interior's regulations requires agency officials to even *consider* soliciting public comments for each individual project, or to determine whether public participation would "assist in reasoned decisionmaking," be "appropriate," or be "helpful." *See generally* 7 C.F.R. §§ 1b.7(n)(1), 1b.5 (2025); 516 DM 1, Appendix 1 at 29 (DOI-300) ("*recommend[ing]*" that officials "determine whether public involvement over and above the NEPA's requirements would be helpful") (emphasis added). Even if an official were to consider inviting public comment on a draft EIS or during the preparation of an EA, USDA's regulations lack any meaningful criteria officials must weigh in considering whether soliciting public input would be appropriate. *See, e.g.*, 7 C.F.R. § 1b.7(n)(1) (2025) (granting officials authority to prepare a draft EIS based on "their judgment"); *id.* § 1b.5(e)(3)(ii), (iii) (2025) ("[p]ublication of a notice of intent . . . for an [EA]" and "the decision to solicit comment on the notice of intent" "shall be at the sole discretion of the responsible official"). Although Interior's Handbook lists factors the agency may consider in deciding whether to offer public comment, 516 DM 1, Appendix 1 at 29 (DOI-300-301)—purportedly on a "case-by-case basis," 91 Fed. Reg. at 8751—these are still only unenforceable recommendations. *See id.* at 8748.

This discretionary approach also fails to "ensure" that environmental amenities and values are appropriately considered, as NEPA requires. Public input unquestionably plays a critical role in ensuring that agencies fully consider "all the environmental tradeoffs that are implicit in [their] decision[s]." *California*, 690 F.2d at 771. Recently, the Ninth Circuit recognized that the "potential costs of reducing public participation" include "insufficient consideration of the [project's] environmental impacts," "in direct tension" with NEPA's" aim to "consider every significant aspect of the environmental impact of a proposed action." *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 39 (9th Cir. 2025) (citation omitted). So too here. The Departments' making public comment—and even the question of whether to consider the

appropriateness of public comment—wholly discretionary falls short of the "methods and procedures" needed to "ensure" consideration of environmental values, and is in direct tension with NEPA's aims, in violation of 42 U.S.C. § 4332(2)(B).

## III. Interior and USDA Fail to Adequately Explain Their Removal of Longstanding Mandatory Public Participation Requirements

Aside from violating NEPA and ignoring congressional ratification, USDA's Interim Final Rule provided only a cursory explanation for its rescission of public participation procedures, while Interior failed to even acknowledge it. And earlier this year, the Departments issued Final Rules, broadly affirming those changes while providing only a cursory and minimal rebuttal to comments, in violation of their APA duties to engage in reasoned decisionmaking.

It is bedrock administrative law that when the government changes its position, it must acknowledge the change and cogently explain its departure from prior agency practice. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *Organized Village of Kake v. Dept. of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc). Thus, "unexplained inconsistency" between an agency's actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Id*. at 966 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

For an agency's policy change to comply with the APA, the agency must (1) display awareness that it is changing position; (2) provide "good reasons" for the new policy, including a rational explanation "for disregarding facts and circumstances that underlay or were engendered by the prior policy;" and (3) show that the new policy is permissible under the relevant statute.[6] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); *see also State Farm*, 463 U.S. at 42 (explaining that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance"). In addition, "when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that were 'within the ambit of the existing

---

[6] Plaintiffs do not contest that the Defendants "believe" their new policies are better, as also required under *Fox Television* and its progeny. *See Kake*, 795 F.3d at 966 (citation omitted).

[policy].'" *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 51).

Both Departments' rulemakings enacted significant revisions to their longstanding NEPA frameworks. They removed requirements to publish a draft EIS and solicit comment on it, 43 C.F.R. § 46.435(a) (2008); 40 C.F.R. § 1503.1(a) (1978) (CEQ regulation incorporated into USDA regulations), instead guaranteeing public participation only at the early "notice of intent" stage when the details of the proposed project are not fully developed, the agency has not evaluated an array of alternatives (including the choice to not do the project at all), and the potential impacts of the project have not yet been identified or analyzed. *See* DOI-16024; USDA-5311; USDA-13908. In addition, both USDA and Interior removed requirements to provide public notice of, and public involvement in, the preparation of EAs "to the extent practicable," 43 C.F.R. § 46.305(a) (2008); 40 C.F.R. § 1501.4(b) (1978), instead making public notice and public involvement fully discretionary, 91 Fed. Reg. at 8751; *id*. at 17077. Beyond this, USDA eliminated Forest Service-specific public participation requirements, such as providing early public participation opportunities or "public scoping" on all EA and CE projects; publishing a "decision memo" informing the public of a project undertaken pursuant to a CE; and, maintaining an online "schedule of proposed actions" to keep the public informed about upcoming projects. 36 C.F.R. §§ 220.4(d), (e), 220.6(f) (2008).

Neither USDA nor Interior even fully recognize that their new regulations reflect a change in position, *Fox Television*, 556 U.S. at 515, instead suggesting their prior policies were solely attributable to CEQ's now-rescinded regulatory framework and that CEQ's rescission of its regulations compelled rescission of each Department's former CEQ-based framework. 91 Fed. Reg. at 8749; *id*. at 17075. This ignores the fact that both Departments' public participation requirements predated the parallel CEQ regulations, *supra* pp. 8-9, as well as that both Departments had explicitly incorporated CEQ's regulations into their own, *supra* pp. 9-10, by extension making them part of their own policies.

Moreover, as explained below, Defendants fail to provide "good reasons" for their decision to upend these longstanding NEPA frameworks. And they ignore significant evidence

and public comments on their respective Interim Final Rules explaining that removal of their longstanding public participation procedures undermines NEPA's informed decision-making and action-forcing purpose and Defendants' purported goals. In addition, they cannot show that their new policies are consistent with NEPA's statutory requirements, especially as those requirements have been refined and clarified by decades of congressional approval of the Departments' and CEQ's interpretations as practicable—and thus required—means of implementing NEPA. And neither Department considered alternatives that could have achieved the same goals without getting rid of public comment procedures. For all of these reasons, their rulemakings are both inconsistent with NEPA and arbitrary and capricious.

**A. USDA and Interior Fail to Provide "Good Reasons" for Eliminating Public Comment on Draft EISs and Public Involvement in the Preparation of EAs.**

Because USDA and Interior do not fully acknowledge a drastic change in their own policies, they do not present any "good reasons" to explain the change, *Fox Television*, 556 U.S. at 515. Nor do their reasons for the new policy satisfy minimal APA scrutiny. USDA and Interior sweepingly claim that their NEPA regulatory overhauls are necessitated by the 2023 NEPA amendments' procedures streamlining NEPA reviews; E.O. 14154's directive that agencies must "prioritize efficiency and certainty over any other objectives"; and Supreme Court case law affirming that the standard of review in APA and NEPA cases entails "substantial deference."

As explained below, none of these authorities supports, much less compels, Defendants' sweeping rescissions of public participation requirements. USDA and Interior also perfunctorily assert that public participation requirements amount to "undue" and "unnecessary" process, ignoring the numerous public comments that explained how these procedures are essential to NEPA's bedrock informed decision-making purpose, democratic "good government," and the Departments' purported goals to promote efficient and certain outcomes for the agencies and project proponents. Rather, the Departments suggest public comment may be beneficial in some cases but claim that agency official discretion will continue to allow public participation where appropriate—without explaining how handing over free rein to agencies will necessarily mean

that agencies will reliably solicit public comment in appropriate cases. None of these flawed rationales constitute "good reasons" for eviscerating longstanding public participation rights.

**1. Defendants' Reliance on NEPA, E.O. 14154, and *Seven County* Is Misplaced.**

Defendants suggest that the abandonment of public notice and comment on draft EISs and public involvement in the preparation of EAs are compelled by statute, because the statute does not expressly require these procedures. 91 Fed. Reg. at 8751; *id.* at 17065, 17075. But the absence of an express statutory requirement requiring publication of a draft EIS is not by itself an adequate explanation for this change—especially where, as here, NEPA charges federal agencies with developing implementing procedures to "ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making." 42 U.S.C. § 4332(2)(B). Thus, NEPA explicitly requires that agencies develop procedures that go beyond the statutory text. Rather than carefully evaluating their longstanding procedures for informed decisionmaking, Defendants simply deem any unenumerated procedures "unnecessary," regardless of their historical and proven benefits to the NEPA process. 91 Fed. Reg. at 8751; *id.* at 17077. In doing so, USDA and Interior flip NEPA's statutory text and purpose on its head.

Even if the Departments were correct that the FRA implicitly limits their authority to maintain their longstanding public participation requirements (which they are not), those limits would also logically preclude the type of ad hoc discretion to impose extra procedures (such as public comment on a draft EIS) that both Defendants conferred on agencies in their Final Rules. *See, e.g.*, 516 DM 1, at Section 3.3 (discretion to publish "pre-decisional environmental documents"); 7 C.F.R. § 1b.7(n)(1) (2025) (providing USDA staff discretion to publish draft EIS). This unexplained and arbitrary line drawing finds no support in the statutory text.

Interior also claims that mandatory comment periods for all EISs and EAs "would not only go beyond statutory requirements but could be in tension with DOI's statutory obligation" to meet the FRA's respective two-year and one-year deadlines for completing an EIS and EA. 91 Fed. Reg. at 8751. But Interior makes no attempt to explore why these time limits are sometimes missed, much less show that even the minimal time investment in public comment does not yield benefits, including overall time savings, to the NEPA process, *infra* pp. 31-32. Further, a study

published by CEQ in January 2025 calls Interior's rationale into question. Analyzing all EIS timelines from 2010 to 2024, CEQ found that the government's EIS processing time was generally trending faster and had decreased by 28 percent from 2020 to 2024. DOI-460; USDA-16084.

Defendants' second rationale—that they must comply with the dictates of E.O. 14154 to "prioritize efficiency and certainty over any other objectives," § 5(c)—fares no better. *See* 91 Fed. Reg. at 8752; *id*. at 17066. An executive order cannot insulate agencies from the APA's arbitrary and capricious standard. *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). To hold otherwise "would shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen." *Id.* Thus, USDA and Interior must still provide rationales for their new policies beyond mere presidential fiat. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA[.]"); *New York v. Trump*, 811 F. Supp. 3d 215, 237-38 (D. Mass. 2025).

Moreover, by its own terms, E.O. 14154 does not support the elimination of public comment requirements. Rather, the order makes clear that the goal to "prioritize efficiency and certainty" does not trump the policy "to guarantee that all executive departments and agencies . . . provide opportunity for public comment," Exec. Order 14154, § 2(h). E.O. 14154 only prioritizes "efficiency and certainty over any other objectives . . . that do not align with the policy goals set forth in section 2 of this order," *id*. § 5(c), which include the opportunity for public comment set out in section 2(h). Indeed, keeping efficiency, certainty, and public comment on par makes sense because public comment promotes more efficient and certain outcomes. *Infra* pp. 31-32.

This leaves the government's third rationale: *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 177 (2025). 91 Fed. Reg. at 8740; *id*. at 17062. But that ruling in no way addressed, let alone dictated, that agencies dispense with requirements for public participation in agency NEPA reviews. Rather, the Supreme Court reaffirmed that NEPA is a "procedural" statute solely designed to enhanced agency decisionmaking; that has long been

black-letter NEPA law, and its recitation in *Seven County* hardly justifies elimination of public involvement in the NEPA processes that agencies do engage in, as set forth in rules at issue here. *See, e.g.*, *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978) ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural."). Moreover, the Supreme Court's core holding has no bearing here. *Seven County* was about whether the lower court had erred by second-guessing the agency's judgment not to analyze certain upstream and downstream effects in its NEPA analysis. 605 U.S. at 177. The Supreme Court wrote that reviewing courts should afford "substantial deference" to an agency's "determination of what details are relevant in an EIS," focusing on whether the agency's decision was "reasonably explained." *Id.* at 180. In other words, the Supreme Court reaffirmed judicial deference to an agency's ultimate evaluation of the facts before it, but it did not remotely suggest, let alone hold, that agencies should curtail or eliminate public comment.

In sum, neither NEPA's text, E.O. 14154, nor *Seven County* support the Departments' removal of public participation requirements from their NEPA regulations.

**2. Both Departments' Efficiency Rationales Are Arbitrary and Capricious.**

Defendants' other rationales for eliminating public comment requirements boil down to getting rid of "unnecessary" or "undue" process—ostensibly for the sake of reducing project delays and uncertainties for the benefit of oil and gas, mining, and other industries. 91 Fed. Reg. at 8751; *id*. at 17076. But in invoking these rationales, both USDA's and Interior's rulemakings fail to explain why these processes are "unnecessary" or "undue," except to say these procedures are not expressly required by statute. *Id.* That rationale blows past the public's long-held critical role in fulfilling NEPA's purpose that agencies "consider every significant aspect of the environmental impact of a proposed action," *Balt. Gas*, 462 U.S. at 97, so they can arrive at more environmentally conscious and protective decisions, *supra* pp. 4-5, 11-12. By attempting to narrowly define what process is required or beneficial in terms of the strict letter of the statute and executive policies, *supra* p. 27, USDA's and Interior's rulemakings arbitrarily fail to consider and weigh the costs of eliminating public comment to fulfilling NEPA's fundamental

informed decisionmaking and "action-forcing" purposes, and to other "good government" values, such as transparency, accountability, public trust, efficiency, and certainty.

*Montana Wildlife Federation v. Haaland*, in which the Ninth Circuit found almost identical efficiency-oriented rationales to be insufficient justification for a less significant curtailment of public participation procedures, is on point. 127 F.4th 1 (9th Cir. 2025). *Montana Wildlife* involved a challenge to BLM's reduction of public comment on oil and gas lease sales, from a 30-day comment period to 15-day period on EAs, among other changes. *Id.* at 39. BLM justified the changes as necessary to "simplify and streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease sales are consistently held." *Id.* at 23.

The Ninth Circuit held this rationale failed to justify the change. The court explained that BLM "failed entirely to acknowledge the potential costs of reducing public participation in leasing decisions, including that shortening the participation opportunity might lead to insufficient consideration" of environmental impacts. *Id.* at 39. In addition, the court concluded that BLM's decision to "prioritize administrative efficiency and expedition of oil and gas production over deliberative decision-making that takes into account informed public comments is in direct tension with NEPA," citing NEPA's aim to "consider every 'significant aspect of the environmental impact of a proposed action.'" *Id.* at 39 (citing *Balt. Gas*, 462 U.S. at 97). Thus, BLM "entirely failed to consider an important aspect of the problem"—"one embedded in NEPA"—and the court affirmed the district court's ruling that BLM's decision was arbitrary and capricious. *Id*. (citation omitted).

Like the agency action in *Montana Wildlife*, Defendants' cursory rationales are inadequate to justify their significant policy reversals. Like the efficiency-oriented rationale found inadequate in *Montana Wildlife*, the government's rationale here is that the new policies eliminate "undue" or "unnecessary process" and presumably lead to faster decisions. But, as in *Montana Wildlife*, the Departments have "failed entirely to acknowledge the potential costs of reducing public participation in leasing decisions," including that eliminating public participation "might lead to insufficient consideration" of environmental impacts, in "direct tension" with

NEPA's purpose to ensure informed decisionmaking. *Id.* at 39. Indeed, the situations where public participation will be most beneficial—when the public can provide additional and pertinent information about the proposed action—are also the ones where that participation is likely to add processing time while agency staff conduct additional analysis. This highlights a core tension in USDA's and Interior's rulemaking approaches: if eliminating public comment indeed speeds things up, it is only because it allows agency staff to avoid grappling with all of the environmental consequences of their decisions—in other words, deliberately engineering a NEPA analysis that fails to take the "hard look" the statute requires.

The loss of public participation benefits cuts even more deeply here than in *Montana Wildlife*, where BLM only halved the public notice and comment period for proposed lease sales. Here, in contrast, USDA and Interior eliminated longstanding public comment requirements for EISs and EAs altogether. As multiple commenters pointed out, public comment has long been shown to improve decisionmaking by alerting agencies to unrecognized environmental impacts and, in many cases, pushing agencies to adopt less-destructive alternatives while still meeting project purposes. *See, e.g.*, DOI-10619 (State of California et al.); DOI-15404 (members of Congress); DOI-15023 (growers association); DOI-16031 (water authority); USDA-4492 (timber trade association); USDA-5622 (water managers); DOI-15412 (National Trust for Historic Preservation). Public participation also serves a core democratizing function, making agencies accountable to the public and providing citizens an opportunity to weigh in on what happens to their public lands. *See, e.g.*, *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt*., 625 F.3d 1092, 1121 n.24 (9th Cir. 2010) (NEPA is a "democratic decisionmaking tool."); *cf. Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 758 (9th Cir. 1992) (explaining that APA's public comment "safeguards" "ensure that government agencies are accountable and their decisions are reasoned"); *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1027-28 (D.C. Cir. 1978) (explaining that APA's public comment procedures mandate a "degree of openness, explanation, and participatory democracy"). Beyond improving decisionmaking, this maximizes transparency and, as CEQ has noted, improves "trust in surrounding communities." DOI-10780; *see also* DOI-8646 (Administrative Conference of the United States: "Public participation is widely understood to

improve the quality, legitimacy, and acceptability of agency decision making."); USDA-15192 (EPA policy: public comment "promotes democracy and civic engagement"). Neither USDA's nor Interior's rulemakings acknowledge any of these costs of eliminating public comment.

Defendants also fail to address concerns from industry and others that eliminating public comment will actually make their NEPA processes less efficient. *See, e.g.*, DOI-974; DOI-15035; DOI-15097; DOI-16085; DOI-16878; DOI-16341-42; USDA-4492; USDA-4537; USDA-2117. Among other things, public comment alerts agencies to potential legal vulnerabilities, such as gaps in their NEPA analysis or non-compliance with substantive laws, and facilitates early identification and resolution of conflicts, including over competing public lands uses. Thus, by providing robust public engagement during the NEPA process and responding to public concerns in the final EIS or EA, agency officials can help ensure their decisions are legal, well-supported, and not subject to avoidable litigation. By eliminating public participation opportunities, Defendants have also made it more difficult to develop well-reasoned and legally durable decisions, which increases possibilities for projects to be tied up in litigation for years. As one industry commenter put it, "it is not the public input process that delays or precludes action, but rather the litigation that results of not using the public input process to improve implementation." USDA-2117. Overall, this results in less efficiency and more uncertainty for federal projects and for the private parties initiating them. In their Final Rules, Defendants fail to acknowledge or respond to this contradiction in their efficiency rationales.

The Departments failed entirely to consider these important aspects of the problem concerning their rules' costs to agency accountability, public trust, efficiency, and certainty—plus, the risk that significant environmental impacts and opportunities to improve environmental outcomes will be overlooked, contrary to NEPA's intent. These oversights resulted in arbitrary and capricious rulemakings. *See also W. Watersheds Project v. Kraayenbrink*, 620 F.3d 1187, 1208 (9th Cir. 2010) (holding BLM's "substantial reductions in the avenues for public input" because "such input is at times 'inefficient' and 'redundant'" was not reasonably explained, in light of agency's contradictory acknowledgments that "public input helps identify environmental impacts," and that meaningful public engagement reduces the likelihood of a contested decision).

These oversights are especially egregious because both Interior and USDA entirely failed to respond to comments raising these issues. Agencies must respond to "'significant' comments, *i.e.*, those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule." *Am. Mining Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (quoting *Home Box Office v. FCC*, 567 F.2d 9, 35 & n.48 (D.C. Cir. 1977)). Comments addressing whether the Departments' rulemakings served NEPA's core purpose of improving environmental decisionmaking, and whether those changes solved the purported "efficiency and certainty" problem that the Departments ostensibly aimed to solve, were significant enough that, had Interior and USDA considered them, they would have necessitated changes in the Departments' rules. In sum, both USDA and Interior lacked "good reasons" for eliminating their longstanding NEPA public participation frameworks, and their explanations for not retaining the CEQ-based framework were arbitrary.[7]

**3. USDA and Interior Fail to Establish that Public Comment Will Continue to Apply Where "Appropriate" or that Existing Procedures Are Adequate.**

Both Departments vaguely acknowledge that public comment can improve the NEPA process, without specifically identifying and evaluating the myriad ways in which agency decisionmakers, the public, and project proponents benefit, *see supra* pp. 11-12. *See* 91 Fed. Reg. at 8752 (Interior "agrees with comments describing how the agency decision-making process can be improved by public comments and other forms of public participation."); *id.* at 17077 (reciting same as to USDA). Rather than reckoning with the loss of these unidentified

[7] USDA briefly notes an additional excuse with respect to public participation in EA development: that the Forest Service's regulations at 36 C.F.R. parts 218 and 219 continue to "provide comment opportunities for certain EAs." 91 Fed. Reg. at 17077. This is a red herring. The Forest Service's part 218 and 219 regulations cannot replace the requirements to conduct scoping "early" in the NEPA review process and to provide public involvement in each EA "to the extent practicable." *See* 36 C.F.R. § 220.4(e) (2008) (referencing 40 C.F.R. 1501.7 (1978)); *see also* 91 Fed. Reg. at 17091 (noting that scoping "should not be conflated with" public comment opportunities in 36 C.F.R. parts 218 and 219). Moreover, recently the Forest Service proposed revisions to the 218 regulations, including further limits on EA public participation. *See id*. at 5387, 5394 (Feb. 6, 2026).

benefits, USDA and Interior seem to suggest that wholly discretionary public comment will be an adequate replacement. *Supra* p. 22.

As noted, the Departments' suggestion that agency officials' discretion will be exercised in every case to ensure appropriate application of public comment procedures is unsupported. Neither USDA nor Interior have any standard, enforceable "methods and procedures" to "ensure" that will happen. 42 U.S.C. § 4332(2)(B). *Supra* pp. 22-23. Both USDA and Interior leave it to chance whether agency officials will allow the public to comment—or, more likely, will withhold public comment periods to evade public scrutiny and accountability. There is thus "no rational connection" between the Departments' decisions to confer unfettered discretion on agency officials, and their assumption that agency officials will invite public participation when it would be "appropriate or helpful," 91 Fed. Reg. at 8752, or would "assist in reasoned decision-making," *id*. at 17077. *State Farm*, 463 U.S. at 43 (citation omitted).

Moreover, neither Department addresses the core problem here: that public comments convey information and ideas the agencies have not recognized on their own. Thus, Defendants cannot limit public comment to when the responsible official deems it "appropriate or helpful" without undermining the quality of NEPA reviews. If agency staff are unaware of a relevant issue, they will not recognize the need to ask for the public's help evaluating it.

The Departments also fail to adequately explain how comment solely at the "notice of intent" stage for an EIS is adequate, by itself, to ensure the environmental impacts of a proposal are adequately considered. *Cf.* 91 Fed. Reg. at 8752-53; *id*. at 17077. A notice of intent is issued at the early stages of the NEPA process, and need only include "preliminary" descriptions of the proposed project and alternatives, and, at most, a "brief summary of expected impacts." *See* 7 C.F.R. § 1b.7(b)(1) (2025); 516 DM 1, at Section 1.8(b)(1)-(2). Such notices often comprise only a few pages and lack site-specific information about affected resources. *See, e.g.*, 91 Fed. Reg. 29155 (May 19, 2026). While this early opportunity to comment on the project plays an important role by allowing members of the public to help identify and narrow issues the agency should consider at the outset of the NEPA process, it is no substitute for the opportunity provided under the prior regulations to evaluate the fully fleshed-out project and present opposing

viewpoints or new information and evidence, based on a fuller understanding of the project and its impacts. In their Final Rules, Defendants fail to address or explain how limiting public input to the notice of intent stage will not undermine informed NEPA decisionmaking. Nor do they explain their decision to disregard empirical data demonstrating that public comment on draft EISs produces better outcomes. *Supra* pp. 11-12.

**B. USDA's Elimination of Forest Service Public Participation Requirements Was Arbitrary and Capricious.**

USDA's wholesale rescission of the Forest Service's regulations eliminated longstanding requirements that guaranteed the public's right to participate in Forest Service decisionmaking over commercial logging, prescribed burning, pest management, road development, oil and gas, and mining projects. Specifically, USDA's rulemaking eliminated the public's right to notice of all upcoming actions in a "schedule of proposed actions," 36 C.F.R. § 220.4(d) (2008), the public's right to participate in "scoping" of EAs and CEs, *id*. § 220.4(e)(1), and public notice of the Forest Service's decision of a project authorized under a CE, *id.* § 220.6(f). Removing these rights to public notice and participation will have far-reaching and profound consequences, given that the vast majority of Forest Service projects are approved under CEs (80.1% between 2006 and 2016) and EAs (17.6% during the same period). USDA-28812; USDA-29229. Although not subject to NEPA's EIS requirement, these projects could span large areas, such as the "[s]alvage of dead and/or dying trees not to exceed 250 acres," 7 C.F.R. § 1b.4(d)(36) (2025); some oil and gas developments, *id*. § 1b.4(d)(39); and "restoration" activities covering up to 2,800 acres, including prescribed burning, vegetation thinning, and timber harvesting, *id*. § 1b.4(d)(47). These projects may cover even larger areas, as USDA's final rule now allows the Forest Service to apply multiple CEs to a single project. *See id*. § 1b.3(e). In addition, these projects may involve "extraordinary circumstances," such as having adverse effects on federally protected species or municipal water sources, but where the Forest Service has determined that a modification to the project reduces those impacts to insignificant levels. *See id*. § 1b.3(f)(1), (3).

As comments on USDA's rulemaking noted, public notice and public participation would be a useful check on the agency's determinations even for categorical exclusions. USDA-29057;

DOI-1162-63. Moreover, these longstanding procedures provide local communities and other interested parties the opportunity to alert the agencies to unforeseen consequences, including for projects the Forest Service has deemed "insignificant." USDA, however, makes little effort to reasonably explain its rescission of these requirements or respond to these concerns.

First, USDA's rulemaking eliminates the requirement to solicit scoping comments early in the process for actions under an EIS, EA, and CE. USDA's rationales for these changes are (1) that the Forest Service regulations did not actually require scoping on EAs and CEs, but the "practice emerged from an understanding of how the Forest Service's regulations interacted with CEQ's NEPA regulations;" (2) that "[n]othing in the statutory test of NEPA as amended requires either scoping or solicitation for public comment" on EAs and CEs; and (3), relatedly, that public input for those projects would constitute "undue process," meaning so-called "responsible official discretion" will be an adequate substitute. 91 Fed. Reg. at 17091. USDA's first rationale is flatly wrong: per the pre-rescission Forest Service regulations, "[s]coping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded[.]" 36 C.F.R. § 220.4(e) (2008). And as explained above, *supra* pp. 19-22, 27, there are myriad reasons why the lack of an express statutory command does not justify a cursory dismissal of a longstanding—and unquestionably useful—NEPA procedure. Furthermore—and as detailed above, *supra* pp. 22-23—substituting unbridled "official discretion" for consistent, predictable NEPA procedures is inconsistent with both the text and purpose of NEPA.

With respect to the requirement for the Forest Service to maintain a "schedule of proposed actions" informing the public of both upcoming and recently-completed NEPA reviews, USDA once again leans on agency discretion: "[t]he ability and capacity of the agency to provide this information may vary based on funding and staffing levels; therefore, the decision to provide this service should not be predetermined in regulation but appropriately decided on a recurring basis." 91 Fed. Reg. at 17091. Once again, this cursory rationale fails to grapple with how removing this critical opportunity for public input and communication will undermine fundamental goals of NEPA, such as informed decisionmaking and democratic accountability. Moreover, the Department overlooks how eliminating the SOPA may actually lead to more

inefficiency, as members of the public instead must resort to submitting Freedom of Information Act requests to stay abreast of agency activities, forcing agency staff to divert resources into responding. USDA-28861.

Finally, USDA fails to even mention—let alone justify—its rescission of the Forest Service requirement to provide timely notification to the public when a project is approved under a CE—previously called a "decision memo." *See* 36 C.F.R. § 220.6(e), (f) (2008). This change deprives the public of needed information about agency activities, undermining public trust and reasoned decisionmaking.

These changes to the Forest Service's longstanding NEPA regulations are not adequately explained—or, in the case of elimination of CE decision memos, are not explained at all—and are therefore arbitrary, capricious, and inconsistent with NEPA.

**C. USDA and Interior Failed to Consider Alternative Approaches within the Ambit of their Existing Policies.**

USDA and Interior also fail to discuss alternative approaches that fall within the ambit of their longstanding policies favoring informed decisionmaking through public participation. *Regents of the Univ. of Cal.*, 591 U.S. at 30; *see also Calif. v. U.S. Dep't of Interior*, 381 F. Supp. 3d 1153, 1168-69 (N.D. Cal. 2019) (collecting cases holding that agency action arbitrary and capricious when agency fails to consider alternatives). For example, the Departments could have retained a general presumption that public participation is required but provided exceptions only in limited exigent circumstances. *See, e.g.*, DOI-15036 (commenter recommending that "flexibility should be exercised within the confines of predictable, binding procedural requirements and clearly defined, limited circumstances"). To that end, the Departments could have promulgated objective factors guiding responsible officials in identifying actions that may proceed without public comment, which would carry the additional benefit of lending clarity and legitimacy to such decisions in the eyes of the public. DOI-857-58; DOI-1279.

USDA and Interior could have also considered re-allocating internal agency resources to further prioritize NEPA processing and project implementation, and improving coordination across agencies with shared jurisdictional authority over a project (as commenters suggested, *see,*

*e.g.*, DOI-1242; DOI-15034; USDA-14683; USDA-29509; USDA-28794). A study published in 2023 debunked claims that environmental analyses are a primary cause of project delays. DOI-16867. Focusing specifically on the Forest Service, the study authors analyzed "4,695 actions involving fuels management, silviculture and invasive species from January 2009 to June 2021." DOI-16868. Of those nearly 5,000 projects, only 4% had been processed through an EIS, whereas 34% of actions were processed through an EA and 62% were approved under a CE. *Id*. For EAs and CEs, the study authors found that the median time spent on NEPA compliance was dwarfed by other agency delays, such as months spent on the contracting process and post-contract implementation delays. *Id.* Here, USDA and Interior, however, have failed to adequately explore the causes of project implementation delays and ways to reduce them.

Because Defendants failed to consider these or other alternatives that would make NEPA processing and project implementation more efficient without eliminating longstanding public participation procedures, their rulemakings were arbitrary and capricious.

**D. Interior and USDA Failed to Adequately Explain How Their New Policies Are Permissible Under NEPA.**

Neither Interior's nor USDA's rulemaking make any attempt to address whether the rescission of longstanding public participation procedures is permissible under NEPA, *Fox Television*, 556 U.S. at 515, except to say that any procedures that go beyond what is expressly required by the statute are unnecessary, and therefore should be abandoned. As previously explained, the rescission of requirements for public comment on draft EISs and public involvement in EAs violates the statute and Congress's intent, so their rescission is not permissible. *Supra* pp. 19-24. Moreover, neither USDA nor Interior attempt to explain why continuing these policies is no longer "practicable" or "possible," 42 U.S.C. §§ 4331(a)-(b), 4332(2)(B). The same is true with respect to USDA's rescission of the Forest Service's public participation procedures.

USDA's and Interior's failure to consider NEPA's "practicability" standard is especially glaring in light of CEQ's, USDA's, and Interior's former longstanding requirements requiring public notice and public involvement, in apparent recognition that these procedures are a

practicable means—and therefore a necessary means—to achieving NEPA's aims. For example, in *Montana Wildlife*, the Ninth Circuit held that BLM failed to address how its new policy of reducing public comment periods was "'permissible under the statute'—as interpreted by the CEQ regulations." 127 F.4th at 39 (citation omitted). This was because BLM did not explain how the shortened comment period "engage[d] the public 'to the extent practicable,' 40 C.F.R. § 1501.4(b), or to 'the fullest extent possible,' *id*. § 1500.2(d)," where BLM had "offered a comment period twice as long under [its prior policy]." *Id*. Likewise, here, USDA and Interior were required to explain how the requirements to circulate a draft EIS, involve the public in the preparation of an EA, involve the public in scoping, and/or maintain a SOPA were no longer "practicable," even though USDA, Interior, and/or their sub-agencies had used these procedures for many years; have an existing obligation to solicit comment from relevant Federal, State, Tribal, and local agencies, 42 U.S.C. § 4332(2)(C); 7 C.F.R. § 1b.7(d)(1)(i)-(ii) (2025); 516 DM 1, Appendix 1 at 45 (DOI-316); and now have the option to solicit public comment.

Interior's and USDA's failures to address NEPA's practicability standard is arbitrary and capricious and violate 42 U.S.C. §§ 4331(a)-(b) and 4332.

## IV. Vacatur is the Appropriate Remedy for USDA's and Interior's APA Violations.

Under the APA, courts normally "set aside" unlawful agency action and remand the matter for further consideration. 5 U.S.C. § 706(2); *All. for the Wild Rockies v. U. S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) ("[V]acatur of an unlawful agency action normally accompanies a remand."). Courts have discretion to remand without vacatur, but only in "limited circumstances," where equity so demands, in light of the "seriousness of the agency's errors" weighed against "the disruptive consequences of an interim change that may itself be changed," *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citation omitted).

Here, the gravity of the errors is significant. The Departments' rules violate NEPA's requirements to use "all practicable means" in cooperation with the public, 42 U.S.C. § 4331(b), and develop "methods and procedures" to "ensure" consideration of environmental values, *id.* § 4332(2)(B). They elevate a non-statutory factor—"efficiency"—at the expense of considering the important (and codified) policy considerations at the heart of NEPA. In the process, the

Departments disregard their own longstanding success implementing a NEPA framework rooted in environmentally conscious decisionmaking aided by public input. They also ignore multiple alternatives approaches that could have served their efficiency goals without eliminating public input altogether. And they fail to grapple with the very real possibility that future actions could be delayed for months or even years in litigation due to deficiencies in their NEPA documents that could have been revealed during a brief period of public input. In other words, these are "fundamental flaws in the agen[ies'] decision[s]" that "make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council*, 806 F.3d at 533.

Turning to the second factor—the "disruptive effect of vacatur"—any consequence must be "serious and irremediable" enough that it "significantly outweigh[s] the magnitude of the agency's error." *Aqualliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 881 (E.D. Cal. 2018) (quoting *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015)). Defendants have the burden of establishing disruptive consequences. *Ctr. for Envtl. Health v. Vilsack*, No. 15-cv-01690-JSC, 2016 WL 3383954, at *13 (N.D. Cal. 2016). Here, the consequences of vacatur would not be disruptive or environmentally harmful but beneficial. *See Pollinator Stewardship Council*, 806 F.3d at 532 (vacating rule when leaving it "in place risks more environmental harm than vacating it"). Vacatur would return USDA and Interior to a status quo that had prevailed for more than five decades—that USDA, Interior, and their sub-agencies give impacted communities an opportunity to weigh in and call attention to overlooked environmental harms and solutions to avoid or minimize the damage, so agencies can make well-informed and better decisions as Congress intended.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Partial Summary Judgment and vacate Interior's and USDA's Final Rules.

Respectfully Submitted,

DATED: June 18, 2026

/s/ *Wendy Park*

Wendy Park (Cal. Bar No. 237331)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Tel: 510-844-7138
Email: wpark@biologicaldiversity.org

Brandon Jones-Cobb (AK Bar No. 1610078)
(*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 30604
Seattle, WA 98113-0604
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org

Hannah Connor (DC Bar No. 1014143)
(*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St. NW, Suite 1300
Washington, DC 20005
Phone: 202-641-6176
Email: hconnor@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity and Sierra Club*

Nathaniel Shoaff (Cal. Bar No. 256641)
Elizabeth Benson (Cal. Bar No. 268851)
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
Phone: 415-977-5610
Email: nathaniel.shoaff@sierraclub.org
Email: elly.benson@sierraclub.org

*Attorneys for Sierra Club*