ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

JOHN K. HEISE
CA Bar No. 331615
Natural Resources Section
United States Department of Justice
Environment & Natural Resources Division
150 M Street N.E.
Washington, DC 20002
John.Heise@usdoj.gov
(202) 598-3312

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,

*Defendants*.

CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,

*Defendants*.

No. 3:25-cv-10793-JSC
No. 3:26-cv-866-JSC

**DEFENDANTS' CONSOLIDATED COMBINED CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Hearing: 11/5/2026, 10:00 a.m.
Courtroom: 8 (19th Floor)

Hon. Jacqueline Scott Corley

# TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF ISSUES .... 2

BACKGROUND .... 4

I. The National Environmental Policy Act .... 4

II. CEQ's 1978 and 2020 Regulations .... 4

III. The Fiscal Responsibility Act's Amendments to NEPA .... 6

IV. The 2024 Rule and Subsequent Litigation .... 6

V. Recent Developments in NEPA .... 7

A. CEQ's Implementation of Executive Order 14154 .... 8

B. The Supreme Court's Decision in *Seven County* .... 8

C. Interior's Revised NEPA Procedures .... 9

D. USDA's Revised NEPA Regulations .... 10

PROCEDURAL HISTORY .... 11

STANDARD OF REVIEW .... 11

ARGUMENT .... 12

I. This Court Lacks Jurisdiction Over Plaintiffs' Claims .... 12

A. Plaintiffs lack standing to bring facial challenges to agency procedures .... 12

B. Plaintiffs' claims are also unripe .... 18

II. NEPA Does Not Require Public Comment on Draft NEPA Documents .... 20

A. NEPA requires public comment only on notices of intent to prepare EISs .... 20

B. Congress did not implicitly legislate public participation requirements .... 27

C. The agencies reasonably explained their changed policy regarding public comments .... 29

1. The agencies' efficiency rationale was a compelling reason for a change ... 30

2. The changed legal framework also supports the agencies' changed position ... 35

3. The agencies' public comment procedures allow them to solicit input when helpful ... 37

D. The agencies did not fail to consider reasonable alternatives ... 39

E. The Final Rules complied with NEPA ... 41

F. The Forest Service's new regulations are not arbitrary and capricious ... 41

III. Plaintiffs Fail to Justify Their Request For Vacatur ... 43

CONCLUSION ... 45

## TABLE OF AUTHORITIES

**Cases**

*350 Montana v. Haaland*,
50 F.4th 1254 (9th Cir. 2022) .... 44
*Alaska Wilderness League v. Jewell*,
788 F.3d 1212 (9th Cir. 2015) .... 23
*Allen v. Wright*,
468 U.S. 737 (1984) .... 12
*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*,
926 F.3d 1061 (9th Cir. 2019) .... 36
*Anderson v. Green*,
513 U.S. 557 (1995) .... 18
*Angov v. Lynch*,
788 F.3d 893 (9th Cir. 2015) .... 38
*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
524 F.3d 938 (9th Cir. 2008) .... 14, 25, 31
*BP P.L.C. v. Mayor of Baltimore*,
593 U.S. 230 (2021) .... 27
*Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .... 28
*CFTC v. Schor*,
478 U.S. 833 (1986) .... 27
*Chamber of Comm. of U.S. v. EPA*,
642 F.3d 192 (D.C. Cir. 2011) .... 16
*City & Cnty. of San Francisco v. Garland*,
42 F.4th 1078 (9th Cir. 2022) .... 18

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 17

*Como-Falcon Cmty. Coal., Inc. v. U.S. Dep't of Lab.*,
609 F.2d 342 (8th Cir. 1979) .......... 24

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) .......... 16

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) .......... 11

*Ctr. for Food Safety v. Regan*,
56 F.4th 648 (9th Cir. 2022) .......... 44

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) .......... 39

*Diamond v. Charles*,
476 U.S. 54 (1986) .......... 20

*FCC v. Fox Television Studios*,
556 U.S. 502 (2009) .......... 30, 34

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 12, 30, 32

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 12, 13, 17

*Fla. Power & Light Co. v. EPA*,
145 F.3d 1414 (D.C. Cir. 1998) .......... 19

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) .......... 27, 28

*FTC v. AT&T Mobility LLC*,
883 F.3d 848 (9th Cir. 2018) .......... 29

*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
691 F.3d 1008 (9th Cir. 2012) ........ 22

*Holder v. Martinez Gutierrez*,
566 U.S. 583 (2012) ........ 27

*Humane Soc. of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ........ 44

*INS v. Chadha*,
462 U.S. 919 (1983) ........ 29

*Iowa v. CEQ*,
765 F. Supp. 3d. 859 (D.N.D. 2025) ........ 7, 35, 45

*Iowa v. CEQ*,
No. 25-1641, 2025 WL 2205808 (8th Cir. July 29, 2025) ........ 45

*Jama v. ICE*,
543 U.S. 335 (2005) ........ 27

*Jicarilla Apache Tribe of Indians v. Morton*,
471 F.2d 1275 (9th Cir. 1973) ........ 24

*League of Cal. Cities v. FCC*,
118 F.4th 995 (9th Cir. 2024) ........ 40

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 11, 12, 23, 29

*Louisiana v. Nat'l Oceanic & Atmospheric Admin.*,
70 F.4th 872 (5th Cir. 2023) ........ 16

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 12

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
121 F.4th 902 (D.C. Cir. 2024) ........ 4, 7, 35

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 26, 34
*Montana Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) .......... 25, 32, 33
*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .......... 23
*Motor Vehicles Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 11
*Mullin v. Al Otro Lado*,
146 S. Ct. 2079 (2026) .......... 23
*Nat. Res. Def. Council v. Jewell*,
749 F.3d 776 (9th Cir. 2014) .......... 17
*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) .......... 39
*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*,
416 U.S. 267 (1974) .......... 28
*Ohio Forestry Ass'n v. Sierra Club,*
523 U.S. 726 (1998) .......... 19
*Pablo Sequen v. Albarran*,
No. 25-CV-06487-PCP, 2026 WL 1805114 (N.D. Cal. June 23, 2026) .......... 44
*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .......... 24
*Pickern v. Pier 1 Imports (U.S.), Inc.*,
457 F.3d 963 (9th Cir. 2006) .......... 34, 40
*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......... 23

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
605 U.S. 168 (2025) ..... passim
*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ..... 13
*State of Cal. v. Block*,
690 F.2d 753 (9th Cir. 1982) ..... 25
*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ..... 12, 13, 15
*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ..... 18
*Twitter, Inc. v. Lynch*,
139 F. Supp. 3d 1075 (N.D. Cal. 2015) ..... 43
*Vermont Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) ..... 24
*Waterkeeper All. v. United States Env't Prot. Agency*,
140 F.4th 1193 (9th Cir. 2025) ..... 11, 23
*Wheeler v. City of Santa Clara*,
894 F.3d 1046 (9th Cir. 2018) ..... 21
*Wild Virginia v. CEQ*,
56 F.4th 281 (4th Cir. 2022) ..... 6, 18, 19

**Statutes**

42 U.S.C. § 4331(a) ..... 22
42 U.S.C. § 4331(b) ..... 22
42 U.S.C. § 4332(B) ..... 4, 22, 23, 26, 28, 34
42 U.S.C. § 4332(C) ..... 4, 7, 21
42 U.S.C. § 4336(b)(2) ..... 21
42 U.S.C. § 4336a(c) ..... 20, 35

42 U.S.C. § 4336a(e) ........ 21, 35

42 U.S.C. § 4336a(g) ........ 21, 35

5 U.S.C. § 702 ........ 11

5 U.S.C. § 706(2)(A) ........ 11

Pub. L. No. 114-94, 129 Stat. 1741 (2015) ........ 28

Pub. L. No. 118-5, 137 Stat. 10 (June 3, 2023) ........ 6, 20, 27, 35

Pub. L. No. 91-190, 83 Stat. 852 (Jan. 1, 1970) ........ 4

**Rules**

Fed. R. Civ. P. 25(d) ........ 1

Fed. R. Civ. P. 56 ........ 1

**Regulations**

36 C.F.R. § 218.1 ........ 42

36 C.F.R. § 219.1 ........ 42

36 C.F.R. § 220.4(e)(2) ........ 42

36 C.F.R. § 220.6(e) (2008) ........ 43

36 C.F.R. § 220.6(f) (2008) ........ 43

40 C.F.R. § 1501.5(f) (2024) ........ 14

**Other Authorities**

42 Fed. Reg. 26,967 (May 24, 1977) ........ 4, 7, 8

43 Fed. Reg. 55,978 (Nov. 29, 1978) ........ 5

82 Fed. Reg. 40,463 (Aug. 24, 2017) ........ 5

85 Fed. Reg. 43,304 (July 16, 2020) ........ 5, 6

87 Fed. Reg. 23,453 (April 20, 2022) ........ 6, 7

89 Fed. Reg. 35,442 (May 1, 2024) ........ 6, 7, 14

90 Fed. Reg. 10,610 (Feb. 25, 2025) ........ 8

90 Fed. Reg. 29,498 (July 3, 2025) ........ 9

90 Fed. Reg. 29,632 (July 3, 2025) ........ 10

90 Fed. Reg. 8353 (Jan. 29, 2025) .......... 7, 8, 34
91 Fed. Reg. 17,062 (Apr. 3, 2026) .......... 10
91 Fed. Reg. 36,787 (June 18, 2026) .......... 33
91 Fed. Reg. 5387 (Feb. 6, 2026) .......... 41
91 Fed. Reg. 618 (Jan. 8, 2026) .......... 8
91 Fed. Reg. 8738 (Feb. 24, 2026) .......... 9, 10
Black's Law Dictionary 1142 (4th rev. ed. 1968) .......... 23
Diane Katz, Curbing Abuses of a Politicized NEPA, HERITAGE FOUNDATION (2020) .......... 2
EZRA KLEIN, DEREK THOMPSON, ABUNDANCE 87-96 (2025) .......... 2
The Procedural Hangover: How NEPA Litigation Obstructs Critical Projects, BREAKTHROUGH INSTITUTE (2025) .......... 2

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on November 5, 2026, at 10:00 a.m., Defendants in Case No. 3:26-cv-866 the U.S. Department of Agriculture ("USDA"), Brooke Rollins, the U.S. Forest Service ("USFS"), Tom Schultz, the Animal and Plant Health Inspection Service ("APHIS"), and Kelly Moore, as well as Defendants in Case No. 3:25-cv-10793 the U.S. Department of the Interior ("Interior" or "DOI"), Doug Burgum, the Bureau of Land Management ("BLM"), Stevan Pearce, the Bureau of Ocean Energy Management ("BOEM"), Matthew Giacona, the Bureau of Safety and Environmental Enforcement ("BSEE"), Kenneth Stevens, the Office of Surface Mining Reclamation and Enforcement ("OSMRE"), Lanny Erdos, the Bureau of Reclamation, Scott Cameron, the U.S. Fish and Wildlife Service ("FWS"), Brian Nesvik, the National Park Service, and Jessica Bowron (collectively, "Defendants") will and hereby do move for summary judgment under Federal Rule of Civil Procedure 56 on Counts III and IV of Plaintiffs Center for Biological Diversity's and Sierra Club's ("Plaintiffs") First Amended and Supplemental Complaints.[1]

Defendants move for summary judgment on the ground that the material facts, as to which there is no genuine dispute, establish that Plaintiffs (1) lack standing, and (2) fail to show that the rulemakings under review violate the National Environmental Policy Act ("NEPA") or the Administrative Procedure Act ("APA"). Plaintiffs fail to identify any projects approved pursuant to the challenged regulations that have caused them concrete harm. And Defendants' rulemakings were both reasonably explained and consistent with the public participation provisions set forth in NEPA. Defendants are therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

[1] Kelly Moore is automatically substituted for Dr. Michael Watson and Stevan Pearce is automatically substituted for Bill Groffy pursuant to Fed. R. Civ. P. 25(d)

**MEMORANDUM OF POINTS & AUTHORITIES**

**INTRODUCTION AND STATEMENT OF ISSUES**

As passed by Congress, NEPA is a modest, purely procedural statute. It requires only that a federal agency consider the environmental effects of a project before acting or granting a permit to a third party to do so. It imposes no substantive mandate. But over the last 50 years, via regulations and at-times-misguided court decisions, NEPA morphed into a favored tool used by project opponents to block and delay federal actions that they oppose.

Commentators across the political spectrum have identified the need for NEPA reform. *See, e.g.*, EZRA KLEIN, DEREK THOMPSON, ABUNDANCE 87-96 (2025); The Procedural Hangover: How NEPA Litigation Obstructs Critical Projects, BREAKTHROUGH INSTITUTE (2025); Diane Katz, Curbing Abuses of a Politicized NEPA, HERITAGE FOUNDATION (2020). To that end, Congress amended NEPA in 2023 to impose strict time and page limits on agencies' environmental reviews, and to otherwise promote efficient and focused NEPA practice. In these revisions, Congress codified a few longstanding regulatory practices for implementing NEPA into the statute itself, modified others, and—crucially—omitted others entirely. Then, in 2025, the Supreme Court issued a landmark decision providing a "course correction … to bring judicial review under NEPA back in line with the statutory text and common sense." *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 184 (2025). *Seven County* highlighted the myriad ways in which NEPA litigation has kept the nation from completing a spectrum of much-needed projects. *Id.* at 183.

Likewise, when he took office, President Trump directed the Council on Environmental Quality ("CEQ") to propose to rescind its regulations governing federal agency compliance with NEPA and directed individual agencies to promulgate their own NEPA implementing procedures in a way that prioritized consistency and efficiency. In response, USDA and Interior promulgated interim final rules ("IFR") in July 2025 that rescinded their existing NEPA procedures and replaced them with new ones (a new, non-regulatory Handbook, alongside a set of NEPA procedures retained in regulations for Interior, and a regulatory revision for USDA). The agencies have since issued final rules (and in Interior's case, an updated NEPA Handbook), which include responses to public comments that made some changes to, but generally affirmed, the IFRs.

Plaintiffs, two environmental nonprofits, challenge the agencies' rulemakings. Their claims fail for both jurisdictional and substantive reasons. First, Plaintiffs cannot establish jurisdiction. Plaintiffs dress their claims up as a denial of their "long-held rights" to make public comment on environmental impact statements ("EISs") and environmental assessments ("EAs"). But even under the prior procedures, public comment was not required for all EAs. And under the new procedures, public comment is still required for EISs. So Plaintiffs' alleged injury reduces to a complaint about when and how many times they get to comment on an EIS, and the loss from regulations of some amorphous language regarding public involvement with EAs. Crucially, Plaintiffs identify *no* project where these changes will have (or have had) a concrete impact, despite 25 attempts to do so. Rather, they bring speculative facial challenges to agency procedures that will not result in any concrete effects until they are applied by individual agency components and subcomponents to specific projects. In short, there is neither standing nor ripeness.

Second, even if this Court has jurisdiction, Plaintiffs' claims fail on the merits. Congress chose to require public comment at only one stage of the NEPA process: an agency's notice of intent to prepare an EIS. The agencies' revised procedures duly implement this congressional requirement while removing blanket requirements for further rounds of public comment, even as they preserve agency discretion to take further comment. Plaintiffs' claim that Congress, while making changes to explicitly speed up the process and mandate only one round of public comment, somehow *sub silentio* ratified the former procedures so that other rounds of public comment are forever required, does not accord with law or common sense. Nor do the agencies' final rules lack a reasoned explanation or ignore the issues raised by Plaintiffs and other commenters. At the end of the day, as Plaintiffs virtually admit, they attempt to fight the tide of Congress's "NEPA amendments, President Trump's executive order, and a recent Supreme Court decision," with their understanding of "NEPA's … purpose." Dkt. No. 36, 25-cv-10793; Dkt. No. 38, 26-cv-866 ("Pls. Mot.") at 4.[2] This attempt must fail.

[2] Counsel for Plaintiffs has represented to the undersigned that, apart from the case caption, the two filings are identical.

Plaintiffs' requested remedy is also fatally flawed. They ask the Court to vacate the final rules, arguing that "[v]acatur would return USDA and Interior to a status quo that had prevailed for more than five decades." Pls. Mot. at 40. Not so. The half-century status quo to which Plaintiffs refer had at its core CEQ's regulations, which were rescinded in 2025 and are not at issue in this case. Those regulations rested on an executive order; two courts held that that order was not sufficient to confer rulemaking authority on CEQ, and that order has since been repealed. CEQ is not a party here, and even if it were, the Court could not reinstate those regulations. USDA's and Interior's prior regulations were explicitly designed to supplement CEQ's now-rescinded regulatory framework. What would be left after vacatur of the agencies' procedural revisions would be a patchwork of regulations irregularly "supplementing" CEQ's now-nonexistent regulations—the definition of a disruptive outcome. Plaintiffs cannot restore CEQ's status quo ante, no matter how badly they want to. The Court should grant summary judgment in Defendants' favor.

## BACKGROUND

### I. The National Environmental Policy Act.

In 1970, President Nixon signed NEPA into law. Pub. L. No. 91-190, 83 Stat. 852 (Jan. 1, 1970). NEPA requires that federal agencies "identify and develop methods and procedures" to "ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(B). Agencies must include a "detailed statement" "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." *Id.* § 4332(C). NEPA further requires agencies to assess the environmental impact of their proposed actions and alternatives to the proposed actions. *See* 42 U.S.C. § 4332(C). But when NEPA was enacted in 1970, it lacked any provision that required an agency to field and respond to public comments or set forth parameters for public participation.

### II. CEQ's 1978 and 2020 Regulations.

NEPA lacks "the sort of clear language Congress typically uses to confer rulemaking authority." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024). Nevertheless, in 1970, President Nixon ordered CEQ to "[i]ssue guidelines to Federal agencies for

the preparation of" the "detailed statements" NEPA required. Exec. Order No. 11514 ("E.O. 11514") 35 Fed. Reg. 4247, 4248 (Mar. 7, 1970). Then, in 1977, President Carter directed CEQ to issue regulations implementing NEPA. Exec. Order No. 11991 ("E.O. 11991"), 42 Fed. Reg. 26967 (May 24, 1977). Consistent with that direction, CEQ issued regulations that purported to be "binding on all Federal agencies for implementing the procedural provisions of [NEPA]." 43 Fed. Reg. 55978, 55991 (Nov. 29, 1978) ("1978 Regulations"). There, CEQ first implemented a three-part scaled approach to meet NEPA's requirements. First, for categories of actions that an agency has determined normally do not have any significant environmental effects, an agency may use what is known as a categorical exclusion ("CE"). *See* 43 Fed. Reg. 55992. Second, an agency may prepare an EA, which "[b]riefly provides sufficient evidence and analysis for determining" whether the agency must prepare a more detailed analysis or may instead issue a finding of no significant impact ("FONSI"). *Id*. at 56004. Third, if an agency determines that the environmental effects are likely significant, it must prepare an EIS. *Id*. at 55994. The regulations specified that public comment was required in the EIS process at two stages: a notice of intent, and "[a]fter preparing a draft environmental impact statement." *Id*. at 55997-98; *see id*. at 55993. By contrast, there was no such requirement to circulate a draft for public comment at the EA stage; the regulations did, however, exhort that "[t]he agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments…." *Id.* at 55992.

The 1978 regulations were largely unchanged for over 40 years. But over the last decade, all three branches of government have set in motion major changes in NEPA legislation, implementation, and litigation, prompted by a shared understanding that project-approval timelines under the old NEPA regime had become unacceptably long. Though CEQ predicted shortly after the 1978 Regulations that agencies would be able to complete most EISs—the most intensive level of NEPA review—in 12 months or less, by 2017, the average time for completing an EIS and issuing a ROD was 4.5 years and the median was 3.5 years. 85 Fed. Reg. 43304, 43305, 43309 (July 16, 2020) ("2020 Rule"). Thus, in 2017, President Trump issued Executive Order 13807, directing CEQ to establish and lead an interagency working group to propose changes to the 1978 Regulations. 82 Fed. Reg. 40463, § 5(e)(iii) (Aug. 24, 2017). In response, CEQ promulgated the 2020

Rule, making significant revisions. 85 Fed. Reg. 43304. The 2020 Rule was challenged in five separate lawsuits, but none resulted in a decision on the merits.[3]

**III. The Fiscal Responsibility Act's Amendments to NEPA.**

In 2023, Congress enacted the Building United States Infrastructure through Limited Delays and Efficient Reviews Act of 2023, which made significant reforms to NEPA as part of the Fiscal Responsibility Act ("FRA"). Pub. L. No. 118-5, 137 Stat. 10 (June 3, 2023). All reforms encouraged more efficient and streamlined NEPA reviews. *See* Ex. 1 to Declaration of John K. Heise. Congress explained that many types of actions were not subject to NEPA at all; clarified and expanded the use of CEs, including by allowing agencies to adopt and use CEs established by other agencies; added measures clarifying (and thus encouraging) when the use of EAs was appropriate rather than EISs; and endorsed the use of programmatic NEPA documents. Importantly, it prescribed page limits for EISs and EAs and imposed time limits for completing NEPA reviews.

These amendments added NEPA's one and only statutory public-comment requirement. New section 4336a(c) provides that "[e]ach notice of intent to prepare an environmental impact statement … shall include a request for public comment on alternatives or impacts and on relevant information, studies, or analyses with respect to the proposed agency action." Neither NEPA's original text nor the FRA's amendments require public comment on EAs, programmatic NEPA documents, or an agency's use, adoption, or establishment of CEs, nor do they require agencies to solicit public comments on draft EISs.

**IV. The 2024 Rule and Subsequent Litigation.**

In May 2024, CEQ published a final rule, 89 Fed. Reg. 35442 ("2024 Rule") (May 1, 2024), making substantial changes to CEQ's regulations.[4] The 2024 Rule stated, "CEQ declines to mandate that all EAs be made available for comment because agencies appropriately have flexibility

---

[3] *Wild Virginia v. CEQ*, 56 F.4th 281 (4th Cir. 2022), was dismissed on jurisdictional grounds. Four others were voluntarily dismissed. *See Env't Justice Health All. v. CEQ*, No. 20-6143 (S.D.N.Y. 2020); *Iowa Citizens for Cmty. Improvement v. CEQ*, No. 20-2715 (D.D.C. 2020); *Alaska Cmty. Action on Toxics v. CEQ*, No. 20-5199 (N.D. Cal. 2020); *California v. CEQ*, No. 20-6057 (N.D. Cal. 2020).

[4] The 2024 Rule was preceded by a rulemaking which reverted three provisions of CEQ's regulations to the language used in the 1978 regulations. *See National Environmental Policy Act Implementing Regulations Revisions*, 87 Fed. Reg. 23453 (April 20, 2022) ("Phase 1 Rule").

to determine what level of engagement is appropriate for an EA given the specific circumstances of a proposed action[.]" *Id*. at 35476. And the rule noted that this flexibility was "consistent with [40 C.F.R.] § 1501.5(f)," the longstanding provision of the CEQ regulations that provided, "[a]gencies shall involve the public … to the extent practicable in preparing environmental assessments." *Id*.

A coalition of 20 states challenged the 2024 Rule. *Iowa v. CEQ*, 765 F. Supp. 3d. 859 (D.N.D. 2025), *vacated as moot*, *Iowa v. CEQ*, No. 25-1641, 2025 WL 2205808, at *1 (8th Cir. July 29, 2025). While *Iowa* was pending, the D.C. Circuit issued a decision in *Marin Audubon v. FAA*, 121 F.4th 902 (D.C. Cir. 2024). The panel found that "[t]he provisions of NEPA provide no support for CEQ's authority to issue binding regulations," nor did E.O. 11991. *Id*. at 912; *see also id.* at 914 ("CEQ therefore had no lawful authority to promulgate these regulations").[5] The district court in *Iowa* issued a decision in February 2025, vacating the 2024 Rule in its entirety. *See* 765 F. Supp. 3d. 859 (D.N.D. Feb. 3, 2025). Largely adopting the reasoning from *Marin Audubon*, the court found that "NEPA … does not give CEQ authority to issue binding regulations." *Id*. at 878. The court also held that portions of the 2024 regulations were contrary to NEPA, *id*. at 884-89, and that some provisions were arbitrary and capricious. *Id*. at 889-91. The court further held that the 2024 Rules' severability provision did not apply and vacated the 2024 Rule. *Id*. at 894-96.

## V. Recent Developments in NEPA.

In January 2025, President Trump issued Executive Order 14154, "Unleashing American Energy." ("E.O. 14154") 90 Fed. Reg. 8353 (Jan. 29, 2025). Among other things, E.O. 14154: (1) revokes President Carter's 1977 Executive Order 11991;[6] (2) directs that CEQ "provide guidance on implementing [NEPA]" and "propose rescinding CEQ's NEPA regulations found at 40 CFR 1500 *et seq*."; (3) instructs CEQ to "convene a working group to coordinate the revision of

---

[5] The D.C. Circuit declined to rehear *Marin Audubon en banc*. *See Marin Audubon Soc'y v. FAA.*, No. 23-1067, 2025 WL 374897 (Jan. 31, 2025).

[6] With the recission of E.O. 11991, the only Executive Order governing agencies' compliance with NEPA is President Nixon's E.O. 11514, which directed CEQ to "[i]ssue guidelines to Federal agencies for the preparation of detailed statements on proposals for legislation and other Federal actions affecting the environment, as required by [42 U.S.C. §4332(C)]." 35 Fed. Reg. 4247.

agency-level implementing regulations for consistency"; (4) and directs that agencies' revised procedures "prioritize efficiency and certainty over any other objectives" that do not align with the goals of the Order. 90 Fed. Reg. at 8355.

**A. CEQ's Implementation of Executive Order 14154**

In keeping with E.O. 14154's directives, CEQ took three actions relevant here. First, on February 19, 2025, it issued guidance to agencies regarding compliance with NEPA. *See* OEPC016860. On September 29, 2025, CEQ issued expanded guidance superseding the February 19 guidance. *See* USDA-00000114-123. The expanded guidance included as an Appendix a non-binding template for agencies to use as a model in revising their individual NEPA procedures. USDA00000124.

Second, on February 25, 2025, CEQ issued an IFR that removed its NEPA-implementing regulations from the Code of Federal Regulations ("CFR") effective April 11, 2025. 90 Fed. Reg. 10610 (Feb. 25, 2025). As CEQ explained, the agency "cited E.O. 11991 as authority in 1978 when it first issued its NEPA regulations. However, that Executive Order has now been rescinded, and CEQ therefore has determined that it is appropriate to remove its regulations from the [CFR]." 90 Fed. Reg. at 10611. Concurrent with its removal of its regulations, CEQ also requested public comment by March 27, 2025, on "the rationale for this action and related matters that may inform CEQ's decision making." *Id*.

Third, on January 8, 2026, and after reviewing over 100,000 comments, CEQ issued a final rule affirming the rescission of its NEPA regulations. 91 Fed. Reg. 618 (Jan. 8, 2026). CEQ explained that "[n]one of the comments received altered CEQ's conclusion that, absent E.O. 11991, CEQ lacks authority to issue regulations binding on other agencies. CEQ therefore adopts as final the interim rule without changes." 91 Fed. Reg. at 620.

**B. The Supreme Court's Decision in *Seven County*.**

On May 29, 2025, the Supreme Court issued its *Seven County* decision. In *Seven County*, the Court recognized that NEPA had evolved into a "blunt and haphazard tool employed by project opponents … to try to stop or at least slow down new infrastructure and construction projects," and explained that a "course correction of sorts is appropriate to bring judicial review under NEPA

back in line with the statutory text and common sense." 605 U.S. at 183, 184. Previous lower-court decisions, the Supreme Court held, had created more process, but fewer results: "more agency analysis of separate projects, more consideration of attenuated effects, more exploration of alternatives to proposed agency action, more speculation and consultation and estimation and litigation," but fewer actual projects. *Id*. at 184 (describing the resultant "[d]elay upon delay" as "Kafkaesque"). Instead, the Court held, "[c]ourts should afford substantial deference and should not micromanage" agency decisions about "depth and breadth" of inquiry or "the length, content, and level of detail" of a NEPA review. *Id*. at 183. The Court also held that the "ultimate question" in a NEPA case "is not whether [a NEPA review] in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained"—and NEPA documentation is "only one component of that analysis." *Id*. at 184–85.

**C. Interior's Revised NEPA Procedures.**

Both agencies took steps to fill the regulatory hole that the rescission of CEQ's regulations left behind. Interior first issued an IFR in July 2025, which partially rescinded its existing NEPA regulations, made targeted updates to other parts of its regulations, and provided an explanation of the agency's basis for proceeding by IFR.[7] 90 Fed. Reg. 29498 (July 3, 2025) (OEPC000026).

In the final rule, Interior made certain substantive changes, responded to comments, and otherwise "adopt[ed]" the IFR as final. 91 Fed. Reg. 8738 (Feb. 24, 2026) (OEPC000183). The final rule made four major changes to Interior's NEPA procedures. First, it "removed most of the existing DOI NEPA regulations in favor of relying on Departmental guidance." 91 Fed. Reg. at 8740. Second, it retained in regulations and made "targeted updates to" "four tools that DOI bureaus rely on, when appropriate, to expedite NEPA reviews and ensure that compliance with NEPA is achieved in a timely manner." *Id*. Those tools are responding to emergencies, use of CEs, allowing applicants and contractors to prepare NEPA documents, and designating lead and cooperating agencies. *Id*. at 8740-42. Third, it summarized DOI's revised NEPA Handbook (although the

[7] Comment was not required because NEPA procedures are policy statements and/or rules of agency procedure, and, alternatively, good cause was satisfied because swift action was necessary due to the lack of a governing framework in the absence of CEQ's regulations.

Handbook is not codified in the CFR). *Id*. at 8742. And, fourth, it responded to over 6,000 public comments. *Id*. at 8746-57.

**D. USDA's Revised NEPA Regulations.**

USDA followed a similar procedural approach to Interior, with some differences in the form and content of the resulting rules. Most notably, USDA consolidated its prior regime of different NEPA regulations for each subcomponent into one unified regime. The agency issued an IFR in July 2025, which "revise[d], move[d] and republish[ed], or remove[d] portions of the USDA NEPA implementing regulations, as well as add[ed] new portions." 90 Fed. Reg. 29632 (July 3, 2025) (USDA-00000099). In contrast to Interior, which relocated most of its NEPA procedures to a departmental handbook, USDA retained its department-wide NEPA procedures in regulations. *See id*. The agency determined that "it is sufficient for the Department to issue a set of uniform procedures, and it is not necessary for each agency with NEPA responsibilities across the Department to supplement the Department NEPA regulations." *Id*. at 29634. The USDA NEPA regulations specifically allow subcomponents within USDA to "establish subcomponent-specific NEPA guidance when necessary to refine NEPA processes and practices to address subcomponent-specific laws and program efficiency," though such guidance "shall avoid creating unnecessary process and should not repeat the requirements, definitions, or other matters that are set forth in this part or [NEPA] itself." *Id*. at 29647. The agency also explained why it was proceeding via an IFR (reasons substantially similar to Interior) and requested comments. *Id*. at 29644.

Nine months later the agency adopted the IFR as final, "with minor changes." 91 Fed. Reg. 17062 (Apr. 3, 2026) (USDA-00000001). USDA addressed public comments in the Federal Register Notice for the final rule and explained that it made certain changes to the Rule's content—in some instances informed by comments—to "make implementation of the revised regulations more efficient, effective, and consistent with other departments or agencies where applicable." *Id*. at 17063-64. The final rule described in detail the changes made to the regulations and USDA's reasoning for them. *Id*. at 17065-91.

## PROCEDURAL HISTORY

Plaintiffs filed the *Interior* complaint on December 18, 2025, about six months after the IFRs became effective. Dkt. No. 1, No. 25-cv-10793. About a month later, they filed their *USDA* complaint. Dkt. No. 1, No. 26-cv-866. In February 2026, the cases were deemed related. Dkt. No. 12, No. 25-cv-10793. And in April 2026, the Court granted the Parties' request to consolidate *Interior* and *USDA* for purposes of summary judgment and set the briefing schedule for the present cross-motions. Dkt. No. 33, No. 25-cv-10793. After the agencies published final rules, Plaintiffs amended their complaints. Dkt. No. 27, 25-cv-010793; Dkt. No. 34, 26-cv-866. Plaintiffs filed their consolidated motion for partial summary judgment on Counts III and IV of their First Amended and Supplemental Complaints on June 18, 2026. *See* Pls. Mot. at 1.

## STANDARD OF REVIEW

Plaintiffs contend that DOI's and USDA's final rules violate the APA. Under this standard, a court may set aside agency action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 702, 706(2)(A). When reviewing an agency's statutory interpretation, "courts use every tool at their disposal to determine the best reading of the statute" and "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400, 412 (2024). "Careful attention to the judgment of the Executive Branch may help inform that inquiry." *Id*. at 412-13.

The APA standard of review is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]o comply with" the arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Waterkeeper All. v. U.S. EPA*, 140 F.4th 1193, 1214 (9th Cir. 2025) (citation omitted). "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. for Biological Diversity v. Zinke*,

900 F.3d 1053, 1067 (9th Cir. 2018) (citation omitted). Judicial review under the arbitrary-and-capricious standard is deferential—it simply "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Loper Bright*, 603 U.S. at 392 (The APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential.").

## ARGUMENT

### I. This Court Lacks Jurisdiction Over Plaintiffs' Claims.

Plaintiffs' 25 member-declarants fail to identify a single project that the agencies approved under the challenged rules that has had a concrete impact on their aesthetic or recreational interests. And Plaintiffs cannot spend their way into standing by creating an organizational injury. Whether analyzed as injury-in-fact or ripeness, this Court lacks jurisdiction over Plaintiffs' facial challenge and should therefore enter judgment in Defendants' favor.

#### A. Plaintiffs lack standing to bring facial challenges to agency procedures.

Article III limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III. To establish Article III standing, a party invoking federal jurisdiction must show (1) that it suffered an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that a favorable decision will likely redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Because NEPA only applies to federal agencies, Plaintiffs challenge rules that "neither require nor forbid any action" on their part. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). Thus, Plaintiffs face a high bar: "[i]n cases of alleged future injuries to unregulated parties from government regulation," a court must ask whether it is "likely that the government's regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 385 n.2 (2024).

For the most part, Plaintiffs ground their claims in speculative procedural harms, and say that a reduction in "their members' ability to meaningfully participate in the NEPA review process" will "increas[e] the risk of environmental harm within the Project Areas." Interior Am. Compl. ¶ 23; USDA Am. Compl. ¶ 17; *see also* Pls. Mot. at 16-17. But standing requires a showing of "imminent harm," not simply a "threat that … the challenged activity would cause [the plaintiff] harm in the reasonably near future." *Summers*, 555 U.S. at 499-500 (internal citation omitted); *see also All. of Hippocratic Med.*, 602 U.S. at 381 (plaintiff seeking "prospective relief such as an injunction, … must establish a sufficient likelihood of future injury"). "[B]are procedural violation[s], divorced from any concrete harm, [fail to] satisfy [Article III's] injury-in-fact requirement." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).

The Supreme Court rejected similar claims in *Summers*. As *Summers* explained: "Respondents argue that they have standing to bring their challenge because they have suffered procedural injury, namely, that they have been denied the ability to file comments on some Forest Service actions and will continue to be so denied. But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." 555 U.S. at 496. Here, the harm is even more speculative: Plaintiffs suggest that there will *eventually* be a project upon which they will not be able to comment; that comment would have swayed Defendants to make a different decision on this hypothetical project; and that Defendants' failure to consider this hypothetical comment on this hypothetical project will ultimately harm their (unspecified) recreational or aesthetic interests. By challenging each agency's procedures for crafting NEPA analyses, Plaintiffs allege injury from an input (the procedures) into an input (the NEPA analysis) to some unspecified future decision. And the specific NEPA analysis conducted for a specific project (e.g., an EIS, EA/FONSI, or CE) "is only one input" among many "into an agency's decision" to approve the underlying project. *Seven County*, 605 U.S. at 180. Plaintiffs' alleged injuries are many degrees removed from anything concrete.

In circumstances where this hypothetical project requires an EIS, Plaintiffs would be alleging harm from the *reduction* in opportunities for comment—from two opportunities to one. As

such, any harm resulting from Plaintiffs' inability to comment twice on a future EIS for a hypothetical project is pure speculation and does not suffice for standing. Plaintiffs fare even worse with respect to EAs. The prior CEQ regime, as well as the USDA and Interior regulations that supplemented it, did *not* require comment on EAs, but only stated that "[a]gencies shall involve the public … to the extent practicable in preparing environmental assessments." 40 C.F.R. § 1501.5(f) (2024). Under the prior regime, the Ninth Circuit held that "circulation of a draft EA is not required in every case." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 952 (9th Cir. 2008). To be sure, the Ninth Circuit also interpreted the "to the extent practicable" language in the former CEQ regulations as requiring some form of public notice that varied depending on "the totality of the circumstances." *Id*. at 953. But the CEQ rule could not have been clearer that "agencies … have flexibility to determine what level of engagement is appropriate for an EA," and, thus, CEQ "decline[d] to mandate that all EAs be available for public comment." 89 Fed. Reg. 35476. Despite Plaintiffs' bluster about "the public's right to involvement in the preparation of EAs," Pls. Mot. at 13, they ultimately concede that comment on EAs has always been discretionary, even as they grumble that it is now "fully" so, *id*. at 25. The absence of the "to the extent practicable" language regarding optional comment on a hypothetical future EA concerning a hypothetical future project is *not* the stuff of which standing is made.

Seeking to buttress their claim to Article III standing, Plaintiffs and their declarants refer to a variety of specific projects. To start, most of these projects progressed under prior agency-specific NEPA procedures and mark instances in which the declarants provided comments. *See, e.g.*, Dkt. No. 36-4 (Boulton Decl.) ¶ 22 (noting that declarant provided "objection comments" regarding sage grouse); Dkt. No. 37-5 (Porter Decl.) ¶ 13 (listing Forest Service projects in New England upon which declarant had provided comments).[8] The same declarants suggest that there will eventually be a project upon which they will not be able to comment adequately and that will therefore harm their recreational or aesthetic interests. This reduces to speculation and does not suffice for standing. *See* Boulton Decl. ¶ 25 (averring that the new regulations will "significantly

[8] For ease of reference, unless stated otherwise, the docket numbers in this Section refer to items on the *Interior* docket, 25-cv-10793.

reduce or eliminate … my ability to participate in the NEPA review process … increasing the risk of environmental harm which can reduce my ability to visit and enjoy certain areas); Porter Decl. ¶ 16 (similar); *but see Summers*, 555 U.S. at 495 (standing not satisfied when there is just a chance that a member's "wanderings will bring him to a parcel about to be affected by" a project). In short, Plaintiffs fail to make any showing that a purported inability to submit comments in the future will necessarily cause them harm.[9]

Only six declarants identify projects that proceeded, at least in part, under the challenged regulations. *See* Dkt. Nos. 36-3 (Bass Decl.) ¶ 10 (USFS's Upper Bunk Fuels Reduction Project); 36-10 (Freeman Decl.) ¶ 11 (BOEM's Lease Sale 258); 36-11 (Gibson Decl.) ¶ 4 (BLM's South Railroad Mine Project); 36-13 (Henderson Decl.) ¶¶ 21, 23 (USFS's Whiskey Charlie Salvage Project and Marmot Spruce Beetle Project); 36-16 (Mannchen Decl.) ¶ 19 (USFS's oil and gas leasing on National Forest and Grasslands in Texas); 37-1 (McMahon Decl.) ¶ 6 (USFS's Whiskey Charlie Salvage Project). But *all* the projects mentioned that moved forward under the challenged regulations considered some form of public comment. The analyses underlying the Texas Oil and Gas Oil Leasing and Marmot Spruce Beetle Salvage Project in fact considered prior public comment. *See* Declaration of Josh White ("White Decl.") ¶¶ 5, 10. The Forest Service responded to declarants' outreach concerning the Whiskey Charlie Salvage Project and the Upper Bunk Fuels Reduction Project. *See id.* ¶¶ 9, 16. Interior held two public meetings, engaged in tribal consultation, and received 149 comments on the South Railroad Mine project; the declarant herself has additional participation rights given her tribal membership. Declaration of Jared Bybee ¶¶ 6, 7, 22;

[9] Plaintiffs point to the study by Stava, et al., *see* Pls. Mot. at 11, which touts the supposed impact of NEPA comments, but that study is deeply flawed. First, rather than measuring whether public comments caused agencies to alter their decisions, the study only counts examples in which agencies stated that changes were made in response to public comments. Agencies have independent legal and institutional incentives to characterize revisions as responsive to public comments, so the study improperly substitutes agency self-reporting for evidence of causation. Second, the study inflates the apparent significance of public participation by defining "substantive" changes so broadly that relatively minor project refinements are treated the same as major revisions to project design or the selection of a different alternative. Third, the paper's conclusions rest on a limited, nonrepresentative sample of EISs drawn from five agencies and three categories of projects, but extrapolates its methodology to draw conclusions about NEPA writ large. The headline percentages cannot reasonably estimate how often public comments influence federal decisionmaking.

Gibson Decl. ¶ 2. Lease Sale 258 was approved, and the lease was issued, in 2023—while the prior rules were in effect—and reflected consideration of approximately 90,000 public comments. Declaration of Casey Rowe ¶¶ 3, 4, 6.

In many cases, the declarants cannot explain whether and how their interests will be harmed because, as it stands, the projects are merely proposed and the agencies are evaluating whether even to approve them. *See* Bass Decl. ¶ 10 (noting that project is "proposed"); Mannchen Decl. ¶ 19 (referring to project as "proposed action"); McMahon Decl. ¶ 6 (describing project as "proposed"). In other instances, the declarants allege future speculative effects and stop short of any present effects or otherwise fail to establish a geographic nexus—as such, the Court is left to speculate as to whether these projects will have a concrete impact on the declarants' recreational and aesthetic interests. *See* Gibson Decl. ¶ 6 (refers to "potential impact from hazardous materials released from the mine," which has not been approved); Freeman Decl. ¶ 11 (notes "concern[] that implementation of Lease Sale 258 will negatively impact my recreational and aesthetic interests in Cook Inlet"); Henderson Decl. ¶¶ 22, 23 (omits detail about present effects of either project).

Despite 25 bites at the proverbial apple, Plaintiffs have failed to identify a single project that has moved forward under the challenged rules, where they would have been able to submit public comments before but could not do so now, and where that change in process caused them some kind of concrete harm. To establish recreational or aesthetic standing, Plaintiffs or their members must establish that they use and will continue to use an area that will likely be impacted because of the challenged regulations. Based on the allegations before the Court, they have not done so. *See, e.g.*, *Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 881 (5th Cir. 2023) ("the declaration does not 'connect the dots' so as to create a genuine issue of material fact" where the "testimony is couched in speculative, general language"); *Chamber of Comm. of U.S. v. EPA*, 642 F.3d 192, 202-03 (D.C. Cir. 2011) (noting "equivocal" statements in declarations are "just the kind … that we have previously rejected as insufficient to establish standing"). Plaintiffs have failed to allege an Article III injury traceable to the challenged regulations.

The so-called "relaxed" standard for traceability and redressability does not solve Plaintiffs' jurisdictional problem. *See* Pls. Mot. at 17 (citing, *inter alia*, *Cottonwood Env't. L. Ctr. v.*

*U.S. Forest Serv.*, 789 F.3d 1075, 1083 (9th Cir. 2015)). To be sure, in the Ninth Circuit, a plaintiff who alleges a procedural injury need not show that the agency would necessarily reach a different decision if forced to follow the correct procedure, but "need only demonstrate that he has a procedural right that, if exercised, *could* protect [his] concrete interests." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (citation and brackets omitted). But even that standard requires a "concrete interest[]"; here, Plaintiffs have alleged none. Plaintiffs do not merely ask the Court to assume that an agency might make a different decision on a project upon remand. Without any project in sight, Plaintiffs instead insist that a hypothetical future project might have a different outcome if a different procedural framework (which may or may not, as applied, be different from the present one) were applicable. That is several bridges too far.

Nor can Plaintiffs rely on supposed organizational injuries to establish standing. Plaintiffs' declarants allege that, because of the new rules, they are "forced to invest significant additional effort to simply determine whether new projects have been proposed, and to gather sufficient information to assess a project's potential environmental impacts." Henderson Decl. ¶ 19; *see also*, *e.g.*, Dkt. No. 37-3 (Nowicki Decl.) ¶ 23 (similar). It is simply not true that Plaintiffs would have to invest more money to "determine whether new projects have been proposed" when Defendants are preparing EISs: the Notice of Intent to prepare an EIS—which is published in the Federal Register—takes care of that. Regardless, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. The challenged rules do not regulate Plaintiffs or impose any burdens on them as a matter of course. And they cannot "manufacture standing merely by inflicting harm on themselves." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Plaintiffs' claimed organizational injuries are not cognizable for Article III purposes.

At bottom, standing requires more than just being potentially affected by agency procedures at some unknown point in the future. Were it otherwise, the constraints of Article III would

be nullified in cases challenging government action. Plaintiffs fail to establish anything more than potential future impact traceable to these procedures, and as such this Court lacks jurisdiction.[10]

**B. Plaintiffs' claims are also unripe.**

Plaintiffs also fail to show that their claims are ripe. "[R]ipeness is peculiarly a question of timing." *Anderson v. Green*, 513 U.S. 557, 559 (1995). "[T]he mere existence of a law absent any threat of" concrete injury "is not sufficient for ripeness." *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1086 (9th Cir. 2022) (citation and brackets omitted). To obtain declaratory and injunctive relief, the plaintiff must establish "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" for the former, and a "present harm … to enjoin" for the latter. *Id.* at 1086.

In a similar case, the Fourth Circuit concluded that the plaintiffs' suit—which challenged 2020 changes to CEQ's regulations—was not ripe. *Wild Virginia*, 56 F.4th at 295. *Wild Virginia* explained that, although CEQ's regulations provided rules for agencies, it was the agencies that would take actions subject to NEPA reviews: "[s]o, to the extent Plaintiffs express fears related to how other agencies will conduct their NEPA reviews of potential future actions after the 2020 Rule, those fears have not yet ripened into actionable injuries." 56 F.4th at 296; *see also id*. (claims that "are 'contingent upon a decision to be made by a third party that has not yet acted' are not ripe") (citation omitted). As *Wild Virginia* noted, "[p]laintiffs are ultimately concerned with the environmental effects of decisions that other agencies might make in conducting their NEPA analyses under CEQ's 2020 Rule. But there are many steps to occur … including, most importantly, that other agencies will need to actually engage in NEPA reviews (or decline to do so) as to particular projects." 56 F.4th at 296 (citation modified).

---

[10] Even if the Court concluded that some of the projects Plaintiffs identify suffice for standing, Plaintiffs still fail to establish jurisdiction to sue most of the named defendants. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Plaintiffs have sued eleven departments and agencies, *see* Dkt. No. 27, 25-cv-010793, at 1-2; Dkt. No. 34, 26-cv-866, at 1, but allege harms related to only a handful of them (specifically, USFS, BLM, and BOEM). Plaintiffs offer the Court no basis to exercise jurisdiction over the APHIS, BSEE, OSMRE, Bureau of Reclamation, FWS, or NPS, (or the officials named as defendants by virtue of their leadership of one of those offices, bureaus, or services).

So too here. Plaintiffs will "have ample opportunity later to bring [their] legal challenge at a time when harm is more imminent and more certain." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998); *see Wild Virginia*, 56 F.4th at 297 ("Plaintiffs can bring a challenge to later agency actions—and, if relevant, to the underlying 2020 Rule"—when it has been applied in a concrete project). Judicial review now "would have to take place without benefit of the focus that a particular [ ] proposal could provide," while delaying review until the "factual components" of application of the final rules have been "fleshed out, by some concrete action" will aid resolution of the Plaintiffs' claims. *Ohio Forestry*, 523 U.S. at 736-37. The final rules do not directly govern Plaintiffs' conduct: they do not "command anyone to do anything or to refrain from doing anything"; "grant, withhold, or modify any formal legal license, power, or authority"; "subject anyone to any civil or criminal liability"; or create "legal rights or obligations." *Id.* at 733; *see Fla. Power & Light Co. v. EPA*, 145 F.3d 1414, 1421 (D.C. Cir. 1998) (facial challenge to regulation unripe where claims were based on plaintiff's "own interpretations of the preamble statements and what could happen if those statements—as interpreted by [plaintiff]—are applied" by the agency). Plaintiffs' attempt to shoehorn a prospective policy grievance into an Article III injury does not pass muster.

These ripeness issues are particularly acute because the fear that Plaintiffs express about the future of NEPA review—that agencies will decline to engage in public comment as to *every* project before the agency—will not come to pass. First, both agencies will allow comment at least once on each EIS, since that is mandated by statute and the current procedures. Second, for a project entailing an EA, Plaintiffs have a different ripeness problem: since the prior regime was discretionary as to comment on EAs, it would take a concrete case—at the very least—before a court could determine whether the current procedures are even *different*. Both agencies retain the option to utilize public comment procedures at later stages of the EIS process when doing so would be helpful. *See* USDA-00000005 (noting that the responsible official has "discretion to determine whether to conduct certain processes based on circumstances unique to the USDA subcomponent and the proposal or project at hand"); OEPC000229 (noting that Interior bureaus may "exercise[e] their discretion to solicit additional public comment when they determine that doing so would be

appropriate or helpful"). Indeed, in practice, the agencies have taken many opportunities to do so. White Decl. ¶ 4 (noting 16 "optional comment opportunities," as well as more than 200 public comment opportunities since issuance of IFR); Declaration of Steven Tryon ("Tryon Decl.) ¶¶ 5-17 (listing optional public comment opportunities offered by subcomponents of Interior).

Plaintiffs' effort to bring a challenge against the entire NEPA framework of USDA and Interior, even before a concrete harm has materialized, again illustrates the true nature of this challenge: they have a fundamental policy disagreement with the direction that NEPA implementation is headed. But "[t]he presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond v. Charles*, 476 U.S. 54, 62 (1986). Given the genesis of this change in direction—that is, action by Congress, the Supreme Court, the President, and CEQ—this Court is not the right forum to adjudicate Plaintiffs' policy preferences. Plaintiffs fail to establish Article III jurisdiction, so the Court should dismiss their claims.

## II. NEPA Does Not Require Public Comment on Draft NEPA Documents.

Plaintiffs' claims fail on the merits as well. At bottom, they ask this Court to hold that Congress has codified past regulations into NEPA, such that the Government's previous *implementation* of NEPA is now statutorily required. According to Plaintiffs, a combination of congressional ratification via *other* statutes and general statements of policy in NEPA have transformed a regulatory choice into a procedural floor.

"[T]he statutory text and common sense" tell a remarkably different story. *Seven County*, 605 U.S. at 184. NEPA as originally written did not require public comment at all. The FRA amended it to provide for the first time that public comment is required in one, and only one, circumstance: notices of intent to prepare an EIS. The challenged final rules provide exactly that, and Plaintiffs are entitled to nothing more.

### A. NEPA requires public comment only on notices of intent to prepare EISs.

NEPA as originally passed did not include any public participation requirements. In 2023, Congress added to NEPA the statute's only specific public participation requirement—that "[e]ach notice of intent to prepare an environmental impact statement … shall include *a* request for public comment." 42 U.S.C. § 4336a(c) (emphasis added); *see* Pub. L. 118-5, 137 Stat. 10 (June 3, 2023).

Congress could have required *additional* requests for public comment, or could have required requests to accompany other announcements. The fact it did not do so is a clear indication that Congress intended to require agencies to engage the public only for notices of intent to prepare an EIS—and even then, only once. *Cf. Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1054 (9th Cir. 2018) (citation omitted) (explaining the "presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions").

The distinction Congress drew makes good sense: if an agency has decided to embark upon the preparation of an EIS, it has already determined that the action is a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), and soliciting public input early in that process may well aid decisionmaking and analysis. Conversely, agencies prepare EAs if the action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," 42 U.S.C. § 4336(b)(2)—in other words, for proposed actions with a smaller expected impact. And the fact that Congress imposed public participation requirements in only one instance makes all the more sense given Congress's competing efficiency concerns, made manifest in the 2023 addition of mandated timelines and page limits for EISs and EAs. 42 U.S.C. § 4336a(e), (g).

USDA and Interior's procedures concerning public participation track NEPA's statutory requirements. OEPC000184 ("DOI's foundation for the updates to its NEPA procedures is NEPA itself."); USDA-00000004 ("These [procedures] … are intended to align NEPA with its Congressionally mandated dimensions[.]"). USDA and Interior required public comment for notices of intent to prepare an EIS, but declined to create blanket public participation requirements that go beyond that. OEPC000228; USDA-00000016. The agencies, moreover, merely set a floor for public participation in their new procedures. Both agencies permit the decisionmaker, on a discretionary basis, to engage in more robust public comment procedures. *See* USDA-00000005 (noting that the responsible official has "discretion to determine whether to conduct certain processes based on circumstances unique to the USDA subcomponent and the proposal or project at hand"); USDA-00000014-16; OEPC000229 (noting that Interior bureaus may "exercise[e] their discretion to so-

licit additional public comment when they determine that doing so would be appropriate or helpful"). In sum, nothing about the challenged procedures contravenes NEPA's text, and the agencies even decided to retain the option to go beyond the minimum public comment that NEPA requires. This approach is faithful to both the letter and spirit of NEPA as amended by the FRA.

Plaintiffs' insistence that NEPA itself requires more robust public participation founders against that statute's plain text. NEPA, as noted, requires public comment in only one place—the issuance of a notice of intent to prepare an EIS—and does *not* require public comment in all the other places where Plaintiffs wish it did. The fact that "Congress knew how to mandate" public comment "yet chose not to" do so for *anything* other than notices of intent to prepare an EIS forecloses Plaintiffs' procedural maximalism. *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1020 (9th Cir. 2012).

Plaintiffs cast about in vain for a statutory hook notwithstanding NEPA's clearly limited procedural entitlements. They settle on the provision that agencies shall "identify and develop methods and procedures, in consultation with [CEQ,] which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(B). Plaintiffs say that a framework that leaves the propriety of public comment in most instances to the discretion of an agency official is not a "method" or a "procedure," does not "ensure" that all environmental amenities are appropriately considered, and is "in direct tension with NEPA's aims." Pls. Mot. at 22-24. Plaintiffs similarly argue that 42 U.S.C. § 4331(b)'s requirement that agencies use "all practicable means" to carry out NEPA's policy aims and "cooperat[e]" with "concerned public and private organizations" means that only Plaintiffs' preferred procedures will do. *See id.* at 19, 22; *see also id.* at 3, 19 (citing 42 U.S.C. § 4331(a)).

There is nothing to commend Plaintiffs' proposed extratextual expansion of those provisions. Section 4332(B) simply instructs agencies to consult with CEQ and craft procedures for implementing NEPA. Required *content* of those regulations derives from elsewhere in the statute, most notably in the original statute from § 4332(C), which prescribes the requirements for EISs,

and, after the FRA amendments, from other provisions such as § 4336 and 4336a and the definitions section at § 4336e. There is, in short, nothing in the plain meaning of Section 4332(B) to that section sets forth substantive requirements for the agency's procedures at all, much less that it requires certain rounds of public comment at certain stages in the procedural process.

Moreover, even reading Section 4332(B) for all it's worth, the agencies have satisfied it. Providing for comment on EIS notices, with discretion to add additional rounds of comment, is definitionally a "method" or "procedure." *See* Black's Law Dictionary 1142 (4th rev. ed. 1968) (defining "method" as "mode of operating"); *id.* at 1368 (defining "procedure" as "mode of proceeding"). And in enacting § 4332(B) and § 4331(b), Congress preserved significant discretion for agencies in implementation.[11] Plaintiffs fixation on the word "ensure" aside, the relevant phrase is "*appropriate* consideration," 42 U.S.C. § 4332(B)—a phrase designed to "leave[] agencies with flexibility," *Loper Bright*, 603 U.S. at 395. The same goes for § 4331(b), which necessarily "suggests agency discretion" given its "open-ended nature." *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1220 (9th Cir. 2015) (construing the phrase "maximum extent practicable").

Indeed, if Plaintiffs were right that multiple rounds of public comment were necessary to "ensure … appropriate consideration," then § 4332(B) would entirely swallow up the FRA's amendment to NEPA. "[I]t is a commonplace of statutory construction that the specific governs the general," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992), and this canon has "full application" to avoid "the superfluity of a specific provision that is swallowed by the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). There would have been no need for Congress to specify that public comment should be required for EIS notices if public comment were required for *all* agency actions since the beginning of NEPA. And it would be especially odd here, given that, "[w]hen Congress amends legislation," it is presumed "that it intends the change to have real and substantial effect." *Mullin v. Al Otro Lado*, 146 S. Ct. 2079, 2092 (2026) (citation omitted). When Congress enacted the FRA, NEPA already directed agencies

[11] Plaintiffs, meanwhile, selectively quote § 4331(a) to suggest it imposes a public-comment policy on the government. Not so. That section provides that the federal government, the public, and state and local governments all have an obligation to work together cooperatively "to create and maintain conditions under which man and nature can exist in productive harmony."

to "ensure" "appropriate consideration" of environmental values. If that already required the extensive procedures Plaintiffs now seek, then, by Plaintiffs' own lights, Congress's amendment did nothing.

Precedent confirms that Plaintiffs cannot transform NEPA's grant of discretion to agencies into a specific substantive entitlement to numerous opportunities for comment. In *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1286 (9th Cir. 1973), the Ninth Circuit, construing the statute directly before the advent of CEQ's regulations, rejected the plaintiffs' argument that NEPA itself required administrative hearings. The court began with observing that "no language in NEPA … indicate[s] that hearings are a requirement in all instances." *Id.* at 1284. And in that light, it held that the plaintiffs "fail[ed] to establish that hearings were so 'appropriate' … that failure to hold them constituted a failure to comply with the requirements of NEPA." *Id.* at 1285. That was so because "[t]o hold in the abstract that meaningful public participation in the NEPA process cannot exist unless public hearings are held subsequent to the issuance of a draft environmental impact statement and prior to the preparation of the final document would be to substitute our judgment for that of Congress." *Id*. at 1286.

The same logic applies here. There is "no express provision in NEPA requiring" Plaintiffs' desired multiple opportunities for public comment for EISs. *Id.* Other than Plaintiffs' say-so, there is nothing to establish that additional opportunities for comment are "so 'appropriate'" as to be a nondiscretionary requirement of NEPA. *Id.* at 1285; *see also Como-Falcon Cmty. Coal., Inc. v. U.S. Dep't of Lab.*, 609 F.2d 342, 345 (8th Cir. 1979) ("[T]here is no statutory requirement that the agency provide such an opportunity" for public input "or an opportunity of a particular kind, and we are unwilling by judicial decision to legislate such a requirement into the Act."). Moreover, using a generalization in the statute to craft extra procedural obligations and impose them on the agencies would cut against basic principles of administrative law. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015). When a procedural statute, such as the APA or, here, NEPA, sets forth "minimum requirements, 'courts lack authority to impose upon [an] agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good.'" *Id.* (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549 (1978)). Just so, the

Court should resist Plaintiffs' invitation to find new procedural requirements, which the agency has rejected, lurking in vague statutory generalities. Meanwhile, for EAs, preexisting caselaw teaches exactly the opposite of what Plaintiffs want: that comment is *not* required. *See Bering Strait*, 524 F.3d at 952 (collecting cases).

Last, neither case that Plaintiffs cite in support of their argument that NEPA requires the public participation procedures they would like is on point. In both cases, the Ninth Circuit interpreted CEQ's regulations. *See Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 39 (9th Cir. 2025) ("*MWF*") (discussing "[w]hether the agency's new policy is 'permissible under the statute'—as interpreted by the CEQ regulations"); *State of Cal. v. Block*, 690 F.2d 753, 770 (9th Cir. 1982) (interpreting 40 C.F.R. § 1500.7(a)). As *MWF* acknowledged, resting on *Bering Strait*, the "statute itself" is silent when it comes to participation required in an EA, and it was construing only the "to the extent practicable" language in the former CEQ regulations. *Id*. at 37-38; *see Bering Strait*, 524 F.3d at 952. The former CEQ regulations cannot be the basis for an interpretation that the statute requires the provisions of the former CEQ regulations; that's entirely circular. As to *MWF*'s holding that reasoned explanation (of action taken under another statute) must take account of NEPA's "purposes," Plaintiffs fail to grapple with the fact that, after the 2023 FRA amendments, efficiency *is* one of NEPA's aims. Defendants have, in any event, fully satisfied their reasoned-explanation obligations, *see infra*, Section II.C.

Likewise, *Block* is a case about the now-rescinded CEQ regulations. 690 F.3d at 770 (construing 40 C.F.R. § 1500.7(a)). To the extent it holds that NEPA itself "requires … public participation in the evaluation of the environmental consequences of a major federal action," *id*. at 771, that's exactly what the agencies—following Congress—provide with the comment period for EIS notices of intent. *Block* predates Congress's specific instructions as to what public comment is required for EISs by four decades. Moreover, Plaintiffs have entirely failed to grapple with the Supreme Court's teaching that "[s]ome courts have strayed and not applied NEPA" properly. *Seven Cnty.*, 605 U.S. at 183. *Seven County* emphasizes repeatedly that lower courts have been mistaken in their application of NEPA and that a "course correction" is needed, *id*. at 184, yet Plaintiffs repeatedly fail to reexamine their authorities from first principles. To the extent *Block* or

*MWF* are read to require ever "more process" under NEPA itself, *id.*, they are, quite simply, wrongly decided.

Properly understood, USDA's and Interior's final rules are completely in keeping with § 4332(B). Congress instructed that "all agencies … shall … develop … procedures." The agencies here clearly *have* promulgated procedures; Plaintiffs simply don't like what they are. Those procedures are supposed to ensure that environmental amenities be given "appropriate" consideration. 42 U.S.C. § 4332(B). To require public participation in every instance that Plaintiffs want elevates consideration of environmental amenities beyond what is "appropriate"—particularly given the Supreme Court's recent observations about the need for NEPA course correction. *See Seven County*, 605 U.S. at 184. Agencies must balance competing concerns when evaluating what process to provide under NEPA, and both Interior and USDA cited efficiency concerns when they promulgated their new rules. USDA-00000005 ("USDA is not carrying forward process requirements, which may have been codified in now rescinded regulations, where these do not prioritize efficiency and certainty and do not avoid and minimize delays and ambiguity in the permitting process"); OEPC000189 (procedures are intended to "mak[e] review faster, more flexible, and more efficient"). Economic efficiency is undoubtedly something an agency can consider when determining "appropriate" consideration—especially in light of § 4332(B)'s own mention of "economic … considerations." 42 U.S.C. § 4332(B); *see also Michigan v. EPA*, 576 U.S. 743, 755 (2015) (concluding the term "appropriate" includes consideration of cost based on "[s]tatutory context"). At a minimum, the language Plaintiffs identify cannot possibly be read as an absolute command to engage the public at every turn the way that they want it to.[12]

[12] Plaintiffs refer to, but do not make a substantive argument about, Executive Order 11514, *see* Pls. Mot. at 6, 8, which instructed agencies, in relevant part, to "[d]evelop procedures to ensure the fullest practicable provision of timely public information and understanding of Federal plans and programs with environmental impact in order to obtain the views of interested parties," 35 Fed. Reg. 4247. This language serves Plaintiffs no better than NEPA's text: the "practicable" limitation leaves much to agency discretion; this passage is by its terms limited to environmental impact statements, given that EAs did not yet exist and the instruction is limited to projects with environmental impact; and the language is, at a high level, too general to contain the specific instruction Plaintiffs would like.

**B. Congress did not implicitly legislate public participation requirements.**

Without any actual text to point to, Plaintiffs rest their hopes on *sub silentio* congressional ratification. In their telling, because Congress passed various *other* laws that referred to the NEPA public participation procedures while CEQ's regulations were in effect, Congress has "affirm[ed] that agencies are to involve the public in draft EISs and/or in preparing EAs," "ratified CEQ's and federal agencies' longstanding position that public participation requirements in NEPA reviews are a 'practicable means' to achieving NEPA's policies and purposes," and confirmed that these comment procedures are "required as part of the NEPA review process." Pls. Mot. at 22. In other words, Plaintiffs claim Congress silently legislated an additional two rounds of public comment.

The doctrine of congressional ratification is inapplicable here. For one, vague invocations of congressional ratification cannot prevail where "the text and structure of the statute are to the contrary." *BP P.L.C. v. Mayor of Baltimore*, 593 U.S. 230, 244 (2021) (citation omitted). Ultimately, congressional ratification is a doctrine of "statutory history." *Holder v. Martinez Gutierrez*, 566 U.S. 583, 593-94 (2012). Here, that history points against Plaintiffs. In 2023, Congress—presumably aware of approximately 40 years' worth of practice under the CEQ regulations—enacted exactly one required public comment procedure. *See* Pub. L. 118-5, 137 Stat. 10 (June 3, 2023). There is no basis for "assum[ing] that Congress has omitted from its adopted text" a blanket requirement for multiple comment periods, especially "when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. ICE*, 543 U.S. 335, 341 (2005).

Along similar lines, ratification arises only where "Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change." *CFTC v. Schor*, 478 U.S. 833, 846 (1986). The ratification canon "derives from the notion that Congress is aware of a definitive … interpretation of a statute when it reenacts the *same* statute using the same language." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019). Then, and "only" then, does the doctrine apply. *Martinez Gutierrez*, 566 U.S. at 593.

None of Plaintiffs' candidates for ratification fit the bill. For Congress to have ratified an interpretation of NEPA, it had to have reenacted *NEPA* without any change. But, as already explained, NEPA did change—it now expressly requires only one comment period for one agency action, and nothing more. Plaintiffs cannot look to *other* statutes for ratification of how CEQ has interpreted NEPA. The fact that Congress may have "enact[ed] similar phrases in other statutes" over the years says "nothing about Congress's understanding of the language it enacted" in the first place. *Food Mktg. Inst.*, 588 U.S. at 439. Regardless, even if such fishing expeditions were permissible under cover of ratification, Plaintiffs' chosen candidates—like the FAST Act (Fixing America's Surface Transportation Act, Pub. L. No. 114-94, 129 Stat. 1741 (2015) (codified at 42 U.S.C. § 4370m-4(d)(1)), codifying certain modified forms of environmental review—are poor prospects. *See* Pls. Mot. at 20-21. Those laws attempted to *limit* public comment periods. It would be particularly perverse to read these reforms as somehow encasing the then-prevalent, then-expansive procedures for NEPA in amber.

Regardless, even if congressional ratification applied here, it would do nothing for Plaintiffs. Ratification is "persuasive evidence" that "the longstanding interpretation placed on a statute by an agency" is "the one intended by Congress." *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 274 (1974). Here, the "longstanding interpretation" of NEPA by CEQ was that the prior process was *a* "method" or "procedure" to ensure "appropriate consideration" of environmental values. 42 U.S.C. § 4332(B). *Cf.* Pls. Mot. at 1-2 (noting that the prior regulations were "[c]onsistent with" NEPA's "statutory requirement[s]"). No one disputes that NEPA *permits* the agencies to adopt Plaintiffs' desired process. The question is whether NEPA *requires* it. No past agency interpretation of the words "method" or "procedure" has ever concluded that they can *only* mean multiple rounds of opportunity for public comment for EISs and EAs.

At most, then, Congress ratified CEQ's understanding that NEPA *allows* Plaintiffs' coveted procedures. That takes this case far outside of the situation in *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). There, the agency interpretation Congress ratified was FDA's understanding that tobacco products outside the scope of the Food, Drug, and Cosmetic Act. That interpretation necessarily limited the agency's discretion. Here, however, CEQ

was interpreting whether a particular process ensured "appropriate consideration"—a term that necessarily includes a range of options. *Loper Bright*, 603 U.S. at 394-95. That Congress agreed that the prior procedures fell within that range says nothing about whether the current procedures fall outside.

Plaintiffs' argument, if accepted, would transform the modest, though indeed already-contested, doctrine of ratification into a threat to the constitutional order.[13] CEQ's prior regulations were a highly reticulated, 40-page document. No case Plaintiffs cite comes close to the supporting the proposition that Congress can "ratify" something like that (or, even, has ever tried to do so) via a few vague phrases, or language in other contexts showing general awareness of the old regulations. If that were sufficient, what would be the point of the constitution's highly specific instructions on how laws are written and made? *See INS v. Chadha*, 462 U.S. 919, 955 (1983). Indeed, as in *Chadha*, Congress here made the "choice to delegate" to agencies the authority to choose appropriate procedures for implementing that statute's aims when it passed NEPA. Congress cannot—and did not, despite Plaintiffs' allegations—silently take that authority back. *Cf. id.* What is really going on is that Plaintiffs are inviting this Court to impose as unchangeable a system that Congress, the President, and the agencies have all been quite clear recently must change. The Court should not take Plaintiffs' invitation to circumvent NEPA's plain text and should grant summary judgment to Defendants on Count III of Plaintiffs' Complaints.

**C. The agencies reasonably explained their changed policy regarding public comments.**

Both USDA and Interior acknowledged that they were changing their position when they announced that they were rescinding their prior NEPA regulations in favor of a new framework. Both agencies offered good reasons for this change: among them, the unworkability of the prior system, the efficiencies to be gained through reform, and the need to update the regulations to conform to changes in legal landscape. Plaintiffs' argument that the agencies' final rules fail to reasonably explain their change in policy therefore lacks merit.

[13] Among other things, the doctrine is in significant tension with "the teaching that 'the view of a later Congress cannot control the interpretation of an earlier enacted statute.'" *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 856 (9th Cir. 2018) (citation omitted).

Under *FCC v. Fox Television Studios*, when an agency changes its position, it must "display awareness that it *is* changing position," it must "show that there are good reasons for the new policy," and the new policy must be "permissible under the statute." 556 U.S. 502, 515 (2009). An agency need not persuade the Court "that the reasons for the new policy are *better* than the reasons for the old one," rather, the agency must merely "*believe*[] it to be better." *Id*. Plaintiffs argue that USDA's and Interior's reasons for their final rules—among them, significant legal changes with which the agencies hoped to align their procedures, an interest in increasing efficiency and certainty, and flexibility in permitting processes—were not "good" enough for purposes of the APA. Pls. Mot. at 26-33.

At bottom, Plaintiffs are making a policy argument: they liked the old system better and wish it were still in place. But neither Plaintiffs nor this court may "substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423. Plaintiffs' argument fails to persuade.[14]

**1. *The agencies' efficiency rationale was a compelling reason for a change.***

In the final rules and supporting documents, both USDA and Interior explained that the status quo ante for NEPA implementation under the prior CEQ regulations was a story of delay, inefficiency, and uncertainty. *See, e.g.*, OEPC000028-29, USDA-00000163 (agency IFRs, citing Supreme Court's holding in *Seven County* for notion that previous NEPA procedures "paralyze[d]" agency decision-making); OEPC000002, USDA-00000066 (agency Regulatory Impact Analyses, noting that "implementation of NEPA remains challenging for complex projects, and the process can be lengthy, disjointed, and costly"); OEPC000010, USDA-00000078-79 (Regulatory Impact

[14] Plaintiffs argue in passing that the agencies did not "fully recognize that their new regulations reflect a change in position." Pls. Mot. at 25. This is nonsense. USDA's and Interior's final rules both begin by stating that the IFRs (which the final rules adopted) rescinded and revised existing NEPA-implementing regulations. *See* USDA-00000001; OEPC000183-84. That CEQ's rescission of its regulations were part of the reason for this change (not "solely" the reason, as Plaintiffs suggest) does not mean the change in position went unacknowledged.

Analyses recognition that uncertainty attendant to NEPA process deters investment). Both agencies recognized that, for EISs, they were typically not meeting the deadlines imposed by the FRA. *See* USDA00000071, OEPC000004-5.

In place of a rigid regulatory framework that required mandated multiple rounds of public participation on every EIS—regardless of the complexity of the proposed agency action, level of public interest, or type of potential environmental impact—the agencies decided to promulgate regulations that adhered to what NEPA, the statute, actually requires in terms of public comment (that is, only for notices of intent for EISs) while retaining the flexibility to offer additional opportunities for public comment when the circumstances so warrant. As to EAs, meanwhile, the preexisting regulations did not mandate public comment any more than the new ones do; discretion is a feature of both regimes. *See supra*, Section II.A. The agencies' new framework adhered to NEPA, while removing language that had caused legal controversy—*see, e.g.*, *Bering Strait*, 524 F.3d at 951 (noting indeterminacy of prior regulations regarding public circulation of EAs)—and reinforced the discretionary aspect, in keeping with the FRA reforms.

The agencies expected that these changes would reduce delays and administrative burdens. *See* OEPC000003 (Interior RIA, projecting that new rules would "reduce regulatory burden, improve processes for applicants and non-federal sponsors, and expedite permitting approvals"); USDA00000076 (USDA RIA, stating, "The revisions to the USDA Rule are anticipated to significantly lower administrative costs as a result of changes to reduce unnecessary paperwork and improve coordination and management at the department-level, while meeting the FRA statutory deadlines which shorten review times."). The efficiency rationale the agencies provided accords with common sense—the removal of a mandatory, rigid public comment or participation process is likely to result in administrative savings and reduce delays—and with simple math. Removing a forty-five-day public comment period, plus the amount of time spent responding to comment, *would in fact* save the agencies months of time. *See* Declaration of Tera Graelyn ¶ 3; Tryon Decl.

¶ 3. Indeed, Plaintiffs themselves acknowledge that "[public] participation is likely to add processing time while agency staff conduct additional analysis." Pls. Mot. at 31.[15] In certain situations (e.g., where public participation could provide crucial information not otherwise ascertainable, such as the conditions on land best known to the landowners), this tradeoff might be worth it, and in other situations (e.g., where the answer to the central question in an environmental assessment is determinate via objective experiment), it might not. *See, e.g.,* The new regulations allow agencies to choose the more efficient and informative path as needed. This efficiency rationale is a good reason for a change in position.

Plaintiffs' chief argument against this commonsense rationale is that the agencies failed to weigh the efficiencies to be gained against the downside of limiting public comment opportunities. Not so. The agencies show clear awareness throughout their rulemakings and response to comments that making public comment optional would reduce the amount of public comment, and thus, in certain circumstances, reduce public input. *See* OEPC000229; USDA-00000016. They acknowledged comments making the exact same arguments Plaintiffs make today. *See* OEPC000227; USDA-00000016. But they explained that, in their views, the cited advantages of mandatory public comment were outweighed by the gains in efficiency and flexibility. Weighing such considerations is a classic task for the political branches, and—where, as here, it is properly explained—one to which this Court should defer. *See Prometheus Radio Project*, 592 U.S. at 423.

Plaintiffs rely upon *Montana Wildlife Federation v. Haaland*—in which the Ninth Circuit concluded that BLM's curtailment of public comment periods violated the APA—to ask this Court to fashion them their desired procedures. *See* Pls. Mot. at 30. But *MWF* never held that considerations of "administrative efficiency" were impermissible, 127 F.4th at 39. It held only that BLM "failed entirely to acknowledge the potential costs of reducing public participation in leasing decisions." *Id.* USDA and Interior did not make that mistake. *See* OEPC000229, USDA-00000016.

---

[15] Plaintiffs argue that "if eliminating public comment indeed speeds things up, it is only because it allows agency staff to avoid grappling with all of the environmental consequences of their decisions" Pls. Mot. at 31. But in this argument, Plaintiffs bake in the assumption that staff ignored something in its initial analysis *and* failed to ask for comment on it. In such a case remand might be appropriate, but this possibility hardly makes the current procedures *per se* inappropriate.

And the agencies' optional public comment procedures mark a significant difference, too: both agencies permit the decisionmaker to seek out public comment if doing so would be helpful. OEPC000229, USDA-00000005. *MWF* did not address how a discretionary "safety valve" of public comment for an agency would bear on a decision to curtail some public comment in the interest of efficiency (and instead addressed an inflexible limit on public comment). And that's to say nothing of the Supreme Court's recent (and post-*MWF*) admonitions to return interpretations of NEPA to "the statutory text and common sense." *Seven County*, 605 U.S. at 184. After the FRA amendments, efficiency *is* one of the aims of NEPA; *MWF*, by contrast, concerned actions taken before the FRA. *Cf.* 127 F.4th at 39. And as noted above, *MWF* primarily construed now-rescinded CEQ regulations. *See* Section II.A, *supra*. The underlying legal framework, agency explanation, and the nature of the change distinguish this challenge from *MWF*.

Plaintiffs also give no reason to think that EAs and draft EISs that do not incorporate public comment and participation will necessarily be deficient or encourage the agencies to "avoid grappling with all of the environmental consequences of their decisions." Pls Mot. at 31. For starters, public comment is a *means* to the end of accurately assessing the "environmental effects of a proposed project," *Seven County*, 605 U.S. at 172, not an end in and of itself. Moreover, the agencies still require public comment as part of the EIS process. *See* USDA-00000015 (explaining that "USDA's stance is that comment at the notice of intent stage is unique in that it provides an opportunity for fact-gathering from persons who may have relevant (indeed, unique) information about environmental conditions of land they live on or by with respect to projects that USDA subcomponents have determined may have a reasonably foreseeable significant impact"); OEPC000232 (similar). Nor is it the case that notices of intent are always short and unspecific. *See, e.g.*, 91 Fed. Reg. 36787 (June 18, 2026). Plaintiffs don't explain why a second public comment period is necessary to achieve NEPA's aims. The agencies' final rules reflect the exercise of reasoned judgment and adhere to the direction of Congress.

Most tellingly, Plaintiffs describe efficiency as a "non-statutory factor" that the agencies "elevate[d] … at the expense of considering the important (and codified) policy considerations at the heart of NEPA." Pls. Mot. at 39. That is a dubious proposition; the statute directs agencies to

take "appropriate consideration" of environmental values, 42 U.S.C. § 4332(B), and the Supreme Court has indicated that cost efficiency is nearly always an "appropriate" consideration, *Michigan*, 576 U.S. at 754. Regardless, after the 2023 FRA, efficiency *is* a statutory factor that the agencies must take into account: the FRA introduced deadlines and page limits for agencies' NEPA analyses. *See* OEPC000228-29, USDA-00000015-16. E.O. 14154 notes these new deadlines and directed the agencies to "prioritize efficiency and certainty" in the permitting process. 90 Fed. Reg. 8355. So once again, Plaintiffs' ultimate disagreement is with Congress and the President, and they offer no reason for the Court to second-guess the agency's decisionmaking.

Moreover, the agencies' rationale for the new rules provides more than a sufficient answer to Plaintiffs' policy concerns (and to the scattered comments they now identify). Stated generally, the comments at issue take the position that more public comment opportunities will lead to better NEPA processes, which can be more efficient because the public can air concerns in advance of a decision, rather than afterwards in litigation, and foster public trust through transparency and consensus-based decisionmaking. *See* Pls. Mot. at 31-33. This reduces to a policy disagreement. The agencies drew upon a wealth of experience overseeing NEPA processes and reasoned instead that an across-the-board public comment requirement bogged down agency decisionmaking, unduly burdened internal resources, and kept them from meeting statutory deadlines for NEPA documents under the FRA. *See* OEPC000228-29, USDA-00000015-16. At bottom, Plaintiffs' argument founders against the standard in *Fox*: the agency need not persuade the Court "that the reasons for the new policy are *better* than the reasons for the old one," but need only provide "good reasons" for the change. 556 U.S. at 515. The agencies have done so here.[16]

[16] To the extent Plaintiffs argue that the agencies should have provided more robust explanations in response to specific comments, they failed to plead this argument with sufficient specificity. Count IV of their complaint alleges a failure to adequately respond to public comments, USDA Am. Compl. ¶¶ 107-110, Interior Am. Compl. ¶¶ 110-113, yet Plaintiffs did not bother to identify any specific comment (among thousands submitted) to which the agencies failed to provide an adequate response. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006) (explaining that "a list of hypothetical possible" iterations of a claim "is not a substitute for … alleging the grounds for a claim").

**2. *The changed legal framework also supports the agencies' changed position.***

The agencies further made the reasonable determination that underlying legal changes militated in favor of new public comment procedures. First, the 2023 FRA amended NEPA, and added to the statute's text exactly one instance in which public comment would be required (and by omission, specifically did not legislate a more robust public comment framework like CEQ's regulations had set forth). 42 U.S.C. § 4336a(c); Pub. L. No. 118-5, 137 Stat. 10. Contrary to Plaintiffs' legislative ratification argument, this amendment evinced a clear expression by Congress that public comment was required in NEPA reviews in one, *and only one*, instance. Not only that, but the FRA added new page limits and deadlines, which put agencies under pressure to move through NEPA review with more efficiency. *See* 42 U.S.C. § 4336a(e), (g). The agencies reasonably concluded that prioritizing efficiency and limiting delays in conducting NEPA reviews are directionally aligned with these statutory changes.

Second, as both agencies noted, CEQ rescinded its regulations—the textual source of the public comment procedures Plaintiffs wish were still in force—in April 2025. OEPC000184; USDA-00000001. Prior to their rescission, two courts concluded that CEQ lacked the authority to issue binding regulations in the first place. *Marin Audubon*, 121 F.4th 902; *Iowa*, 765 F. Supp. 3d. 859. So although the agencies were not writing on a completely blank slate, they had considerably more latitude than before to craft new regulations that aligned with the statute's text.

Third, President Trump's E.O. 14154 not only emphasized efficiency of agency actions and permitting processes going forward, but revoked President Carter's E.O. 11991—the original basis for CEQ's supposed authority to issue regulations binding on other agencies. Plaintiffs completely ignore the latter development, but its significance looms large: in the absence of an executive order, CEQ now lacks the authority it once claimed to issue regulations, and the agencies' prior regulations depended on the existence of CEQ's own, then-binding regulations, so the status quo ante rests firmly in the rearview mirror.

Fourth, both agencies cited the Supreme Court's decision in *Seven County*, which emphasized that NEPA had expanded beyond its original intended scope into a burdensome procedure that borders on the Kafkaesque. USDA-00000004; OEPC000189. *Seven County* also emphasized

that the agency is best equipped "to assess what facts are relevant to the agency's own decision," and that the "level of detail" should not be excessively second-guessed. 605 U.S. at 181. Public comment is an additional input that goes to the level of detail of an agency's analysis. In other words, *Seven County* endorsed a more limited interpretation of what NEPA requires, as well as deference to agency discretion, and the agencies sought to align their new procedures accordingly.

It is black-letter law (not to mention common sense) that a change in the underlying legal framework can prompt a regulatory shift. *See, e.g.*, *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1086 (9th Cir. 2019) ("[T]he enactment of a statutory amendment obviously makes a concomitant regulatory amendment appropriate"). Taken together, and with an eye towards the policy interest in efficiency set forth in Section II.C.1, *supra*, the agencies made the manifestly reasonable determination that these legal developments supported a change in policy. USDA-00000001; OEPC000189. These legal developments collectively suggested that, in the judgment of the Supreme Court, President, and Congress, NEPA review in general, and public comment in particular, had "grown" beyond reasonable bounds. *Seven County*, 605 U.S. at 184. So the agencies made the reasonable, and reasonably explained, decision to trim back public comment requirements.

In hopes of dodging the agencies' sensible conclusion, Plaintiffs attack a straw man. They say that the agencies determined that these legal changes "compelled" the content of the final rules. Pls. Mot. at 27. Not so: the agencies said these legal developments either "supported" this change, USDA-00000001, or that the final rules represented an effort to align with these legal developments and respond to policy concerns, OEPC000189. Nowhere did the agencies describe the specifics of their final rules as mandatory changes dictated by these legal developments.

Relatedly, Plaintiffs attempt to dismiss each of these legal developments as individually insufficient for the change that the agencies elected to make. Pls. Mot. at 27-28. That argument misses the mark. The agencies never took the position that any of these developments, standing alone, dictated the scope and content of their final rules. Rather, the point is that these developments, taken together, left the agencies with a materially different legal landscape and marked a general change of tide. *See* USDA-00000001; OEPC000189. Given that CEQ's regulations no

longer existed, the agencies needed to fill the regulatory gap and provide procedures to ensure their subcomponents' compliance with NEPA. Not only did the agencies address a need for clarity, but they followed an instruction set forth in Executive Orders to fill the regulatory gap. *See* E.O. 11514, § 2(b) (instructing agencies to develop NEPA procedures); E.O. 14154 (directing agencies to revise agency-level implementing regulations). The agencies made the reasonable decision to fill that gap with policies that aligned with NEPA's text, rather than create additional public comment requirements that didn't. Plaintiffs' counterarguments here are meritless.

**3. *The agencies' public comment procedures allow them to solicit input when helpful.***

Plaintiffs separately attack the agencies' decision to allow public comment when helpful as an inadequate replacement for the procedures that used to be set forth in CEQ's regulations. Pls. Mot. at 33-35. This argument again misses the point: there is no requirement that the original CEQ regulations must be the baseline against which all subsequent developments are measured. Rather than carry forward the cumbersome original regulations in perpetuity, the agencies elected to allow decisionmakers to solicit public comment when they determine that doing so will be helpful. Thus, the agencies can avail themselves of the benefits of public comment when helpful, while dispensing with the cumbersome requirements for multiple, mandatory public comment rounds on every EIS.

Plaintiffs say that the problem with these optional public comment mechanisms is that they confer "unfettered discretion" on decisionmakers to utilize public comment, whereas NEPA demands that agencies use "methods" and "procedures" to ensure consideration of unquantified environmental amenities. Pls. Mot. at 34, *see also id*. at 22-23. Plaintiffs are wrong on the facts: the discretion the agencies have is not "unfettered," but guided by coherent principles. For USDA, a decisionmaker may solicit additional public comment when doing so would "assist in reasoned decision-making, not preclude them from meeting statutory deadlines (for EAs/EISs), and not otherwise create unnecessary delays and ambiguity in the environmental review and permitting process." USDA00000016. Interior instructs that a decisionmaker may do so "when they determine that doing so would be appropriate or helpful," OEPC000229, and sets forth additional factors to make this judgment in the Handbook, *see* OEPC000300-01. Plaintiffs are wrong on the law: NEPA

does not say that the decision to offer a discretionary public comment period (which the text of the statute does not mention) must be guided by a mandatory, enforceable process—even if that is what Plaintiffs prefer. *See* Pls. Mot. at 23. And Plaintiffs have no meaningful argument that a discretionary process somehow cannot be a "method" or "procedure."

Plaintiffs also speculate that the agencies' optional public comment procedures amount to a hollow offer. *See* Pls. Mot. at 34 (asserting that the agencies "will withhold public comment periods to evade public scrutiny and accountability"). But the agencies' representations about their intention to utilize public comment procedures when helpful are entitled to a presumption of regularity. *See Angov v. Lynch*, 788 F.3d 893, 905 (9th Cir. 2015). Moreover, experience has shown that Plaintiffs are wrong. USDA has offered dozens of public comment periods since the issuance of the IFR, and Interior has likewise identified numerous examples of discretionary public comment processes being put to use. White Decl. ¶ 4; Tryon Decl. ¶¶ 5-17. Unmoored from any evidence, Plaintiffs' attempt to cast aspersions about the agencies' good faith intention to use these optional procedures is entitled to no weight at all.

And although Plaintiffs argue that the agencies have failed to address the "core problem"—that public comments necessarily "convey information and ideas the agencies have not recognized on their own," and thus the new procedures will supposedly fail to ensure adequate NEPA review, Pls. Mot. at 34—the record is to the contrary. Even so, the agencies explained that they will still solicit public comment on EISs, at the notice of intent stage, but that EAs generally involve actions that will not have a significant impact on the environment so public participation does not serve the same function as it would for an EIS. *See* Section II.C.1, *supra*. Plaintiffs, for their part, have failed to articulate why the agencies' new rules will necessarily lead to more reviews that do not satisfy NEPA's requirements. The agencies have a significant amount of expertise to draw upon in making decisions concerning the environmental impact of their decisions, and have an interest in ensuring that their reviews pass NEPA muster: Plaintiffs and other similarly situated organizations will surely be standing by to litigate against and attempt to block projects they don't like if they believe that the agency has failed to comply with NEPA. At its core, NEPA requires agencies

to consider the environmental consequences of an action before making an irreversible and irretrievable commitment of resources, and agencies can and will do so even if public comment has in some instances become optional. Plaintiffs' contentions here lack merit.

### D. The agencies did not fail to consider reasonable alternatives.

Plaintiffs also argue that the agencies should have further considered certain alternatives proposed by commenters. Pls. Mot. at 37-38. But Plaintiffs fail to identify reasonable or viable alternatives that suggest the agencies failed to consider important aspects of the problem, so their argument here fails to persuade. "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (citation modified). This is not a strict requirement that compels an agency to examine "all policy alternatives," but is instead part of the general instruction that an agency consider important aspects of the problem before it. *Id*. at 30, 33. Thus an agency "need not consider every alternative proposed," but must instead consider only "significant," "viable," and "obvious" alternatives. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013).

Plaintiffs' so-called alternatives did not merit further discussion because, at bottom, they were not "viable." The first alternative Plaintiffs identify is that the agencies "could have retained a general presumption that public participation is required but provided exceptions only in limited exigent circumstances," and set forth "objective factors guiding responsible officials in identifying actions that may proceed without public comment." Pls. Mot. at 37. This proposal largely duplicates the prior (now-rescinded) CEQ framework, which generally required public participation unless a categorical exclusion applied. Plaintiffs propose what is effectively an additional categorical exclusion for a narrow set of exigent circumstances. But there is no reason to think that Plaintiffs' proposal would address the agencies' efficiency concerns given the limited nature of Plaintiffs' preferred alternative compared to the status quo ante. This proposal would not help the agencies meet the new deadlines in the 2023 FRA. And this alternative would do nothing to help the agencies align with the legal changes mentioned above (the FRA, rescission of CEQ's regulations, *Seven County*, and E.O. 14154).

The second alternative Plaintiffs identify suggests that the agencies keep the CEQ framework in place but "re-allocat[e] internal agency resources" and "improv[e] coordination across agencies with shared jurisdictional authority" to address any concerns about efficiency and delay. Pls. Mot. at 37-38. In other words, Plaintiffs want to return to the agencies' prior rules—a regulatory framework that no longer exists—and force the agencies to throw more resources at what has proven to be an unworkable and inefficient set of public participation procedures. That could address delays only in an imaginary world of unlimited agency resources. Plaintiffs further argue that that additional mandatory public comment should have been retained because "the government's EIS processing time was generally trending faster"—without noting that that same study found that the processing time was still *above* the 2-year deadline.[17] Pls. Mot. at 28; *see* OEPC-000460; USDA-00016084. In contrast, the agencies reasonably took the position that failing to comply with the law was not an acceptable outcome. Plaintiffs' throw-more-resources-at-it approach would do nothing to resolve concerns about administrative burden and efficiency and again ignores the underlying legal developments that prompted these changes. That the agencies did not analyze in detail Plaintiffs' proposed alternatives does not mean that they failed to consider important aspects of the problem.[18]

Boiled down, Plaintiffs' suggested alternatives amount to the agencies staying the course. Those so-called "alternatives" cannot provide the basis for vacating the final rules. Whenever an agency considers doing *anything* it necessarily contemplates (and rejects) doing *nothing*. And regardless, the agencies are not required "to consider alternative solutions that [do] not address the problem[s] [they have] identified." *League of Cal. Cities v. FCC*, 118 F.4th 995, 1018 (9th Cir. 2024). Plaintiffs' argument to the contrary is their disappointment that the agencies did not *adopt*

[17] That study is, moreover, deeply flawed. It compares apples to oranges, by measuring the time to complete an EIS as the time to finish the EIS itself, not time to issue a record of decision ("ROD"), which is longer and which previous CEQ studies had used as their baseline. It assesses only the median, not the mean (thus excluding outlier projects), and fails to account for agency resource availability, and policy changes, among other exclusions.

[18] To the extent the gravamen of Plaintiffs' argument here is that the agencies failed to respond with sufficient specificity to individual comments, they have they failed to plead it. *Pickern*, 457 F.3d at 969.

their preferred policy, not that the agencies did not *consider* them. The APA gives no relief for that sort of policy disagreement.

**E. The Final Rules complied with NEPA.**

Plaintiffs' final argument under this heading restates their meritless arguments that the final rules did not comply with NEPA. The argument that the final rules—which are designed to, and in fact do, align with NEPA's text—somehow violate the unspoken meaning of the statute are just as unpersuasive here. *See supra* Section II.A. Plaintiffs' argument that CEQ's public comment rules were "practicable … and therefore … necessary" fails on many fronts, among them: (1) the agencies' experience with the CEQ framework as inefficient and burdensome did not, in fact, indicate that this system was practicable; (2) even if the old CEQ framework was "practicable," a "practicable" means of carrying out a statute is not the same as a "necessary" means of doing so; and (3) given the underlying legal changes that the agencies concluded supported the final rules, the fact that the agencies used these old procedures "for many years" says nothing about what future rules should look like. Plaintiffs' supporting authority at most supports the notion that an agency *can* offer public comment periods under NEPA (which they have done and will continue to do) not that they *must* do so in all instances that Plaintiffs would like. *See* Pls. Mot. at 38-39. Plaintiffs' argument here lacks merit.

**F. The Forest Service's new regulations are not arbitrary and capricious.**

Plaintiffs separately take issue with the Forest Service's rescission of its NEPA regulations.[19] The Forest Service previously had offered more robust public comment procedures than other agencies. Specifically, the Forest Service had, under its prior regulations, notified the public of upcoming actions in a "schedule of proposed actions" as well as authorizations for an action to proceed under a categorical exclusion, and had also offered public participation for scoping of EAs and CEs. *See* USDA-00000030. In the final rule, the Forest Service eliminated certain procedures for scoping EAs and CEs, as well as the "schedule of proposed actions" and notification that an action would proceed under a CE, *see id*., but retained regulations that give the public opportunities

[19] Plaintiffs do not challenge the Forest Service's Section 218 rulemaking, which proposed amendments to other public participation requirements. *See* 91 Fed. Reg. 5387 (Feb. 6, 2026).

to comment on certain EAs and EISs, *see* 36 C.F.R. §§ 218.1 *et seq*., 219.1 *et seq*. The final rule explained that, much like the other regulatory changes, the intention of the new regulations was to align the regulations with statutory language, give more discretion to decisionmakers to determine when public comment would be helpful, and avoid "undue process for each and every action undergoing NEPA review." USDA-00000030.

The arguments Plaintiffs raise here with respect to scoping of EAs and CEs largely track what they have argued elsewhere: that the absence of a statutory command to use a given procedure does not mean that its rescission is appropriate, that the comment processes in place before were "unquestionably useful," and generally that fewer opportunities for public comment "is inconsistent with both the text and purpose of NEPA." Pls. Mot. at 36. These arguments fail just the same, and for the same reasons. The Forest Service made the policy choice that giving decisionmakers more discretion to determine when to use public comment, rather than requiring it across the board, would serve efficiency and ease administrative burdens.

Plaintiffs ignore that the Forest Service had substantial discretion to utilize public comment under the prior procedures. The Forest Service's prior regulations provided: "[b]ecause the nature and complexity of a proposed action determine the scope and intensity of analysis, no single scoping technique is required or prescribed." 36 C.F.R. § 220.4(e)(2) (now rescinded). While public comment opportunities could be provided as part of scoping, they were not required. And the Forest Service's scoping procedures depended on CEQ's now-rescinded regulations, which further supported USDA's decision to revisit these procedures when determining how they would be carried forward in the revised USDA NEPA regulations.

Plaintiffs' contrary arguments do not move the needle. The argument that NEPA required the prior procedures—which Plaintiffs themselves appear to concede lacks a basis in NEPA's text, *see* Pls. Mot. at 36 (noting that "lack of an express statutory command" that required the old procedures)—is no more persuasive here. And the Forest Service correctly accounted for the significant legal changes in the NEPA context (the 2023 FRA, CEQ's rescission of its regulations, E.O. 14154, and *Seven County*) as a supportive basis for the changes.

Plaintiffs argue that the final rule should have grappled further with the downsides of eliminating the schedule of proposed actions and responded to speculation about the possibility that this change would cause inefficiencies. Pls. Mot. at 36-37. But the Forest Service has better insight into the efficiency of its own procedures, and also explained that forthcoming changes to notice systems—which it said will "inevitably lead to the decommissioning of outdated system platforms"—and the creation of systems that may "replicate[]" the schedule of proposed actions' functionality pointed against keeping that system active. USDA-00000030.

Plaintiffs also say that the final rule did not mention or justify the removal of regulations that require notification of the public about the use of a CE. Pls. Mot. at 37. That is demonstrably false. The final rule mentioned the "rescission of the 36 CFR 220 regulations," which obviously includes 36 C.F.R. § 220.6(e), (f) (2008), and explained that the purpose of this change was to "establish consistent CE documentation requirements for all USDA agencies." USDA-00000029. The final rule thus mentioned and justified the removal of the provision about notifying the public regarding the use of a CE. And not to mention that the explanation that USDA provided for the rescission of the rest of the chapter (efficiency, alignment with law, etc.) more than suffices for the rescission of this particular regulation. Plaintiffs' arguments on this score lack merit.

**III. Plaintiffs Fail to Justify Their Request For Vacatur.**

What Plaintiffs really want is a return to the time when CEQ's regulations were in place, which required more robust public comment and participation procedures for EAs and draft EISs. *See* Pls. Mot. at 40 ("Vacatur would return USDA and Interior to a status quo that had prevailed for more than five decades—that USDA, Interior, and their sub-agencies give impacted communities an opportunity to weigh in and call attention to overlooked environmental harms and solutions to avoid or minimize the damage, so agencies can make well-informed and better decisions as Congress intended.").[20] But the Court cannot provide Plaintiffs this relief.

[20] Plaintiffs endorse the theory that the Court could vacate the final rules and put the IFRs back in place. *See* Dkt. No. 23, Case No. 3:25-10793, at 4-5. Defendants therefore reiterate their position that Plaintiffs' claims against the IFRs are moot. *See Twitter, Inc. v. Lynch*, 139 F. Supp. 3d 1075, 1081 (N.D. Cal. 2015) ("[W]hen subsequent legislation or rulemaking supersedes challenged regulations or rules, the challenge is moot."). If the Court grants summary judgment to Defendants, it should also dismiss as moot Counts I and II of Plaintiffs' Amended Complaints.

Although vacatur is the "presumptive" remedy in the Ninth Circuit, it is not automatic, but instead "depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022) (citation omitted). Where vacatur would have a "disruptive impact" on a regulatory regime—particularly an environmental regulatory regime—remand without vacatur is appropriate. *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 668 (9th Cir. 2022). Similarly, where the "agency may be able readily to cure a defect in its explanation of a decision," remand without vacatur is appropriate. *Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP, 2026 WL 1805114, at *40 (N.D. Cal. June 23, 2026) (citing *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010)).

The agencies have plainly not made a legal error in their interpretation of NEPA. *See* Section II.A, *supra*. The bulk of Plaintiffs' argument goes to the alleged failure by the agencies to provide "good reasons" for changes set forth in the final rules. *See* Pls. Mot. at 24-39. If the Court agrees with this aspect of Plaintiffs' argument, the better course would be to remand the final rules to the agencies for further explanation, which the agencies can readily provide.

The disruptive consequences of vacatur would be significant. If the Court vacates the final rules, the remaining regulatory framework would *not* be the CEQ's 1978 or 2024 regulations, but the interregnum left behind after the rescission of CEQ's regulations in 2025. Plaintiffs ask the Court for an injunction ordering the agencies to "operate under the NEPA procedures regarding public participation that" the agencies "applied before the Interim Final Rule[s] took effect." Dkt. No. 27, 25-cv-010793, at 32; Dkt. No. 34, 26-cv-866, at 30. While the agencies chose, as a matter of policy, to act in some cases *as if* CEQ's rules were still on the books between April and June 2025, the Court cannot require this, nor would it happen by operation of law. Instead, the status quo that would be left after vacatur would be precisely the situation that prompted the agencies to issue rules in the first place: the absence of a coherent NEPA regulatory framework. *See* USDA-00000001 (describing its prior regulations as a 'supplement'' that 'incorporates and adopts' the CEQ's NEPA regulations"); OEPC000184 ("DOI's regulations were originally designed to supplement CEQ's NEPA regulations"). The impact of such a vacatur on ongoing and future reviews

of proposed actions would be confusing, as there would be no comprehensive procedures upon which an agency could rely.

While Plaintiffs may argue that, as in *Iowa*, the preexisting rules should revert to force as a matter of law, *see* 765 F.Supp.3d at 896, the situations are crucially different. *Iowa* concerned vacatur of a CEQ regulation, which would be replaced by an older CEQ regulation. Here, to reinstate the status quo ante in full, the Court would have to reinstate not only the DOI and USDA rules, but the CEQ rules which they supplemented. That in turn would require reinstating E.O. 11991 and/or addressing the issues of the CEQ's statutory rulemaking authority, called into question by *Marin Audubon* and *Iowa*. And even if the Court were able to do all this—though neither CEQ nor the President are parties, and despite a host of constitutional issues raised by the prospect of ordering the President to issue an executive order—that would also call into question whether *Iowa* should remain moot under the *Munsingwear* doctrine. *See* 2025 WL 2205808. In short, a "return" to the status quo is not as simple as Plaintiffs suggest. Plaintiffs offer the Court no reason to enforce their policy preferences as a mandatory injunction against the agencies.

Last, if the Court concludes that vacatur is appropriate, it need not apply the same remedy to both agencies or across agency subcomponents (indeed, Plaintiffs lack standing to sue most of the subcomponents they named as defendants). And if the Court were to conclude that one agency's explanation satisfied the APA and the other's did not, a remedy as to one final rule and not the other would be the correct result.

## CONCLUSION

Plaintiffs ask this Court to adjudicate an abstract policy disagreement. But the agencies' interpretation of what NEPA requires is correct, and they offered good reasons for the changes memorialized in the final rules. Plaintiffs fail to identify any concrete harm their members have suffered that is attributable to the final rules. And Plaintiffs ask for a radical remedy that goes well beyond what the Court can or should offer. Defendants request that the Court enter summary judgment in their favor on Counts III and IV of Plaintiffs' Amended Complaints.

July 31, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

*/s/ John K. Heise*
JOHN K. HEISE (CA Bar No. 331615)
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-3312
Email: john.heise@usdoj.gov

*Attorneys for Defendants*