Wendy Park (Cal. Bar No. 237331)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: 510-844-7138
Email: wpark@biologicaldiversity.org

Brandon Jones-Cobb (AK Bar No. 1610078)
(*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 30604
Seattle, WA 98113-0604
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org

Hannah Connor (DC Bar No. 1014143)
(*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St. NW, Suite 1300
Washington, DC 20005
Phone: 202-641-6176
Email: hconnor@biologicaldiversity.org

*Counsel for Plaintiffs Center for Biological Diversity & Sierra Club*

(Additional counsel listed in signature block)

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.<br><br>*Defendant*s.<br><br>CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, | Civil Action No. 3:25-cv-10793-JSC<br><br>(rel. 3:26-cv-00866-JSC)<br><br>**PLAINTIFFS' CONSOLIDATED COMBINED RESPONSE TO DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Time: November 19, 2026, 10 a.m.<br>Hearing Location: Courtroom 8, Golden Gate |

| | |
|---|---|
| *Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, et al.<br><br>*Defendants*. | Ave., San Francisco, CA<br><br>Judge: Hon. Jacqueline Scott Corley |

# TABLE OF CONTENTS


TABLE OF ACRONYMS ..................... ix
INTRODUCTION ..................... 1
ARGUMENT ..................... 1

I. Defendants' Challenges to the Court's Jurisdiction Fail. ..................... 1

A. Plaintiffs Have Established Associational Standing. ..................... 2

B. Plaintiffs Have Procedural Standing. ..................... 6

C. Plaintiffs Have Organizational Standing. ..................... 8

D. Plaintiffs' Claims Are Ripe. ..................... 9

II. Congress Ratified CEQ's Notice and Comment Requirements. ..................... 12

III. Defendants' Replacement of Methods and Procedures for Public Participation with Open-Ended Discretion Violates 42 U.S.C. § 4332(2)(B). ..................... 17

IV. USDA and Interior's Evisceration of Opportunities for Public Participation from their NEPA Procedures Was Arbitrary and Capricious. ..................... 21

A. The 2023 Fiscal Responsibility Act Amendments Do Not Provide a Good Reason for the Defendants' Evisceration of Public Participation. ..................... 22

B. Neither E.O. 14154, CEQ's Rule Rescission, Nor *Seven County* Provide Good Reasons for Rescinding Longstanding Public Participation Requirements. ..................... 24

C. Defendants Fail to Support their Assumption that Discretionary Public Participation Will Have Zero Costs, and that its Benefits Outweigh the Costs. ..................... 25

D. USDA Fails to Justify the Elimination of Forest Service-Specific NEPA Procedures. ..................... 27

V. Vacatur is the Appropriate Remedy. ..................... 28

CONCLUSION ........................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd.*,
365 F. Supp. 3d 118 (D.D.C. 2019) ............ 6

*All. for the Wild Rockies v. Higgins*,
183 F.4th 671 (9th Cir. 2026) ............ 5

*Am. Great Lakes Ports Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020) ............ 30

*Ariz. All. for Retired Americans v. Mayes*,
__F.4th__, No. 22-16490, 2026 WL 2277101 (9th Cir. Aug. 7, 2026) ............ 8, 9

*Ass'n of Am. Universities v. DOE*,
789 F. Supp. 3d 118 (D. Mass. 2025) ............ 24

*Atieh v. Riordan*,
727 F.3d 73 (1st Cir. 2013) ............ 26

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
524 F.3d 938 (9th Cir. 2008) ............ 5, 18

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) ............ 20

*Cent. Delta Water Agency v. U.S.*,
306 F.3d 938 (9th Cir. 2002) ............ 4

*Citizens for Better Forestry v. USDA*,
341 F.3d 961 (9th Cir. 2003) ............ 5, 7, 10, 11

*Citizens for Better Forestry v. USDA*,
632 F. Supp. 2d 968 (N.D. Cal. 2009) ............ 7

*City & Cnty. of San Francisco v. Whitaker*,
357 F. Supp. 3d 931 (N.D. Cal. 2018) ............ 7

*City of Davis v. Coleman,*
521 F.2d 661 (9th Cir. 1975) ............ 7

*Como-Falcon Cmty. Coal., Inc. v. U.S. Dept. of Labor*,
609 F.2d 342 (8th Cir. 1979) ............ 20

*Cottonwood Envtl. L. Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ............ passim

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) .......... 23

*Ctr. for Biological Diversity v. U.S. BLM*,
141 F.4th 976 (9th Cir. 2025) .......... 20

*Ctr. for Biological Diversity v. U.S. BLM*,
No. 1:23-cv-00938-JLT-CDB, 2025 WL 973980 (E.D. Cal. April 1, 2025) .......... 9

*Ctr. for Biological Diversity v. U.S. EPA*,
168 F.4th 1164 (9th Cir. 2026) .......... 7

*Ctr. for Food Safety v. Perdue*,
517 F. Supp. 3d 1034 (N.D. Cal. 2021) .......... 1

*Davis v. Mich. Dept. of Treasury,*
489 U.S. 803 (1989) .......... 14

*Diamond Alt. Energy, LLC v. U.S. EPA*,
606 U.S. 100 (2025) .......... 6

*DOT v. Public Citizen*,
541 U.S. 752 (2004) .......... 20

*Earth Island Inst. v. Hogarth*,
494 F.3d 757 (9th Cir. 2007) .......... 23

*Encino Motorcars*, *LLC v. Navarro*,
579 U.S. 211 (2016) .......... 7, 29

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) .......... 10, 11

*Envtl. Def. Fund v. U.S. EPA*,
515 F. Supp. 3d 1135 (D. Mont. 2021) .......... 6

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 21, 22, 27

*FDA v. All. for Hippocratic Medicine*,
602 U.S. 367 (2024) .......... 8, 9

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 13, 16, 17

*Food Marketing Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) .......... 13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,

528 U.S. 167 (2000) ... 2

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ... 9

*Jama v. ICE*,
543 U.S. 335 (2005) ... 14

*Jicarilla Apache Tribe of Indians v. Morton*,
471 F.2d 1275 (9th Cir. 1973) ... 19

*Jones v. L.A. Cent. Plaza LLC*,
74 F.4th 1053 (9th Cir. 2023) ... 26

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) ... 16

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ... 14

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ... 23

*Minerva Surgical, Inc. v. Hologic, Inc.*,
594 U.S. 559 (2021) ... 12

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ... 20, 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Auto. Ins. Co.*,
463 U.S. 29 (1983) ... 19, 22

*Nat. Res. Def. Council v. EPA*,
489 F.3d 1250 (D.C. Cir. 2007) ... 30

*Nat'l Wildlife Fed'n v. Brownlee*,
402 F. Supp. 2d 1 (D.D.C. 2005) ... 11

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) ... 24

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005) ... 4

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ... 10, 11

*Or. Nat. Desert Ass'n v. Rose*,
921 F.3d 1185 (9th Cir. 2019) ... 21

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)........................................................................................................ 20

*Pollinator Stewardship Council v. U.S. EPA*,
806 F.3d 520 (9th Cir. 2015) ........................................................................................ 29

*Red Lion Broadcasting Co. v. FCC*,
395 U.S. 367 (1969)........................................................................................................ 13

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S 168 (2025)................................................................................................... 20, 24

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009)............................................................................................... 2, 3, 6, 7

*Trout Unlimited v. Morton*,
509 F.2d 1276 (9th Cir. 1974) ...................................................................................... 20

*United States v. Estate of Romani*,
523 U.S. 517 (1998)........................................................................................................ 13

*W. Watersheds Proj. v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2010) ................................................................................ passim

*Warth v. Seldin*,
422 U.S. 490 (1975).......................................................................................................... 8

*Wild Virginia v. CEQ*,
544 F. Supp. 3d 620 (W.D. Va. 2021) ......................................................................... 10

*Wild Virginia v. CEQ*,
56 F. 4th 281 (4th Cir. 2022) .................................................................................. 10, 12

*WildEarth Guardians v. Mont. Snowmobile Ass'n*,
790 F.3d 920 (9th Cir. 2015) ........................................................................................ 21

*Yesler Terrace Cmty. Council v. Cisneros*,
37 F.3d 442 (9th Cir. 1994) ............................................................................................ 8

**Statutes**

5 U.S.C. § 706.............................................................................................................. 29

16 U.S.C. § 3164........................................................................................................... 15

16 U.S.C. § 6513........................................................................................................... 15

16 U.S.C. § 6514........................................................................................................... 15

30 U.S.C. § 1419 ........ 15

42 U.S.C. § 4321 ........ 23

42 U.S.C. § 4331 ........ 1, 12, 16

42 U.S.C. § 4332 ........ passim

42 U.S.C. § 4336a ........ 4, 23

42 U.S.C. § 4370m-2 ........ 14

42 U.S.C. § 4370m-4 ........ 14, 15

42 U.S.C. § 4370m-6 ........ 14

42 U.S.C. § 9117 ........ 15

43 U.S.C. § 2006 ........ 15

49 U.S.C. § 47171 ........ 16

FAA Reauthorization Act of 2024, Pub. L. 118–63, title VII, § 783 (2024), 138 Stat. 1302 ........ 16

FAST Act (FAST-41), Pub. L. 114-94, title XLI, § 41001 (2015), 129 Stat. 1741 ........ 14

Healthy Forests Restoration Act, Pub. L. 108-148, title I § 103 (2003), 117 Stat. 1896 ........ 15

**Regulations**

7 C.F.R. § 1b.1 (1983) ........ 29

7 C.F.R. § 1b.2 (2025) ........ 18

7 C.F.R. § 1b.7 (2025) ........ 4

7 C.F.R. § 3100.20 (1979) ........ 29

36 C.F.R. § 220.4 (2008) ........ 27

40 C.F.R § 1502.7 (1978) ........ 23

40 C.F.R. § 1500.1 (1978) ........ 12

40 C.F.R. § 1501.10 (2020) ........ 23

40 C.F.R. § 1501.4 (1978) ........ 5

40 C.F.R. § 1501.7 (1978) ........ 23

40 C.F.R. § 1501.7 (2008) ........ 27

40 C.F.R. § 1503.1 (1978) ........ 16

43 C.F.R. § 46.20 (2008) ........ 29

43 C.F.R. § 46.305 (2008) ........ 30

43 C.F.R. § 46.435 (2008) ........ 30

**Legislative History**

S. Rep. No. 91-296, 91st Cong., 1st Sess. (1969) ........ 19

**Federal Register Publications**

91 Fed. Reg. 17062 (April 3, 2026) ........ 18, 19, 22, 23

91 Fed. Reg. 8738 (Feb. 24, 2026) ........ 18, 19, 22, 23

Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025) ........ 24, 28

## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| APHIS | Animal and Plant Health Inspection Service |
| CE | categorical exclusion |
| CEQ | Council on Environmental Quality |
| EA | environmental assessment |
| EIS | environmental impact statement |
| FAST-41 | Title 41 of the Fixing America's Surface Transportation Act |
| NEPA | National Environmental Policy Act |
| SOPA | Schedule of Proposed Actions |
| USDA | U.S. Department of Agriculture |

## INTRODUCTION

The National Environmental Policy Act (NEPA) was enacted on the democratic principle that transparency about government proposals is necessary to good government, and that public scrutiny and well-informed viewpoints support federal agencies in making decisions that better serve the public and not merely special interests. NEPA procedures thus empower everyday Americans to better protect their air, water, public lands, wildlife, and communities in order to "restor[e] and maintain[] environmental quality to the overall welfare and development, . . . to foster and promote the general welfare, . . . and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a).

Defendants, through the rulemakings challenged here, have inverted Congress's NEPA objectives. Defendants can now operate in a silo of secrecy by allowing significant industrial projects with often irreversible environmental impacts to remain largely hidden from public view until *after* those projects are approved. The Departments' defense of these rulemakings, as with the rulemakings themselves, disregards NEPA's history and plain text, and, if upheld, would eviscerate Congress's intent to ensure meaningful public involvement and transparency in agency decisionmaking affecting the environment—effectively gutting NEPA's procedural safeguards. Because the Departments' rulemakings violate NEPA and the Administrative Procedure Act (APA), Plaintiffs respectfully request that the Court vacate them.

## ARGUMENT

### I. Defendants' Challenges to the Court's Jurisdiction Fail.

Defendants' attack on Plaintiffs' associational standing for lack of concrete or imminent threat of injury ignores firmly established Ninth Circuit precedent. For a facial challenge to a rulemaking, neither the doctrine of associational standing nor procedural standing requires certainty regarding exactly where and when Defendants' policies will apply. But even accepting Defendants' interpretation, Plaintiffs have identified "certainly impending" and imminent injuries from approved projects subject to the Departments' policies. *See Ctr. for Food Safety v. Perdue*, 517 F. Supp. 3d 1034, 1038-39 (N.D. Cal. 2021). The Plaintiff organizations have also established standing in their own right by demonstrating harms to their core business activities of

tracking and commenting on projects to protect public lands and imperiled wildlife. For similar reasons, Plaintiffs' claims are also ripe.

**A. Plaintiffs Have Established Associational Standing.**

Plaintiffs easily clear the bar for associational standing based on the threat of imminent and ongoing harm that Defendants' rulemakings pose to their members. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Plaintiffs' members have concrete plans to use or visit places where Defendants have applied the challenged regulations, to the detriment of those members' concrete interests. For example:

- In August 2026, the Bureau of Land Management (BLM) approved the South Railroad Mining Project without soliciting public comment on a draft environmental impact statement (EIS), threatening Center member Mary Gibson's recreational, wildlife viewing, health, and spiritual interests in areas near the mine. Supp. Gibson Decl. ¶¶ 4-5 (attached hereto); Dkt. 36-11 (Gibson Decl.) ¶¶ 5-13.[1]

- The Bureau of Ocean Energy Management leased oil and gas underlying Cook Inlet (Lease Sale 258) without soliciting public comment on a draft EIS, threatening Center member Cooper Freeman's recreational, fishing, and wildlife viewing interests, as well as his ability to weigh in on issues that a federal court held the agency was required to consider. Supp. Freeman Decl. ¶¶ 3-6, 12 (attached hereto). The lessee can now conduct certain activities that threaten Mr. Freeman's interests. *Id.* ¶ 9.

- In September 2026, the Forest Service approved an oil and gas leasing availability analysis for the National Forests and Grasslands of Texas without circulating a draft EIS for comment, threatening Sierra Club and Center member Brandt Mannchen's and Plaintiffs' ability to protect their interests in forest preservation, and ultimately Mr. Mannchen's recreational, aesthetic, and educational interests from oil and gas drilling. Supp. Mannchen Decl. ¶¶6-8 (attached hereto); Dkt. 36-16 ¶¶ 5-23.

- The Forest Service approved the Whiskey Salvage Project through a categorical exclusion (CE), threatening Center member James McMahon's interest in viewing wildlife. The agency approved the project on July 1, 2026 without public scoping—as previously required, 36 C.F.R. § 220.4(e) (2008)—or any other form of public notice or comment. Dkt. 38-5 (White Decl.) ¶ 8.

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009), relied upon by Defendants, Dkt. 38 (Defs.' Mot.) at 13, supports Plaintiffs' standing. In *Summers,* the Court indicated that a

[1] All docket references are to the *Interior* case docket (No. 3:25-cv-10793).

member who had a demonstrated interest "in viewing the flora and fauna" in a specific area would have had standing to challenge rules limiting public comment, if not for a separate settlement addressing that member's interests. *Summers*, 555 U.S. at 494. The Court found that other members had only asserted a "vague desire" and "'some day' intentions" to return to the affected forests, which was "insufficient to satisfy the requirement of imminent injury." *Id.* at 496. Here, as with the member cited favorably in *Summers*, Plaintiffs' members have definite plans to enjoy areas that are threatened by specific projects "unlawfully subject to the regulations." *Id*. at 495096; *see also Cottonwood Envtl. L. Ctr. v. U.S. Forest Serv*., 789 F.3d 1075, 1080-81 (9th Cir. 2015) (distinguishing *Summers* on similar grounds). Accordingly, *Summers* buttresses Plaintiffs' standing.

Notably, the Court's imminence inquiry focused on the member's plans to return to the project areas, not whether the projects—described as future "plans" to conduct timber sales, *Summers*, 555 U.S. at 507—had already been approved, or how soon trees would be cut.[2] It sufficed that the projects were "subject to the challenged regulations." *Id*. at 496. *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 484-85 (9th Cir. 2010) is also on point. There, the Ninth Circuit held that a plaintiff had standing to facially challenge regulations that were alleged to violate the Federal Land Policy and Management Act's public participation requirements. *Id*. at 499. The regulations threatened "a concrete interest in and an imminent harm to specific allotments of BLM land to which the 2006 Regulations apply," *id*. at 484, and they threatened the plaintiff's "involvement in public land grazing management," *id.* at 485, even though the regulations "ha[d] not yet been applied by the BLM," *id*. at 486. Here, the harm is even more imminent because the challenged regulations have already been applied.

Defendants' contention that more certainty is required also disregards longstanding precedent recognizing that "increased risk of harm can itself be an injury in fact." *Ocean*

[2] *See also* Office of the Solicitor General, U.S. Dept. of Justice, *Summers v. Earth Island Inst.* – Petition, available at https://www.justice.gov/osg/brief/summers-v-earth-island-inst-petition (certiorari petition in *Summers* and member affidavit noting that only "several," not all, of the 20 projects had been approved).

*Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005) (citation omitted). A plaintiff need not wait until an agency's action inflicts actual harm before challenging the broader programmatic action creating the risk of harm. *See Cent. Delta Water Agency v. U.S.*, 306 F.3d 938, 948, 949-50 (9th Cir. 2002) (discussing cases); *Cottonwood*, 789 F.3d at 1081 (finding "standing to challenge programmatic management direction without also challenging an implementing project that will cause discrete injury" when the programmatic direction is "fairly traceable to some action that will affect the plaintiff's interests"). And it makes no difference that Defendants *could* exercise their discretion (ad hoc) to allow public participation because Defendants' rulemakings increase the risk of environmental harm and "offer[] no specific or concrete plan" to ensure that risk will be avoided. *Cent. Delta Water*, 306 F.3d at 950.

Defendants also attempt to trivialize Plaintiffs' threatened injuries, arguing that any harm from reducing EIS public participation opportunities "from two opportunities to one" is speculative. Dkt. 38 at 13. But the earlier "notice of intent" need only include a "preliminary description" of the project and a "brief summary of expected impacts," 7 C.F.R. § 1b.7(b) (2025); DOI NEPA Handbook § 1.8(b)(1), (2)(ii) (Feb. 2026) (DOI-282), and the public may then only comment on the scope of issues an upcoming EIS will address. *See* 42 U.S.C. § 4336a(c). That is a far cry from the opportunity to comment on the "detailed," science- and data-backed "discussion and analysis" required in an EIS. 42 U.S.C. § 4332(2)(C), (D), (E). A draft EIS is thus the public's *only* chance to evaluate the agency's analysis, meaningfully comment on the fully fleshed out project and its impacts, and thus alert the agency to potentially overlooked harmful outcomes. *See id*. § 4332(2)(C)(i)-(iii).

As for environmental assessments (EAs), Defendants fabricate a strawman, arguing that Plaintiffs cannot suffer harm because they never had a categorical right to comment on draft EAs to begin with. *Cf.* Dkt. 38 at 14. But Plaintiffs' claims concern USDA's and Interior's elimination of the public's right to involvement in an EA's preparation "to the extent practicable." 43 C.F.R. § 46.305(a); 40 C.F.R. § 1501.4(b) (1978). That right guaranteed the public "sufficient environmental information" to permit "the public to weigh in with their views

and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008) (interpreting CEQ's former analogous regulation, 40 C.F.R. § 1501.4(b) (1978)).[3] The denial of this formerly "mandatory inclusion of the public in the [EA] process" therefore results in a non-speculative "added risk to the environment." *Citizens for Better Forestry v. USDA (Citizens I)*, 341 F.3d 961, 971 (9th Cir. 2003).

That Defendants may conduct additional NEPA reviews at later site-specific stages of projects that have already been, or are about to be, approved (e.g., Lease Sale 258, National Forests and Grasslands of Texas Oil and Gas Leasing Plan) is immaterial. *Cf.* Dkt. 38-3 (Rowe Decl.) ¶ 10; Dkt. 38-5 (White Decl.) ¶ 6. Depriving the public of the opportunity to provide input on these programmatic actions threatens concrete harm because those actions define which areas are open to development and set standards against which later site-specific actions will be evaluated. *Cottonwood*, 789 F.3d at 1082 (upholding standing to challenge programmatic action and analysis because "even though individual projects may trigger additional [analysis], that scrutiny is dependent, in large part, on the [programmatic analysis]"). *See also* Supp. Mannchen Decl. ¶¶ 13-14; Supp. Freeman Decl. ¶¶ 7-8.

The Departments' regulations are also currently harming Plaintiffs' members' professional and avocational interests. Without timely access to information about pending projects and their environmental impacts, members cannot effectively carry out their professional and avocational responsibilities, including ground-truthing agency information; tracking, monitoring, and commenting on projects; educating the public on agency activities; and working to reduce the risk of harm or damage from projects.[4] That harm is sufficient for standing. *See,*

[3] In interpreting laws mirroring or incorporating terms of art from CEQ's regulations, courts rely on the CEQ regulations to understand their meaning. *See All. for the Wild Rockies v. Higgins*, 183 F.4th 671, 682 (9th Cir. 2026) (terms of art "obviously transplanted from another legal source . . . bring[] the old soil with it" (citation modified)).

[4] Dkt. 36-4 (Boulton Decl.) ¶¶ 14-15, 17, 20-26; Dkt. 36-6 (Burdette Decl.) ¶¶ 6, 8, 12-13, 17-19, 22; Dkt. 36-7 (Craven Decl.) ¶¶ 12-20; Dkt. 36-15 (Jespersen Decl.) ¶¶ 13-20; Dkt. 36-16 (Mannchen Decl.) ¶¶ 4-7, 14-20, 23; Dkt. 37-5 (Porter Decl.) ¶¶ 10-20.

*e.g.*, *Envtl. Def. Fund v. U.S. EPA*, 515 F. Supp. 3d 1135, 1146 (D. Mont. 2021) (finding standing to challenge rule that threatened members' professional interests "in pursuing their intended research agendas"); *see also Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd*., 365 F. Supp. 3d 118, 130 (D.D.C. 2019).

Defendants' attacks on traceability and redressability similarly fail because they rely on the mistaken view that Plaintiffs' members lack concrete interests. *Cf.* Dkt. 38 at 17. Further, Plaintiffs need only show their members' injuries are "likely caused by the defendant" and "would likely be redressed by judicial relief." *Diamond Alt. Energy, LLC v. U.S. EPA*, 606 U.S. 100, 111 (2025) (citation omitted)). Just as a probabilistic "added risk to the environment"—and to Plaintiffs' members' interests—is sufficient to establish injury, so too is that added risk traceable to those policies and redressable. Plaintiffs thus have associational standing.

**B. Plaintiffs Have Procedural Standing.**

While the foregoing is sufficient to establish standing, Plaintiffs also meet the lower threshold for procedural standing because they have shown a "geographic nexus" between their members and specific public lands that will "suffer[] an environmental impact" under the Departments' policies. *W. Watersheds*, 632 F.3d at 485 (citation omitted). That is all that is required to show procedural standing for Plaintiffs' APA claims, *see id*.—not, as Defendants aver, the identification of specific instances where projects have been approved without the opportunity for public participation. *Cf.* Dkt. 38 at 16.

Defendants misconstrue *Summers*, which did not involve an allegation of a *procedural* violation in the agency's *adoption* of a challenged regulation, as Plaintiffs allege here. Instead, *Summers* involved an alleged substantive violation—that the agency, having dispensed with public notice and comment and administrative appeals for certain timber sale projects, violated the statutory "guaranteed right to comment." *See Summers*, 555 U.S. at 497. Only that facial challenge to the agency's regulations remained after the organizational plaintiff and government had settled the project-specific challenge. *Id*. at 494. The Supreme Court held the alleged deprivation of those procedural rights "in the abstract," unattached to any "concrete application of" the regulations threatening their members' interests, was a "procedural right in vacuo"

insufficient to establish standing. *Id*. at 494, 496.

In contrast, here, the Departments' rulemaking violated not just substantive rights conferred by NEPA, but also Plaintiffs' procedural rights to reasoned decisionmaking under the APA. *City & Cnty. of San Francisco v. Whitaker*, 357 F. Supp. 3d 931, 941-42 (N.D. Cal. 2018) (citing *Encino Motorcars*, *LLC v. Navarro*, 579 U.S. 211, 221 (2016)). Plaintiffs may enforce these procedural rights by showing "(i) the agency violated certain procedural rules, (ii) those rules protect a concrete interest of the plaintiff, and (iii) it is 'reasonably probable' that the challenged action threatens that concrete interest." *Ctr. for Biological Diversity v. U.S. EPA*, 168 F.4th 1164, 1175 (9th Cir. 2026) (citation omitted).[5] Plaintiffs thus are "not required to challenge directly any specific project because . . . the procedural injury was complete" when the Departments adopted their rules without following APA rulemaking requirements. *Cottonwood*, 789 F.3d at 1081 (citation modified); *see also Citizens for Better Forestry v. USDA (Citizens II)*, 632 F. Supp. 2d 968, 981-82 (N.D. Cal. 2009) (distinguishing *Summers* on same grounds).

Plaintiffs' members demonstrate a "concrete interest" by establishing "their geographic proximity to and use of areas that will be affected by the [challenged] policy." *Citizens I*, 341 F.3d at 971; *see also W. Watersheds*, 632 F.3d at 485. The members' declarations establish their extensive and routine use of public lands subject to the Departments' policies, and their plans to return to these lands in the future.[6] And because the elimination of public input procedures increases "risk to the environment," *see Citizens I*, 341 F.3d at 971 (citation omitted), there is a "reasonable probability" that it threatens Plaintiffs' interests, *Center*, 168 F.4th at 1175; *see also City of Davis v. Coleman,* 521 F.2d 661, 670-71 (9th Cir. 1975) (the "creation of a risk that serious environmental impacts will be overlooked" is "a sufficient 'injury in fact' to support standing"); Dkt. 36 at 11-12 (describing studies showing public comment improves decisionmaking). Moreover, Interior's and USDA's sub-agencies have already applied the new

[5] Defendants do not disagree that those procedural rights are designed to protect the concrete interests at issue here. *See* Dkt. 36 at 16. *See also Whitaker*, 357 F. Supp.3d at 942.

[6] *See, e.g.*, Dkt. 36-1 (Akland Decl.) ¶¶ 2-6; Dkt. 36-4 (Boulton Decl.) ¶¶ 5-11; Dkt. 36-5 (Bugbee Decl.) ¶¶ 7-14; Dkt. 36-9 (Curran Decl.) ¶¶ 4-10; Dkt. 36-15 (Jespersen Decl.) ¶¶ 5-10.

rules and proceeded without public participation in approving various projects, *see supra* p. 2, "establish[ing] an immediate threat to plaintiffs' concrete interests," *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 446 (9th Cir. 1994). Accordingly, Plaintiffs have procedural standing to pursue their APA claims.

**C. Plaintiffs Have Organizational Standing.**

In an *en banc* opinion, the Ninth Circuit recently reaffirmed that "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Ariz. All. for Retired Americans v. Mayes*, __F.4th__, No. 22-16490, 2026 WL 2277101, at *4 (9th Cir. Aug. 7, 2026) (en banc) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Accordingly, the relevant inquiry is "whether the challenged conduct 'directly affected and interfered with' the plaintiff organizations' core activities." *Mayes*, 2026 WL 2277101 at *7 (quoting *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 395 (2024)). Here, Plaintiffs' core business activities include tracking, and commenting on, proposed agency actions affecting public lands and wildlife; monitoring government programs and policies; engaging in policy and legal advocacy on federal land management decisions; and, disseminating information about government actions to members, policymakers, government officials, and other interested members of the public.[7] The Departments' rulemakings harm Plaintiffs' ability to engage in these core business activities in a way that is both concrete and particularized.[8]

For example, USDA eliminated Forest Service-specific requirements to maintain a Schedule of Proposed Actions, allow the public to participate in the scoping process for all proposed projects, and publish a Decision Memo explaining the "what" and "why" of a decision to apply a CE. The loss of these crucial tools for information sharing and collaboration has made

[7] Dkt. 36-4 (Boulton Decl.) ¶¶ 15, 18, 25; Dkt. 36-7 (Craven Decl.) ¶¶ 2, 4; Dkt. 36-8 (Cummings Decl.) ¶¶ 6-11, 13-14; Dkt. 36-10 (Freeman Decl.) ¶¶ 17, 19, 22; Dkt. 36-13 (Henderson Decl.) ¶¶ 4-9; Dkt. 37-3 (Nowicki Decl.) ¶¶ 18-19.

[8] Dkt. 36-4 (Boulton Decl.) ¶¶ 15, 18, 24; Dkt. 36-7 (Craven Decl.) ¶¶ 2-4, 8-13; Dkt. 36-8 (Cummings Decl.) ¶¶ 6-11, 13-14; Dkt. 36-10 (Freeman Decl.) ¶¶ 17, 19, 22; Dkt. 36-13 (Henderson Decl.) ¶¶ 11-12, 14; Dkt. 37-3 (Nowicki Decl.) ¶ 21-23.

it more difficult—and sometimes impossible—for Plaintiffs to even find out about projects on public lands, let alone weigh in on their impacts.[9] This is a concrete and particularized injury. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding that when a challenged action "perceptibly impaired" an organization's core activities, "there can be no question that the organization has suffered injury in fact"); *Ctr. for Biological Diversity v. U.S. BLM*, No. 1:23-cv-00938-JLT-CDB, 2025 WL 973980, *8 (E.D. Cal. April 1, 2025) (concluding "that participating in decision-making processes related to oil and gas drilling are core business activities of the organizations, and BLM's unlawful issuance of [drilling permits] without public notice harms the organizations' ability to participate"). The resulting resource expenditure needed to continue accomplishing Plaintiffs' core business activities—such as seeking information through informal requests to agency staff,[10] or periodically submitting Freedom of Information Act (FOIA) requests[11]—is further "evidence of an injury." *Mayes.*, 2026 WL 2277101 at *7.

Thus, this is not a case where the Plaintiffs seek to "spend [their] way into standing," as Defendants claim. Dkt. 38 at 17. Defendants ignore the crucial distinction between a plaintiff expending resources to oppose the action which they are seeking standing to challenge (which cannot be the basis for organizational standing, *Hippocratic Medicine*, 602 U.S. at 394) and situations where the challenged policy interferes with the plaintiff's ability to engage in core business activities that predated the policy (which can be a cognizable injury for organizational standing, *Mayes*, 2026 WL 2277101 at *7). Here, Plaintiffs do not predicate standing on their efforts to oppose the Departments' NEPA rulemakings, but rather on the harm to their core business activities from implementation of those rules. This is sufficient to confer standing.

**D. Plaintiffs' Claims Are Ripe.**

"Evaluating ripeness in the agency context requires considering "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would

---

[9] Dkt. 36-8 (Cummings Decl.) ¶ 16-17; Dkt. 36-10 (Freeman Decl.) ¶ 22; Dkt. 36-13 (Henderson Decl.) ¶¶ 12-19; Dkt. 37-3 (Nowicki Decl.) ¶ 21-23.

[10] Dkt. 36-13 (Henderson Decl.) ¶ 18.

[11] Dkt. 36-8 (Cummings Decl.) ¶¶ 15-17; Dkt. 36-13 (Henderson Decl.) ¶¶ 15-16; Dkt. 37-3 (Nowicki Decl.) ¶ 23; Supp. Mannchen Decl. ¶ 15 (attached hereto).

inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt*. ("*EDC*"), 36 F.4th 850, 870 (9th Cir. 2022). Further, procedural violations are ripe "at the time the failure takes place, for the claim can never get riper." *Cottonwood*, 789 F.3d 1075, 1084; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998). Accordingly, "[t]he imminence of project-specific implementation 'is irrelevant to the ripeness of an action raising a procedural injury.'" *Cottonwood*, 789 F.3d at 1084 (citing *Citizens I*, 341 F.3d at 977); *see also EDC*, 36 F.4th at 871. Thus, regardless of whether site-specific projects implementing Defendants' rulemakings exist—which they do—Plaintiffs' procedural claims challenging the regulations' compliance with the APA are ripe.

*Wild Virginia v. CEQ*, 56 F. 4th 281 (4th Cir. 2022), is not controlling. *Cf.* Dkt. 38 at 18. Although the plaintiffs in that case brought procedural claims under the APA alleging "a legally deficient rulemaking process" in CEQ's revision of NEPA regulations, *Wild Virginia v. CEQ*, 544 F. Supp. 3d 620, 640 (W.D. Va. 2021), the Fourth Circuit declined to adopt *Ohio Forestry*'s maxim that procedural violations "can never get riper," 523 U.S. at 737, instead dismissing it as "dicta" concerning only procedural NEPA claims. *Wild Virginia*, 56 F. 4th at 297. But the Ninth Circuit has not limited *Ohio Forestry* in the same way. *See, e.g.*, *W. Watersheds*, 632 F.3d at 486, 494-95 (holding ripe and resolving APA claim that agency failed to reasonably explain its public participation policy change).

In any event, Plaintiffs satisfy the three-pronged ripeness test with respect to both their procedural and substantive claims. First, delayed review would cause hardship to Plaintiffs. Under *Ohio Forestry*, "adverse effects of a strictly legal kind," such as a rule that "abolish[es] anyone's legal authority to object to trees' being cut," is the type of hardship favoring immediate judicial review. 523 U.S. at 733 (emphasis added) (citation omitted). That is precisely the hardship Plaintiffs face under USDA's and Interior's rulemakings—the abolition of the public's legal right to receive advance notice of, and/or comment on, proposed mines, drilling, logging, and other harmful development projects on public lands that they routinely monitor and track. *Cf. id*. at 734 (holding claim was unripe, in part, because before the agency could permit logging, it

was required to "permit the public an opportunity to be heard"); *see also Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 8-9 (D.D.C. 2005) (finding plaintiffs "suffer[ed] immediate hardship from the issuance of the challenged [nationwide permits]," because plaintiffs are no longer "informed of pending permitting actions" nor "have a chance to lodge their objections," unlike in *Ohio Forestry*).

Delayed review would also "inflict[] significant practical harm" on Plaintiffs' future ability to protect their interests in public lands and wildlife protection and to pursue legal recourse with respect to particular projects. *Ohio Forestry*, 523 U.S. at 733. The elimination of assured public participation has already prevented Plaintiffs from finding out about proposed actions and restricted their ability to engage in project reviews and influence the outcome of project decisions, before their approval, without resort to litigation. *Supra* n.9. As a result, Plaintiffs have spent significant staff time and resources attempting to track projects through FOIA requests. *Supra* n.11. *See also Citizens I*, 341 F.3d at 977-78 (facial challenge to forest plan rule ripe where USDA "has [already] implemented the . . . [r]ule's 30-day protest protocol" for a specific land use plan and "already withdrawn the regional guides" required by the prior plan). The rulemakings also hamper Plaintiffs' ability to develop and submit evidence into the administrative record, prejudicing their ability to bring future legal challenges based on a fully developed record.

Second, resolution of the case would not interfere with further administrative action, because both USDA's and Interior's rules are at "an administrative resting place," *EDC*, 36 F.4th at 870, and "final," *W. Watersheds*, 632 F.3d at 486. And third, the Court does not need a more concrete factual setting to adjudicate whether the rules' elimination of a requirement for notice and comment on a draft EIS, or for public involvement "to the extent practicable" in the preparation of an EA, was reasonably explained under the APA and/or permissible under NEPA. Those claims rest entirely on legal arguments concerning the Departments' explanations for the

rulemakings and NEPA's text and statutory history. Accordingly, Plaintiffs' claims are ripe.[12]

**II. Congress Ratified CEQ's Notice and Comment Requirements.**

Early on, CEQ recognized that "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," and that "public scrutiny [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b) (1978). *See also* Dkt. 36 at 6-8. Congress has ratified that principle—and the related CEQ requirements that the public must have the opportunity to comment on draft EISs and participate in the preparation of EAs—over and over as a "practicable means" of implementing NEPA, 42 U.S.C. § 4331(a), (b). Defendants' narrow reading of NEPA, focused exclusively on the 2023 Fiscal Responsibility Act (FRA) Amendments, is contrary to fundamental canons of statutory construction.

For starters, Defendants incorrectly assert that ratification "arises only where Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change." Dkt. 38 at 27 (citation modified). The "reenactment canon" that Defendants refer to is a different species of ratification not at issue here that essentially relies on Congress's awareness of an administrative or judicial interpretation and its presumed choice not to override it by reenacting the statute without "material change." *See Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 585 & n.4 (2021) (Barrett, J., dissenting). Rather than claiming ratification has occurred through congressional silence, Plaintiffs here show that affirmative enactments throughout NEPA's statutory history "effectively ratified" a regulatory interpretation. *See FDA*

[12] *Wild Virginia* is not controlling. That case largely challenged "*how* NEPA analyses will be conducted" under CEQ's 2020 regulations—not the elimination of any procedural step. 56 F.4th at 295 (emphasis added). Further, the plaintiffs could not point to any instance in which an agency had applied the 2020 regulations or an "imminent likelihood of that occurring," *id*. at 298-99, given that during the litigation, CEQ had amended the regulations in 2022, *id*. at 292, 296, and had directed agencies to adopt their own NEPA regulations, while applying their preexisting NEPA regulations consistent with CEQ's 2022 regulations in the meantime, *id*. at 300.

*v. Brown & Williamson Tobacco Corp.* ("*Brown*"), 529 U.S. 120, 156 (2000).[13] Courts accord "great weight" to ratification accomplished via "positive legislation." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380-82 (1969). That type of ratification occurred here, where Congress expressly incorporated the CEQ's mandatory public participation procedures into various subsequent NEPA-expediting statutes.

Contrary to Defendants' contention, it does not matter that the relevant subsequent statutes did not directly amend NEPA. A "specific policy embodied in a later federal statute" should control the earlier statute's construction, "even though it ha[s] not been expressly amended," *United States v. Estate of Romani*, 523 U.S. 517, 530-531 (1998), "particularly where Congress has spoken subsequently and more specifically to the topic at hand," *Brown,* 529 U.S. at 133. Here, subsequent statutes are highly probative of Congress's intent. Although NEPA tasks *all* federal agencies with the responsibility of implementing the law's mandates across the executive branch, Congress has enacted subsequent agency- and project-specific statutes that seek to expedite the NEPA process in limited circumstances by carefully modifying—but not rescinding—CEQ's longstanding public participation framework. In doing so, Congress reinforced and clarified that public participation is an indispensable part of NEPA reviews, even where reviews should be expedited. Defendants fail to explain why the NEPA policies expressed in these later statutes should have any less force merely because they do not amend NEPA across the board.

Defendants contend that because the "text and structure" of the FRA Amendments only expressly require that public comment be solicited at an EIS's "notice of intent" stage, Congress could not have intended to require comment on a draft EIS or public involvement in an EA—and

[13] *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019), which Defendants cite for the proposition that ratification "only" occurs when it "reenacts the same statute" is therefore inapposite. Further, that case did not concern statutory history of the contested FOIA exemption, but merely "similar language in other statutes" that had no apparent relation to FOIA. *Id*. at 439.

thus the Court need not look outside the four corners of NEPA. Dkt. 38 at 27.[14] In so doing, Defendants effectively ask the Court to shirk its constitutional duty to "independently interpret statutes and effectuate the will of Congress," and "apply all relevant tools" to determine the best interpretation of the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). They ignore the "fundamental canon" that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"—not "in a vacuum." *Davis v. Mich. Dept. of Treasury,* 489 U.S. 803, 809 (1989). In fact, Defendants make no attempt to reconcile their narrow reading of NEPA, based entirely on the 2023 FRA Amendments, with the full statutory framework, which necessarily includes later agency- and project-specific statutes.

When the analysis directed by *Loper Bright* is applied, NEPA's statutory history shows that Congress ratified CEQ's longstanding public participation framework as a practicable and necessary means of implementing NEPA, by retaining that essential framework in legislation seeking to expedite NEPA reviews. For example:

(1) Title 41 of the FAST Act (FAST-41[15]), Pub. L. 114-94, title XLI, § 41001 (2015), 129 Stat. 1741, requires that agencies "*shall* establish a [draft EIS] comment period of not less than 45 days and not more than 60 days," 42 U.S.C. § 4370m-4(d)(1) (emphasis added), for certain large-scale infrastructure projects, such as data center, energy production, transmission, pipeline, manufacturing, and other projects that require approval by one or more federal agencies, *id*. § 4370m-6. All "covered projects" "shall" use FAST-41's NEPA-expediting procedures. *See id*. § 4370m-2(a)(1), (b)(2)(C)(i), et seq. The only way to fully effectuate and reconcile the plain language of FAST-41 and Congress's intent to expedite the approval of FAST-41 projects is to recognize Congress's ratification of public comment on a draft EIS as necessary to effectuating NEPA. By contrast, Interior appears to interpret FAST-41's mandatory draft EIS comment period requirement as optional, having recently approved the South Railroad project under

---

[14] *Jama v. ICE*, 543 U.S. 335 (2005) does not support the contention that the Court's analysis should end with the statute's "text and structure." *See id*. at 345, 351-52 (considering both "text and structure" and ratification, but holding latter test was not met).

[15] *See* https://www.permitting.gov/projects/title-41-fixing-americas-surface-transportation-act-fast-41 (referring to Title 41 of the FAST Act as "FAST-41").

FAST-41, without soliciting public comment on a draft EIS, in violation of 42 U.S.C. § 4370m-4(d)(1)'s plain text. Supp. Gibson Decl. ¶ 4. That interpretation is untenable.

(2) Likewise, with respect to the preparation of EAs, FAST-41 affirmatively directs that the lead agency "*shall establish a comment period* of not more than 45 days after the date on which the materials on which comment is requested are made available." 42 U.S.C. § 4370m-4(d)(2) (emphasis added).

(3) Under the Healthy Forests Restoration Act (HFRA), Pub. L. 108-148, title I § 103 (2003), 117 Stat. 1896, Congress sought to expedite and "priorit[ize] authorized hazardous fuel reduction projects" to protect "at-risk communities." 16 U.S.C. § 6513. Congress singled out CEQ's public comment procedures and made clear that they still apply to HFRA projects, requiring that "the Secretary *shall* provide an opportunity for public comment during the preparation of *any* [EA] or [EIS]" for such projects. *Id.* § 6514(g) (emphasis added).

(3) Other statutes reflect the same intent. *See* 43 U.S.C. § 2006(b) (requiring that, by December 1, 1978, "all [EISs] concerning proposed crude oil transportation systems . . . shall be completed, made available for public review and comment, [and] revised to the extent appropriate in light of such comment"); *see also* 16 U.S.C. § 3164(e)-(f) (requiring that "[t]he draft of *any [EIS] required under [NEPA] . . . shall be completed* within nine months" of an application for an Alaska transportation or utility project, and that the agency consider public comment). And where statutes have limited the time to "publish" a draft EIS—the purpose of which has always been to solicit public comment, Dkt. 36 at 6-11—Congress has endorsed the requirement to solicit public comment on a draft EIS. *See, e.g.,* 30 U.S.C. § 1419(c)(1), (d); 42 U.S.C. § 9117(e).

Defendants incorrectly note that these statutes only limit the length of public comment periods and suggest it would be "perverse" to presume that Congress intended to "encase[]" CEQ's longstanding procedures through these amendments. Dkt. 38 at 28. They also suggest that these statutes only establish that Congress endorsed CEQ's authority to require public participation. But these arguments miss the point: even Congress's expedited NEPA procedures for certain projects require agencies to make draft EISs available for public comment. For

example, notably, after the FRA Amendments, Congress enacted the following provision to "expedite[] environmental review" of aviation projects:

> The Secretary *shall establish* the following deadlines for comment during the environmental review process for a project:
>
> (A) For comments by agencies and the public on a draft [EIS], a period of not more than 60 days *after publication in the Federal Register of notice of the date of public availability of such statement*. . . .

FAA Reauthorization Act of 2024, Pub. L. 118-63, title VII, § 783 (2024), 138 Stat. 1302, 1307 (codified at 49 U.S.C. § 47171(m)(2)(A)) (emphases added); *see also* 49 U.S.C. § 47171(l) (Secretary "shall solicit and consider comments from interested persons . . . in accordance with [NEPA]"). At a minimum, Congress's inclusion of this language—against the backdrop of the former CEQ regulations' requiring public notice of a draft EIS, 40 C.F.R. § 1503.1(a)(4) (1978)—evinces Congress's endorsement of public notice and comment procedures as a practicable means of implementing NEPA and thus a required feature of NEPA reviews. Meanwhile, the Departments' cramped interpretation subverts congressional will by making their generally applicable NEPA procedures more abbreviated than the procedures Congress enacted to expedite NEPA review for select categories of priority projects.

Altogether, Congress's long history of approving and/or incorporating CEQ's former public participation procedures into various NEPA-expediting and other statutes effectively ratified that draft EIS and EA public participation procedures are a practicable and thus necessary means of implementing NEPA. Defendants' contention that "practicable" does not mean "necessary" ignores NEPA's plain text, namely Congress's "*all* practicable means" phrasing, which occurs twice in the statute. *See* 42 U.S.C. § 4331(a) (federal government must "use all practicable means and measures" to advance NEPA's environmental objectives "in cooperation with" the public); *id.* § 4331(b) (government must "use all practicable means . . . to improve and coordinate Federal plans, functions, programs, and resources"); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976).

*Brown*, 529 U.S. at 144, is therefore analogous. There, the Supreme Court held that Congress' enactment of six statutes regulating tobacco products "effectively ratified" FDA's

conclusion that it lacked authority to regulate tobacco under an earlier statute. *Id.* at 137-38, 143-44. This is because a contrary interpretation would have necessarily resulted in FDA banning tobacco, which would have "plainly contradict[ed]" the later statutes' policy to protect consumers from tobacco short of a ban. *Id*. at 139. Here, a policy that public participation in NEPA reviews is entirely discretionary would contradict Congress's policy expressed in FAST 41 and other NEPA expediting statutes that public participation is a practicable means of implementing NEPA and thus a baseline NEPA requirement, even where Congress sought to make NEPA reviews more efficient. And just as Congress's understanding of FDA's authority to regulate tobacco products limited FDA's discretion in *Brown*, Congress's ratification of what is "practicable" necessarily "limit[s] the agency's discretion" here. *Cf.* Dkt. 38 at 28-29.

Defendants make exaggerated claims that applying congressional ratification here would threaten "the constitutional order" by allowing a "later Congress" to "control the interpretation of an earlier enacted statute," and take back agencies' authority to "choose appropriate procedures." Dkt. 38 at 29 & n.13. But Congress's prerogative to *enact* statutes adopting administrative interpretations is not an impermissible interpretive exercise. And this type of analysis is a "classic judicial task"—"reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *Brown*, 529 U.S. at 143 (citation modified). Further, Plaintiffs' narrow ratification argument does not preclude federal agencies from continuing to formulate their own NEPA procedures so long as they do not conflict with the public notice and comment ratification at issue here.

In sum, statutory history confirming Congress's endorsement of these public participation procedures as a practicable means to achieving NEPA's ends cannot be read out of the statute.

## III. Defendants' Replacement of Methods and Procedures for Public Participation with Open-Ended Discretion Violates 42 U.S.C. § 4332(2)(B).

Defendants' contention that 42 U.S.C. § 4332(2)(B) does not require any particular procedure misunderstands Plaintiffs' claim. Plaintiffs do not ask the Court to declare that 42 U.S.C. § 4332(2)(B) requires a specific public comment procedure (including public comment

on a draft EA, as Defendants erroneously claim), but instead challenge the replacement of prescribed public comment procedures with open-ended administrative discretion that leaves whether to solicit public comment to the subjective whim of agency officials. That open-ended discretion violates 42 U.S.C. § 4332(2)(B)'s requirement for "methods and procedures which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." *See also* 91 Fed. Reg. 8738, 8740 (Feb. 24, 2026) (final rule stating Interior "is issuing this final rule and NEPA Handbook *in compliance with* . . . 42 U.S.C. § 4332(2)(B). . . .): *see also* 7 C.F.R. § 1b.2(a)(3) (2025) (USDA recognizing duty to follow section 4332(2)(B) in revising NEPA regulations).

Under the prior, systematic regulatory framework, Defendants' prescribed public participation process was routine and predictable—once a draft EIS was completed, agencies would circulate it for public comment. With respect to EAs, agencies had more discretion to determine what level of public involvement would be "practicable," but at the very least had to (1) provide notice of the proposed action, (2) determine what type and amount of public information would be "sufficient" to allow for "meaningful" public involvement "to the extent practicable" under the circumstances, and (3) implement that. *Bering Strait*, 524 F.3d at 953. Now, whether an agency decisionmaker offers any public input opportunity on a draft EIS or during the preparation of an EA depends on, for USDA sub-agencies, vague, nonbinding factors that are only laid out in the preamble to its Final Rule, not in its regulations, 91 Fed. Reg. 17062, 17075 (April 3, 2026); and, in the case of Interior, an internal agency guidance only "recommending" comment when "appropriate or helpful." Dkt. 38 at 37 (citing USDA-16 and DOI-229). Contrary to Defendants' representation, this "discretion" to solicit public comment—where nothing requires the agency to even *consider* whether to solicit public comment—is not a "method or procedure" in the NEPA review process, *cf. id*. at 23, nor does it "ensure" "appropriate" consideration of environmental values even where public input could be "helpful."

Although section 4332(2)(B) does not require any particular procedure, the wholesale rescission of public participation procedures in favor of relying on unfettered discretion is the

polar opposite of "ensur[ing]" the consideration of environmental values in bureaucratic decisionmaking. And the Departments' contention here that any public participation requirement would be "extratextual," Dkt. 38 at 22, only illustrates the problem with their new approach. By choosing to enact regulations that require nothing more than what NEPA's text already requires, *see e.g.*, 91 Fed. Reg. at 8751 (justifying Interior's removal of public participation because the new regulations purportedly "mirror what NEPA requires"); *id.* at 17077 (justifying new USDA regulations because "Congress has not elected to make pre-decisional public involvement a requirement")—and making anything beyond the statutory text entirely discretionary—the Departments have abdicated their duty to "identify and develop" *any* "methods and procedures" at all, much less ones that "ensure" consideration of environmental values. 42 U.S.C. § 4332(2)(B). At a minimum, the Departments' failures to consider the critical role that public participation procedures have played in ensuring the consideration of environmental values constitutes a failure to consider an "important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Defendants' reliance on *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275 (9th Cir. 1973), is misplaced. In *Jicarilla*, the Ninth Circuit took for granted NEPA's requirement for "meaningful public participation," observing that NEPA's legislative history reflected a "desire for a greater degree of responsiveness by administrative decision makers." *Id*. at 1286 (citing S. Rep. No. 91-296, 91st Cong., 1st Sess. at 5 (1969)).[16] But given that the agency had already solicited comment on a draft EIS, the Court held that an adversarial hearing was not necessary "for public participation and commentary to be meaningful." *Jicarilla,* 471 F.2d at 1288. Defendants' other cases are similarly inapposite—neither dealt with the rescission or replacement of a procedure or method that the agency had already developed and whether its replacement with unfettered discretion violated section 4332(2)(B). *Cf. Como-Falcon Cmty.*

---

[16] Specifically, the legislative report criticized that "[p]ublic desires and aspirations are seldom consulted" in "environmental decisionmaking," and stated "we cannot continue on this course." S. Rep. No. 91-296, *supra,* at 5; *see also id*. at 8 (noting that "federal[] . . . construction activities such as highways . . . proceed without reference to the desires and aspirations of local people").

*Coal., Inc. v. U.S. Dept. of Labor*, 609 F.2d 342, 344-45 (8th Cir. 1979) (rejecting claim that public hearing before deciding whether to prepare an EIS was required); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (rejecting claim that APA's rulemaking procedures applied to non-rulemaking action).

Although Defendants attempt to minimize Ninth Circuit holdings affirming the importance of public participation in implementing NEPA, claiming they only concern the CEQ regulations, Dkt. 38 at 25, 33, the key holdings refer to NEPA itself, not CEQ's regulations. *See, e.g.*, *California v. Block*, 690 F.2d 753, 770-71 (9th Cir. 1982) ("NEPA requires responsible opposing viewpoints to be included in the final EIS. . . . NEPA requires not merely public notice, but public participation in the evaluation of the environmental consequences of a major federal action."); *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 39 (9th Cir. 2025) (noting NEPA's goal to promote "deliberative decision-making that takes into account informed public comments"); *see also Trout Unlimited v. Morton*, 509 F.2d 1276, 1282 (9th Cir. 1974) (holding, before issuance of CEQ regulations, that EIS "should provide the public with information on the environmental impact of a proposed project as well as encourage public participation in the development of that information"). The decades-long consensus across courts, CEQ, and federal agencies going back to NEPA's inception—that public participation plays an important role in ensuring that environmental values are not overlooked—still stands.

Defendants suggest that the courts have overreached in highlighting the role of public participation in NEPA, pointing to *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S 168 (2025), but Defendants cannot cite any holding in *Seven County* that disturbs these binding decisions regarding public participation. Indeed, the Supreme Court has measured the adequacy of NEPA reviews based on whether it fosters informed public participation. *See DOT v. Public Citizen*, 541 U.S. 752, 769 (2004) (holding EA was not required to disclose and consider particular impact where the "larger audience" could have "no impact on [the agency's] decisionmaking," and the agency "could not act on whatever input this larger audience could provide" (citation modified)). So has the Ninth Circuit. *See Ctr. for Biological Diversity v. U.S. BLM*, 141 F.4th 976, 993-94 (9th Cir. 2025) (explaining that the "touchstone" of the court's

review "is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation"); *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1192 (9th Cir. 2019) ("Such late analysis, conducted without any input from the public, impedes NEPA's goal of giving the public a role to play in the decisionmaking process and so cannot cure deficiencies in an EA." (internal quotations omitted)); *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 927 (9th Cir. 2015) (invalidating EIS because the failure to provide "relevant information" "stymied the public's ability to challenge agency action" (citation modified)).

Ultimately, while the Departments have some flexibility in how to "ensure" that agencies "appropriately" consider environmental values, their evisceration of the right to meaningful public involvement—an essential means of bringing pertinent information and concerns to the agencies' attention—cannot be reconciled with the statutory mandate in section 4332(2)(B).

## IV. USDA and Interior's Evisceration of Opportunities for Public Participation from their NEPA Procedures Was Arbitrary and Capricious.

The Departments cannot sidestep their legal violations by attempting to reduce Plaintiffs' challenges to the Departments' rulemakings to a mere "policy disagreement." Dkt. 38 at 34, 41, 45. While agencies are permitted to reverse course, the Departments' rulemakings fail all three *Fox Television* factors, which require an agency to display awareness that it is changing positions, to demonstrate that the new policy is permissible under the statute, and provide good reasons for the change. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). First, Defendants' assertion that they "displayed awareness" of the policy changes at issue here does not square with their position that there was no change to public involvement procedures for the preparation of EAs. Dkt. 38 at 14, 19, 31. As explained above, Defendants' insistence that the former EA procedures prescribed no minimum level of public involvement is incorrect. *Supra* p. 4. Thus, the change in EA public involvement procedures still goes unacknowledged.

Second, Defendants' new rulemakings are not "permissible under the statute." *Fox Television*, 556 U.S. at 515. Even though NEPA requires agencies to "use *all* practicable means" to carry out NEPA's aims, *supra* p. 16, Defendants do not point to anywhere in the rulemakings

where they addressed the permissibility of removing public participation requirements in light of this standard. Defendants also rely on impermissible post hoc reasoning, Dkt. 38 at 31-32 (citing post-decisional declarations of agency officials), claiming that the old CEQ scheme was neither efficient nor practicable, *id*. at 41. The "agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. Even if those explanations could be read into the rulemakings (which they cannot), they are entirely unsubstantiated, *infra*. Defendants fail to explain how, after more than five decades of public input in NEPA reviews, that framework suddenly became impracticable.

And, third, the Departments failed to articulate "good reasons" for their drastic changes to longstanding policy. *Fox Television*, 556 U.S. at 515. Indeed, neither rulemaking demonstrates that mandatory public participation has prevented compliance with NEPA's statutory deadlines; has resulted in inefficient or uncertain outcomes, against E.O. 14154's policy to promote efficiency and certainty; or has caused courts to run afoul of the judicial deference principles articulated in *Seven County*. Thus, their claim that the elimination of public input was necessary to make their procedures "compatible" with these authorities, 91 Fed. Reg. at 8740; *id*. at 17066, because purportedly "public comment in particular, had 'grown' beyond reasonable bounds," Dkt. 38 at 36, lacks merit.[17] Defendants other "good reasons" also fail, as explained below.

### A. The 2023 Fiscal Responsibility Act Amendments Do Not Provide a Good Reason for the Defendants' Evisceration of Public Participation.

Defendants suggest that the FRA Amendments give them more latitude to prioritize the speedy approval of projects over the consideration of public comments, arguing that efficiency is an implied statutory purpose after the FRA Amendments. Dkt. 38 at 35. But what Congress did in 2023 is much more modest than the government would like the Court to believe. Congress (1) codified page limits that had been in CEQ's—and thus the Departments'—NEPA regulations for

---

[17] The Departments' assertion that they never claimed these authorities "compelled" the elimination of public participation procedures contradicts their rulemakings' statements that they "revised or removed" NEPA regulations because they were "not compatible" with those authorities. 91 Fed. Reg. at 8740; *id*. at 17066. Plaintiffs' arguments challenging Defendants' rationales still stand on the same grounds set forth in their Motion.

decades, *compare* 42 U.S.C. § 4336a(e)(1) *with* 40 C.F.R § 1502.7 (1978); (2) incorporated longstanding CEQ regulations requiring public scoping for EISs, *compare* 42 U.S.C. § 4336a(c) *with* 40 C.F.R. § 1501.7(a)(1) (1978); (3) enshrined the use of EAs and CEs, *see* Dkt. 36 at 8; and (4) put in place a 2-year deadline for EISs, along with a 1-year deadline for EAs, 42 U.S.C. § 4336a(g)(1)(A), (B), which had been codified in CEQ's regulations since 2020, 40 C.F.R. § 1501.10(b) (2020). Congress also provided that if an "agency determines it is not able to meet the deadline," it can simply "establish a new deadline" providing as "much additional time as necessary," 42 U.S.C. § 4336a(g)(2).

These codifications of preexisting procedures and practices hardly imply a fundamental transformation of NEPA into a paperwork exercise that elevates "efficiency" over informed environmental decisionmaking. *Cf.* 91 Fed. Reg. at 8752; *id*. at 17066. At most, they enshrined what agencies had already put into practice. They certainly did not declare that, henceforth, public input should be an ancillary or non-existent consideration in NEPA's implementation.

And meanwhile, neither the government's brief nor the rulemakings it defends pay even lip service to NEPA's actual statutory purposes and policies. "An agency may not ignore factors Congress explicitly required be taken into account." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007) (citation omitted). The Departments fail to address how dispensing with vital sources of information would promote NEPA's fundamental goal to "prevent or eliminate damage to the environment and biosphere," 42 U.S.C. § 4321, and "ensure" consideration of environmental values, 42 U.S.C. § 4332(2)(B); *supra* pp. 17-21. Nor do they recognize, as Congress did, the statute's action-forcing purpose through the consideration of opposing viewpoints. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 370-71 & n.14 (1989).

Instead, the Departments elevate, above all else, an "efficiency" factor that Congress itself did not say should trump all other relevant considerations. By focusing on the executive's policy preference to the total exclusion of NEPA's fundamental objectives—which meaningful public involvement is essential to achieving—the Departments engage in quintessential arbitrary and capricious action. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1205 (9th Cir. 2008) (invalidating rulemaking that relied on "consumer demand

to such an extent that it ignored" energy conservation—the "fundamental purpose of the statute and an explicit statutory factor that [agency] 'shall' consider"); *Mont. Wildlife*, 127 F.4th at 39 (failure to consider that "shortening the participation opportunity might lead to insufficient consideration of the environmental impacts," "in direct tension with NEPA," was arbitrary).

### B. Neither E.O. 14154, CEQ's Rule Rescission, Nor *Seven County* Provide Good Reasons for Rescinding Longstanding Public Participation Requirements.

The Departments next argue that the supposedly "changed legal framework" supports their rule changes. Dkt. 38 at 35. Beyond referencing the FRA Amendments—which, as explained above, enacted minimal changes to the NEPA process that in no way justify the challenged regulatory changes—USDA and Interior point to Executive Order 14154, the rescission of CEQ's regulations, and the Supreme Court's *Seven County* decision as justification for their changed policy. But none of these authorities speak to, let alone provide support for, the jettisoning of public involvement in the process.

First, E.O. 14154 does not reasonably explain the Departments' rulemakings. It provides some context for the "why" of the agency's policy changes—including, apparently, making it Executive Branch policy to prioritize "efficiency and certainty" over the objectives of so-called "activist groups," Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025), § 5(c)—but mere invocation of an executive order's policies does not establish that rules enacted pursuant to it are supported by good reasons. *See Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see also Mont. Wildlife*, 127 F.4th at 39; *Ass'n of Am. Universities v. DOE*, 789 F. Supp. 3d 118, 140 (D. Mass. 2025). Here, the rulemakings did not explain why the Departments targeted public participation and how its elimination would serve E.O. 14154's efficiency goals, especially where the public raised concerns that eliminating public comment opportunities would undermine efficiency and certainty. Dkt. 36 at 32. Moreover, the rulemakings cannot rely on E.O. 14154 to justify elevating the Departments' efficiency objectives over public participation, in light of E.O. 14154's policy to "guarantee that all . . . agencies . . . provide opportunity for public comment," Exec. Order 14154 2(h). Defendants fail to respond to that discrepancy. *See* Dkt. 36 at 28.

*Seven County* also cannot justify Interior and USDA's sweeping regulatory changes.

Defendants state that *Seven County* "endorsed a more limited interpretation of what NEPA requires, as well as deference to agency discretion" in determining which potential impacts are most relevant to their decisions. *Cf.* Dkt. 38 at 36. But nothing in the Court's ruling suggests that agencies could, or should, drastically curtail public involvement in their NEPA processes.

USDA and Interior also point to the fact that "CEQ rescinded its regulations . . . in April 2025," *id*. at 35. But USDA and Interior each still had their own NEPA regulations in effect at that time, and those regulations—standing alone—included the exact procedures that Plaintiffs argue Defendants unlawfully rescinded. *See infra* pp. 29-30. In other words, Plaintiffs challenge each Department's rescission of its own regulations, not CEQ's. Nothing in the dismantling of CEQ's regulations dictated what should come next. The Departments had the authority to preserve their standalone public participation procedures or revise them consistent with NEPA.

Relatedly, those standalone public participation procedures in fact incorporated or echoed CEQ's regulations and remained intact despite CEQ's rescission, so the interwoven Department-CEQ regulations are precisely the "baseline" against which the Departments' new NEPA procedures must be measured, despite Defendants' contention to the contrary. *Cf.* Dkt. 38 at 37. In any event, the Departments were obligated to reasonably explain why their own new regulations largely dispensed with longstanding public involvement. They failed to do so.

Finally, the Departments suggest that Plaintiffs improperly focus on whether "any of these developments, standing alone," justified their changed policies. *Id.* at 36. Purportedly, "these developments, taken together, left the agencies with a materially different legal landscape and marked a general change of tide." *Id*. It is unclear how Plaintiffs (and, indeed, the Court) should evaluate the legality of the Department' actions without interrogating each of their stated reasons. But regardless, each of the Departments' rationales is meritless, and the Departments' "greater than the sum of its parts" framing does not change that.

### C. Defendants Fail to Support their Assumption that Discretionary Public Participation Will Have Zero Costs, and that its Benefits Outweigh the Costs.

Defendants suggest that their efficiency rationale was sufficient because the rulemakings noted potential savings in time, costs, and paperwork, *cf.* Dkt. 38 at 31, but those perfunctory

claims are insufficient. *Supra* pp. 22, 24. Moreover, the rulemakings never considered the other side of the ledger—the lost benefits of public comment, as demonstrated in various studies—none of which the Departments addressed in their rulemakings.[18] Nor did they consider the lost benefits of agency accountability, public trust, and reduced litigation risks. Dkt. 36 at 29-32. Defendants cannot point to any specific statement in the record acknowledging these tradeoffs, much less any determination they made that the "advantages of mandatory public comment" were purportedly "outweighed by the gains in efficiency and flexibility*,"* Dkt. 38 at 32.

The Departments' switch from mandatory to entirely discretionary public participation does not relieve them of the obligation to consider those tradeoffs. Although Defendants suggest that the rules optimize efficiency and public participation benefits because they "allow agencies to choose the more efficient and informative path as needed," *id*., neither Department's rule requires agencies to evaluate, much less "choose," a NEPA process based on those factors. *See also id*. at 37 (stating agencies "may"—not "must"—solicit public comment when it would be "helpful"). Defendants note that agencies have solicited public comment in certain cases (citing post-decisional evidence not properly before the Court), *id*. at 38, but that does not mean agencies are soliciting public input based on whether doing so would be efficient and informative. In the absence of any definite and objective protocol ensuring they will, it was arbitrary for the Departments to assume that discretionary public participation will pose zero costs to informed decisionmaking—or will carry out NEPA's objectives just as effectively as the Department's former mandatory procedures.

Likewise, the Departments failed to consider an important aspect of the problem in

[18] Defendants' attempt to discredit one of these studies, *see* Dkt. 38 at 15 n.9, is an improper post hoc rationale. Neither Department even acknowledged this study, although numerous comments raised it. *See, e.g.*, DOI-1355; DOI-15035-36; DOI-15042; DOI-15404-405; DOI-15583; USDA-14726; USDA-28840. Relatedly, Defendants' only defense to Plaintiffs' claim that the rulemakings failed to respond to significant comments is that the Complaint was insufficiently specific. Dkt. 38 at 34 n.16. But sufficiency of the pleadings is not at issue at summary judgment. *See Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1059-60 (9th Cir. 2023). And no such pleading requirement exists in APA cases, where the key issue is "whether the administrative record supports the agency's decision." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013).

failing to consider proposed alternatives that would have preserved binding public participation requirements. Defendants' rulemakings entirely failed to grapple with the possibility that less drastic measures—such as providing for limited case-by-case exceptions to mandatory public participation, based on narrow objective factors—could have achieved their efficiency goals without costs to informed agency decisionmaking. The prior NEPA framework required public comment on a draft of *every* EIS. Thus, the proposed alternative would indeed be a significant change, contrary to Defendants' post hoc reasoning. *Cf.* Dkt. 38 at 39.

**D. USDA Fails to Justify the Elimination of Forest Service-Specific NEPA Procedures.**

USDA's justifications for eliminating Forest Service-specific NEPA procedures similarly fall flat. As an initial matter, USDA's arguments reinforce its failure to "display awareness" that it is changing its policy. *Fox Television*, 556 U.S. at 515-16. With respect to scoping on projects proposed under EAs or CEs, USDA argues that public comment was never actually required because the Forest Service had "substantial discretion to utilize public comment under the prior procedure." Dtk. 38 at 42; *see also* 91 Fed. Reg. at 17076. In support, the Department cites prior 36 C.F.R. § 220.4(e)(2) (2008): "Because the nature and complexity of a proposed action determine the scope and intensity or analysis, no single scoping technique is required or prescribed." Dkt. 38 at 42.

But this selective quotation omits the immediately preceding sentence in that paragraph: "Scoping shall be carried out in accordance with the requirements of 40 CFR 1501.7." 36 C.F.R. § 220.4(e)(2) (2008). And 40 C.F.R. § 1501.7(a)(1) (1978) required the agency official to publish notice of the scoping process in the Federal Register and "[i]nvite the participation of . . . interested persons (including those who might not be in accord with the action on environmental grounds)." USDA arbitrarily eliminated public scoping on all Forest Service actions without acknowledging the change.

USDA also rehashes allusions to "the 2023 FRA, CEQ's rescission of its regulations, E.O. 14154, and *Seven County*." Dkt. 38 at 42. But the FRA timelines cannot save USDA's arguments: USDA does not explain how removing public notice in a Schedule of Proposed

Actions (SOPA) would impact a project's schedule, and CEs are not subject to the timelines at all. Beyond that, CEQ's regulatory changes do not support the rescission of the Forest Service's regulations. USDA's regulations not only incorporated the prior CEQ regulations by reference, *see infra* 29-30, but the requirements for scoping on "all" Forest Service actions, SOPAs, and public notice of CE decisions went above and beyond, and stood independently of, CEQ's regulatory requirements. *See also* Dkt. 38 at 41 (acknowledging Forest Service "had offered more robust public comment procedures than other agencies"). And, for the same reasons explained above, neither E.O. 14154 nor *Seven County* support the rescission.

USDA also claims that the planned "decommissioning" of the existing online SOPA system and its potential replacement was a good reason for getting rid of SOPAs. *Cf. id.* at 43. But the need to update the Forest Service's online platform does not justify throwing out the proverbial baby with the bathwater. Likewise, that USDA's purpose was to maintain consistency across all USDA agencies' CE "documentation" requirements, *id*., says nothing about the merits of eliminating the Forest Service's approach—or the tradeoffs of doing so, including harm to the public's ability to timely find out about large-scale forest logging projects. *See* Dkt. 36 at 35.

Thus, the changes to USDA's longstanding regulations are not adequately explained.

## V. Vacatur is the Appropriate Remedy.

USDA and Interior concede that vacatur is the "presumptive" remedy here. Dkt. 38 at 44. But they incorrectly argue that their errors were not legal in nature and, therefore, that remand without vacatur is appropriate. As explained above, the Departments' rules ignored congressional ratification, express statutory duties, and NEPA's core goals, instead elevating "efficiency" over all other factors. Worse, they justified these changes based on a presidential policy that actually "guarantee[s] . . . opportunity for public comment," E.O. 14154(2)(h). And they ignored important aspects of the problem, including that shortcutting public input may lead to oversights, tying projects up in avoidable litigation, and undermining their goals of more certain and efficient outcomes. On top of all that, they ignored regulatory alternatives to unbridled discretion that could have accomplished their stated aims with less damage to the public's ability to weigh in on how public lands get managed. These "fundamental flaws" "make

it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 533 (9th Cir. 2015); *see also Encino Motorcars*, 579 U.S. at 220 (rule without a reasoned explanation "cannot carry the force of law" (citing 5 U.S.C. § 706(2)).

Defendants also argue that the disruptive consequences of vacatur would be significant, but that claim is meritless. Most of the public participation procedures eliminated by the rulemakings had reliably been in place for more than a half-century. Even the more recent Forest Service-specific provisions had been in place since 2008. Throughout this period, myriad projects occurred on public lands with the benefit of public input. In this context, a return to the status quo ante while USDA and Interior go through another rulemaking process is hardly the burden the Departments suggest.

In addition, there is no legal basis for the Departments' claim that vacatur would not return them to the pre-2025 regulatory status quo. Dkt. 38 at 44. USDA's regulations explicitly "incorporate[d] and adopt[ed]" CEQ's regulations by reference, 7 C.F.R. § 3100.20(a) (1979) (subsequently recodified at 7 C.F.R. § 1b.1(a) (1983)), and that incorporation was static. It cannot be the case that an agency can incorporate an external source into its regulations, and that any later change to the external source would enact an unacknowledged revision to the agency's regulations as well. That result would subvert the APA's rulemaking procedures, not to mention effectively cede control of the agency's executive function to an external actor. Thus, a reversion to USDA's prior regulations would also revert to CEQ's regulations that they incorporated.

Similarly, Interior said its regulations "supplement[]," and were "to be used in conjunction with, the CEQ regulations," which it also explicitly cross-referenced.[19] 43 C.F.R. § 46.20(a) (2008). Thus, while Interior never used the term "incorporation by reference," the plain language of prior 43 C.F.R § 46.20(a) accomplished that result. Moreover, Interior's regulations *independently required* "public involvement" in each EA "to the extent practicable," *id*. §

[19] Defendants' suggestion that the FRA Amendments prevent it from returning to the prior status quo lacks merit. Nothing in the prior regulations (or in CEQ's, for that matter) would run afoul of the page limits and time limits set forth in the FRA Amendments. Moreover, by their terms, Defendants' regulations must give way to "[in]compatible" statutory requirements. *Supra* n.17.

46.305(a), as well as the solicitation of public comment on each draft EIS, *id.* § 46.435(a), (b). *See also* Dkt. 38-4 (Tryon Decl.) ¶ 3 (Interior official acknowledging "repealed regulations . . . had previously required [Interior's] bureaus to solicit public comment on draft EISs and . . . allow for public participation to the extent practicable when preparing EAs"). Thus, the Departments are wrong that vacatur would not return them to the status quo ante.

While the consequences of vacatur would be minimal for the Departments, the consequences of remand without vacatur to Plaintiffs and the public would be severe. The public will lose invaluable opportunities to weigh in on agency decisions impacting the environment. For draft EISs and EAs, the availability of opportunities for public participation will be left to the whims of agency officials. And as Plaintiffs and their members have already experienced over the past year, it will be difficult or impossible to timely learn about projects approved via CEs, which account for the vast majority of Forest Service public lands decisions. Meanwhile, the Departments' incentive to undertake another rulemaking process would be nil. Remand without vacatur would effectively result in "an indefinite stay" of the Court's decision, as "agencies naturally treat it as such." *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring)). And indefinitely delayed action on remand would "not provide [Plaintiffs] with the complete relief they sought." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020). For these reasons, the equities here favor vacatur.

**CONCLUSION**

Plaintiffs respectfully request that the Court vacate (1) the Departments' rescission of requirements for public comment on draft EISs and public involvement in the preparation of EAs, and (2) USDA's rescission of the Forest Service's regulations requiring (a) public scoping on all Forest Service actions, (b) publication of SOPAs, and (c) public notice of projects approved under a CE.

Respectfully Submitted,

DATED: September 11, 2026 <u>/s/ *Wendy Park*</u>

Wendy Park (Cal. Bar No. 237331)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Tel: 510-844-7138
Email: wpark@biologicaldiversity.org

Brandon Jones-Cobb (AK Bar No. 1610078)
(*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 30604
Seattle, WA 98113-0604
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org

Hannah Connor (DC Bar No. 1014143)
(*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St. NW, Suite 1300
Washington, DC 20005
Phone: 202-641-6176
Email: hconnor@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity and Sierra Club*

Nathaniel Shoaff (Cal. Bar No. 256641)
Elizabeth Benson (Cal. Bar No. 268851)
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
Phone: 415-977-5610
Email: nathaniel.shoaff@sierraclub.org
Email: elly.benson@sierraclub.org

*Attorneys for Sierra Club*